# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC D/B/A QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC D/B/A MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC D/B/A WITSEND MOSAIC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, <br><br> Defendants. | COURT NO. 25-00078 |

## COMPLAINT

## INTRODUCTION

1.    Through a series of Executive Orders and related proclamations and memoranda, President Trump has declared national emergencies, imposed tariffs on imports, and modified tariff rates, timing, and scope. These tariffs are unlawful and unconstitutional.

2.     First, the President's Executive Orders purport to rely for authority on the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–10, which grants certain authorities to the President "to deal with an unusual and extraordinary threat with respect to" a declared national emergency, *id.* §§ 1701–02. While IEEPA authorizes the President to take a number of significant actions, the imposition of tariffs is not among them. Second, the national emergencies declared by the President do not constitute an "unusual and extraordinary threat" as required by IEEPA, rendering any tariffs imposed pursuant to IEEPA unlawful. But if the Court finds that IEEPA does authorize these tariffs, then IEEPA transfers Congress's legislative power under Article I, Section 8, "[t]o lay and collect Taxes, Duties, Imposts and Excises," to the President in violation of the U.S. Constitution.

3.     Because the tariffs are unlawful, the modifications to the Harmonized Tariff Schedule of the United States (HTSUS) made by U.S. Customs and Border Protection (Customs) pursuant to those Executive Orders are unlawful. As a result, Plaintiffs are entitled to a refund of the difference between any tariffs collected from Plaintiffs pursuant to those HTSUS modifications and any tariffs that would otherwise apply to Plaintiffs' imports. And this Court should enjoin any future implementation of tariffs imposed pursuant to IEEPA.

## JURISDICTION

4.     The Court has subject matter jurisdiction under 28 U.S.C. § 1581, which provides that:

> the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . .

(B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue; (C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or (D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph . . . .

28 U.S.C. § 1581(i)(1) (paragraph breaks removed).

5.     This is a civil action commenced against the United States, its agencies, and its officers, arising out of the Defendants' imposition of tariffs in reliance on IEEPA, a law that they wrongly assert provides for tariffs but that does provide for, inter alia, the regulation and prohibition of importation of certain property. 50 U.S.C. § 1702(a)(1)(B).

## PARTIES

6.     Plaintiffs are American businesses that purchase goods from all over the world. Competition, profit margins, and the unavailability of domestic goods require each plaintiff to import at least some articles from abroad.

7.     Plaintiff Princess Awesome, LLC, is a Maryland limited liability company that makes children and adult clothing with the intention that all individual human beings deserve to be seen as their true selves and honored for their own unique set of interests. In March 2025, Princess Awesome was invoiced by Customs for $1,041.40 in tariffs pursuant to actions challenged herein for girls' dresses imported from China. Princess Awesome has also ordered additional products from Peru, Bangladesh, and India that they anticipate will arrive in the United States in the coming weeks and are continuing to place new orders for imports.

8.    Plaintiff Stonemaier, LLC, is a Missouri limited liability company. It is a tabletop game publisher based in St. Louis; its games are distributed worldwide. Stonemaier is perhaps best known for its renowned game Wingspan. Stonemaier has printed all of their products over the last 13 years at a factory in China owned by Panda Game Manufacturing, a Canadian company—a process that started before the tariffs were imposed. Stonemaier has imports ready to ship on which it estimates it will pay millions in tariffs pursuant to actions challenged herein. Stonemaier anticipates future orders of games to be printed in China that will also be subject to tariffs levied pursuant to actions challenged herein.

9.    Plaintiff Upward Glance, LLC, is a Wyoming limited liability company doing business as Quent Cordair Fine Art, which was established by artist Quent Cordair in 1996. It is a premier provider of contemporary romantic realism in painting, sculpture, and drawing, and it has grown to serve an international clientele of private and corporate collectors. Quent Cordair Fine Art regularly imports art as part of its business and expects to pay tariffs on that imported art pursuant to actions challenged herein.

10.    Plaintiff 300 Below, Inc., is an Illinois corporation that develops and deploys an innovative process to freeze metal parts to extend their life. 300 Below imports from China brake rotors that it processes domestically and resells as well as the specialty freezers themselves for resale. Neither the brake rotors nor the specialty freezers are reasonably available in the United States. 300 Below is currently awaiting the arrival of two specialty freezers from China on which it expects to pay a higher

delivered duty paid fee as a result of tariffs imposed pursuant to actions challenged herein. 300 Below will also have to pay a higher fee pursuant to actions challenged herein on all future imports.

11.    Plaintiff KingSeal Corporation is a California corporation doing business as Wesco Enterprises, Inc. KingSeal imports foodservice products that are generally produced only in China. KingSeal has paid $4,159 in tariffs levied pursuant to actions challenged herein on a shipment of its products from China. KingSeal has been invoiced by Customs for $9,797 in tariffs pursuant to actions challenged herein on a second shipment from China. KingSeal has a third shipment on its way from China on which it estimates it will pay substantial tariffs pursuant to actions challenged herein. KingSeal will also have to pay tariffs pursuant to actions challenged herein on all future imports.

12.    Plaintiff Mischief, LLC, is a Minnesota limited liability company doing business as Mischief Toy Store. Approximately 95% of the products sold in its store are imported, with 85% of those products coming from China. The tariffs levied pursuant to actions challenged herein will likely have a substantial negative impact on Mischief's business as a result of price increases on those products.

13.    Plaintiff Spielcraft Games, LLC, is a Nebraska limited liability company. It is an independent publisher of tabletop games whose mission is to deliver positive gaming experiences for everyone to enjoy. In April 2025, Spielcraft paid $4,335.40 in tariffs levied by Customs pursuant to the actions challenged herein for a board-game set imported from China. Spielcraft has another shipment inbound

from China on which it will have to pay tariffs pursuant to actions challenged herein. Spielcraft will also have to pay tariffs on all future imports pursuant to actions challenged herein.

14. Plaintiff Rookie Mage Games, LLC, is an Ohio limited liability company dedicated to creating new and creative ways for friends and families to gather around a table and have some fun. In April 2025, Rookie Mage paid $3,120.80 in tariffs levied by Customs pursuant to actions challenged herein for products imported from China. Rookie Mage also will have to pay tariffs pursuant to actions challenged herein on all future imports.

15. Plaintiff XYZ Game Labs, Inc., in an Illinois corporation. Its mission is to create engaging, beautiful, and accessible games. XYZ Game Labs hopes to design and publish a long line of games that people will enjoy sharing with their non-gamer friends. XYZ Game Labs currently has goods being manufactured in China that it plans to import into the United States later this year and on which it estimates it will pay substantial tariffs pursuant to actions challenged herein. XYZ Game Labs will also have to pay tariffs pursuant to actions challenged herein on all future imports.

16. Plaintiff Tinkerhouse, Inc., is a Washington corporation founded with the mission to help tabletop players get to the fun, faster. Tinkerhouse is currently producing in China a tabletop roleplaying game accessory, on which it has already made a down payment, that it plans to import into the United States later this year and on which it estimates it will pay substantial tariffs pursuant to actions

challenged herein. Tinkerhouse will also have to pay tariffs pursuant to actions challenged herein on all future imports.

17.    Plaintiff Reclamation Studio, LLC, is a Wisconsin limited liability company doing business as WitsEnd Mosaic. Artist-owned and established in 1994, WitsEnd Mosaic had the vision to bring mosaic art supplies to artists and hobbyists via its online store long before its competitors. WitsEnd Mosaic has placed orders for products from Turkey and Italy on which it estimates it will pay tariffs pursuant to actions challenged herein. In the normal course of its business, WitsEnd Mosaic imports products from six countries and expects that the tariffs imposed pursuant to actions challenged herein will cause it substantial financial harm.

18.    Defendant U.S. Customs and Border Protection (Customs) is a federal agency headquartered in Washington, D.C.

19.    Defendant Pete R. Flores is the Acting Commissioner for Customs and is sued in his official capacity.

20.    Defendant Department of Homeland Security (DHS) is a federal agency headquartered in Washington, D.C.

21.    Defendant Kristi Noem is the Secretary of DHS and is sued in her official capacity. The Complaint refers to Secretary Noem, along with DHS, Acting Commissioner Flores, and Customs, as the "DHS Defendants."

22.    Defendant U.S. International Trade Commission (USITC) is a federal agency headquartered in Washington, D.C.

23.    Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

24.    Defendant United States of America is a sovereign entity and the government of the United States.

25.    Defendant Executive Office of the President is a federal agency, headquartered in Washington, D.C., that oversees, inter alia, the United States Trade Representative.

## STANDING

26.    Plaintiffs have standing to bring this action pursuant to 28 U.S.C. § 2631(i), which provides that "[a]ny civil action of which the Court of International Trade has jurisdiction, other than an action specified in subsections (a)–(h), may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5."

27.    Plaintiffs KingSeal, Spielcraft, and Rookie Mage have already paid tariffs imposed pursuant to actions challenged herein.

28.    Plaintiffs Princess Awesome and KingSeal were invoiced by Customs for a tariff imposed pursuant to actions challenged herein.

29.    Plaintiffs 300 Below, KingSeal, and Spielcraft each have shipments en route to the United States on which they expect to pay tariffs pursuant to actions challenged herein.

30.    Plaintiffs Stonemaier, XYZ Games, Tinkerhouse, and WitsEnd each have products that have been produced or are in production that they plan to import

to the United States and on which they expect to pay tariffs pursuant to actions challenged herein.

31.    Each of the Plaintiffs anticipates paying tariffs directly or indirectly pursuant to actions challenged herein on an ongoing basis for imports brought into the United States for their businesses.

## TIMELINESS

32.    An action over which this Court has jurisdiction pursuant to 28 U.S.C. § 1581(i) must be brought within two years after the cause of action first accrues. 28 U.S.C. § 2636(i).

33.    Plaintiffs are commencing this action pursuant to 28 U.S.C. § 1581(i) by concurrently filing a summons and complaint within two years after the cause of action first accrued. The claims asserted by Plaintiffs accrued at the earliest on February 4, 2025, the effective date of the President's Executive Order 14195, imposing the initial 10% ad valorem tariff on China. *See* Executive Order 14195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121, 9122 (Feb. 7, 2025), § 2(a). This action is therefore timely filed.

## STATEMENT OF FACTS

### Legal Background

34.    President Trump has issued a series of Executive Orders imposing tariffs and claiming authority pursuant to the Constitution and the laws of the United States, including IEEPA, the National Emergencies Act (NEA), section 604 of the Trade Act of 1974, and 3 U.S.C. § 301.

35.    The NEA, Pub. L. 94-412, 90 Stat. 1255 (Sept. 14, 1976), codified as amended at 50 U.S.C. §§ 1601–51, and IEEPA, Pub. L. 95-223 (Title III), 91 Stat. 1626 (Dec. 28, 1977), codified as amended at 50 U.S.C. §§ 1701–10, were both adopted in the 1970s, following congressional investigation and evaluation of statutes providing the President with substantial emergency powers, and on the heels of perceived presidential abuses of power.

36.    The NEA sets forth a process for presidential declarations of national emergency and congressional review and termination of the same. 50 U.S.C. §§ 1621–22.

37.    IEEPA grants the President certain authorities that "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of" IEEPA. 50 U.S.C. § 1701(b).

38.    The "unusual and extraordinary threat" with respect to which the national emergency is declared must be one that "has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States[.]" *Id.* § 1701(a).

39.    In such an emergency, IEEPA authorizes the President to "investigate, regulate, or prohibit" "transactions in foreign exchange," "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and "the importing or exporting of currency or securities," "by any person,

or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(A).

40.    IEEPA also authorizes the President to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B).

41.    Section 604 of the Trade Act of 1974, codified as amended at 19 U.S.C. § 2483, provides that the "President shall from time to time, as appropriate, embody in the [HTSUS] the substance of the relevant provisions of this chapter, and of other Acts affecting import treatment, and actions thereunder, including removal, modification, continuance, or imposition of any rate of duty or other import restriction."

42.    3 U.S.C. § 301 provides that the President "is authorized to designate and empower the head of any department or agency in the executive branch, or any official thereof who is required to be appointed by and with the advice and consent of the Senate, to perform without approval, ratification, or other action by the President (1) any function which is vested in the President by law, or (2) any function which such officer is required or authorized by law to perform only with or subject to the approval, ratification, or other action of the President[.]" Section 301 further provides,

however, that it does not "relieve the President of his responsibility in office for the acts of any such head or other official designated by him to perform such functions."

43.    Article I of the Constitution provides that "[a]ll legislative Powers herein granted" are "vested in" Congress. U.S. Const. art. I, § 1.

44.    Article I further provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises" and to "regulate Commerce with foreign Nations[.]" U.S. Const. art. I, § 8, cls. 1, 3.

45.    The Administrative Procedure Act directs the Court to "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity[,]" 5 U.S.C. § 706(2)(B), or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[,]" *id.* § 706(2)(C).

**President Trump's Policy Memoranda**

46.    On January 20, 2025, President Trump issued an America First Trade Policy Memorandum, directing his administration to, among other things, investigate the causes of the United States' "large and persistent annual trade deficit in goods" and the "economic and national security implications and risks resulting from such deficits." America First Trade Policy, 90 Fed. Reg. 8471 (Jan. 30, 2025), § 2(a). The President further directed his administration to "recommend appropriate measures, such as a global supplemental tariff or other policies, to remedy such deficits," and to recommend the best methods to collect tariffs, duties, and other foreign trade-related revenues. *Id.* § 2(a)–(b).

47.    President Trump issued a similar memorandum on February 13, 2025. *See* Reciprocal Trade and Tariffs, 90 Fed. Reg. 9837 (Feb. 19, 2025). There, the Pres-

ident stated that the United States has "one of the most open economies" and "among the lowest weighted tariff rates in the world." *Id.* at 9837, § 1. The United States, the Memorandum continues, "imposes fewer barriers to imports than other major world economies, including those with similar political and economic systems." *Id.* And "[f]or many years, the United States has been treated unfairly by trading partners, both friend and foe," and this "lack of reciprocity is one source of our country's large and persistent annual trade deficit in goods . . . ." *Id.* Accordingly, the Memorandum declared, "[i]t is the policy of the United States to reduce our large and persistent annual trade deficit in goods and to address other unfair and unbalanced aspects of our trade with foreign trading partners." *Id.* § 2. Finally, the Memorandum announced the intention of a plan "to counter non-reciprocal trading arrangements with trading partners . . . ." *Id.* The President directed his administration to "investigate the harm to the United States from any non-reciprocal trade arrangements adopted by any trading partners" and propose "remedies in pursuit of reciprocal trade relations with each trading partner." *Id.* at 9838, § 3(a).

**The 2025 Executive Orders and HTSUS Modifications**

48.    On February 1, 2025, the President issued an Executive Order that imposed a 10% ad valorem rate of duty on all articles that are products of China, effective February 4, 2025. Executive Order 14195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121, 9122 (Feb. 7, 2025), § 2(a).

49.    E.O. 14195 referenced the January 20, 2025, America First Trade Policy Memorandum, Proclamation 10886 of January 20, 2025 (Declaring a National Emer-

gency at the Southern Border of the United States), 90 Fed. Reg. 8327 (Jan. 29, 2025); and Executive Order 14157 of January 20, 2025 (Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists), 90 Fed. Reg. 8439 (Jan. 29, 2025). *Id.* at 9121–22.

50.    The President stated that "the sustained influx of synthetic opioids has profound consequences on our Nation" and that the Chinese Communist Party "has subsidized and otherwise incentivized [Chinese] chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States." *Id.* at 9121.

51.    E.O. 14195 purported to "expand the scope of the national emergency declared in" Proclamation 10886 "to cover the failure of the [Chinese] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." *Id.* at 9122, § 1. Despite the initial finding that the influx of synthetic opioids has been "sustained" and the fact that "the direct flow of fentanyl and other synthetic opioids from" China to the United States dates back at least to President Trump's first administration, the Executive Order nevertheless states that the Chinese government's "failure to act constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States." *Id.* at 9121–22.

52.    The President directed the DHS Secretary to "determine the modifications necessary to the [HTSUS] in order to effectuate the objectives of this order

consistent with law" and to "make such modifications to the HTSUS through notice in the Federal Register." *Id.* at 9123, § 2(d).

53.    On February 4, 2025, Customs issued a notice in the Federal Register modifying the HTSUS "to implement the rates of duty imposed by" Executive Order 14195. *Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025, Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9038, 9038 (Feb. 5, 2025).[1]

54.    On February 5, 2025, the President issued an Executive Order temporarily restoring duty-free *de minimis* treatment for eligible imports. Executive Order 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9277 (Feb. 11, 2025), § 1. On February 12, 2025, Customs published an amended notice in accordance with Executive Order 14200. *Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025, Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9431 (Feb. 12, 2025).

55.    The President issued another Executive Order raising the ad valorem rate of duty on articles imported from China from 10% to 20% because he determined that China had "not taken adequate steps to alleviate the illicit drug crisis through

---

[1] The Complaint refers collectively to all of Customs' modifications to the HTSUS pursuant to the Executive Orders identified herein as the "HTSUS Modifications."

cooperative enforcement actions." Executive Order 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025).

56.    On March 6, 2025, Customs published a further amended notice modifying the HTSUS accordingly, effective March 4, 2025. *Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,426 (Mar. 6, 2025).

57.    On April 2, 2025, the President issued an Executive Order stating that he had received the results of the reviews directed in the January 20, 2025, America First Trade Policy Presidential Memorandum and the February 13, 2025, Reciprocal Trade and Tariffs Memorandum, and was "taking action based on those results." Executive Order 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041, 15,041 (Apr. 2, 2025).

58.    The President declared a national emergency with respect to the threat of "underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption," which were "indicated by large and persistent annual U.S. goods trade deficits[.]" *Id.*

59. The President further stated that the annual trade deficits "have led to a hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." 90 Fed. Reg. at 15,041. And he asserted that "tariff rates and non-tariff barriers that make it harder for U.S. manufacturers to sell their products in foreign markets" and that "key U.S. trading partners" "suppress domestic wages and consumption, and thereby demand for U.S. exports, while artificially increasing the competitiveness of their goods in global markets." *Id.* The Executive Order states that it is "these conditions" which gave rise to the national emergency which the "order is intended to abate and resolve." *Id.*

60. Despite the President's acknowledgement that annual U.S. goods trade deficits are "persistent" and "a feature of the global trading system[,]" 90 Fed. Reg. at 15,042, and that the decline in U.S. manufacturing has occurred "[o]ver time," *id.* at 15,043, the President nevertheless determined that the "underlying conditions" constitute an "unusual and extraordinary threat to the national security and economy of the United States[,]" and the President declared a national emergency with respect to this threat, *id.* at 15,041, 15,044–45.

61. The Executive Order states that "[i]t is the policy of the United States to rebalance global trade flows by imposing an *ad valorem* duty on all imports from all trading partners" except as otherwise identified. 90 Fed. Reg. at 15,045, §§ 2, 3(a). This additional ad valorem duty "shall start at 10 percent" but shall increase for "trading partners" identified in the Executive Order's Annex I. *Id.* § 2. These addi-

tional ad valorem duties "shall apply until such time as [President Trump] determine[s] that the underlying conditions described above are satisfied, resolved, or mitigated." *Id.*

62.     These new tariffs are "in addition to any other duties, fees, taxes, exaction or charges applicable to such imported article" except as otherwise exempted in the Executive Order. 90 Fed. Reg. at 15,046, § 3(c).

63.     Annex I of the Executive Order provides a 34% "Reciprocal Tariff, Adjusted" rate for China. *Id.* at 15,049.

64.     The Executive Order provides that the additional 10% duty on all imports would start on April 5, 2025, and the country-specific ad valorem duty rates would start on April 9, 2025. *Id.* at 15,045, § 3(a).

65.     Also on April 2, 2025, the President issued an Executive Order ending the *de minimis* exception on articles imported from China. Executive Order 14256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14,899, 14,899 (April 7, 2025), § 1.

66.     On April 8, 2025, the President issued an Executive Order in recognition of China's announcement that it would retaliate against the United States in response to Executive Order 14257, and he raised the tariff on imports from China from 34% to 84%. Executive Order 14259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed.

Reg. 15,509, 15,509 (Apr. 14, 2025), § 2. It also raised the tariff on articles eligible for *de minimis* treatment. *Id.* at 15,509–10, § 3.

67. On April 9, 2025, in response to additional retaliatory measures, the President issued Executive Order 14266 and again raised the tariff on goods imported from China to address the trade deficit emergency to 125%, effective April 10, 2025. Executive Order 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625, 15,626 (Apr. 15, 2025), § 3. This Executive Order also suspended until July 9, 2025, Executive Order 14257's individual reciprocal tariff rates for countries in Annex I, and instead, imposed a 10% ad valorem tariff, stating that "more than 75 other foreign trading partners . . . have approached the United States to address the lack of trade reciprocity in our economic relationships and our resulting national and economic security concerns." *Id.* at 15,625–626, §§ 1–2.

68. As of this filing, the total tariff amount imposed through IEEPA on most Chinese imports is 145%—the 20% tariffs imposed by Executive Order 14228 and the 125% tariff imposed by Executive Order 14266.

69. Like the amount of the tariffs imposed, their scope is also in flux. For example, on April 11, 2025, President Trump issued a Presidential Memorandum that exempted many electronics imported from China from the tariffs established in connection with the trade deficit emergency. *Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as amended*, https://www.whitehouse.gov/presidential-actions/2025/04/clarification-of-exceptions-under-executive-order-14257-of-

april-2-2025-as-amended/ (Apr. 11, 2025). But on April 13, 2025, President Trump stated on Truth Social that his memorandum the previous day was not an exception, and electronics are "just moving to a different Tariff 'bucket.'" @realDonaldTrump, Truth Social (Apr. 13, 2025, 3:36 PM), https://truthsocial.com/@real-DonaldTrump/posts/114332337028519855.

## STATEMENT OF CLAIMS

### COUNT I

### IEEPA Tariffs Are Imposed in Excess of Statutory Authority Because IEEPA Does Not Authorize Tariffs

### (All Defendants)

70.     The preceding paragraphs are incorporated by reference.

71.     A presidential action may be set aside if the President's action involves "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1260 (Fed. Cir. 2023) (citation omitted).

72.     With respect to imports, IEEPA only authorizes the President to "by means of instructions, licenses, or otherwise . . . investigate, regulate, or prohibit . . . any transactions in foreign exchange" and to "regulate . . . any . . . importation [] of any property in which any foreign country or a national thereof has any interest by any person." 50 U.S.C. § 1702(a)(1)(A), (B).

73.     IEEPA does not mention or reference tariffs.

74.     The statutory authority to "regulate" imports does not include the authority to impose tariffs.

- 20 -

75.     Article I, Section 8 of the U.S. Constitution grants Congress in separate clauses the "Power to lay and collect Taxes, Duties, Imposts and Excises" and the power "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cls. 1, 3.

76.     Not long after the Constitution's ratification, the Supreme Court affirmed that the powers to impose tariffs and to regulate commerce are "substantive, and distinct from each other." *Gibbons v. Ogden*, 22 U.S. 1, 201 (1824).

77.     Accordingly, IEEPA's grant of authority to "regulate" cannot be read to include the distinct power to impose tariffs.

78.     No other law cited by the President in the Executive Orders identified above confers upon him the authority to impose the tariffs.

79.     Because IEEPA does not authorize the President to impose tariffs, the above-identified Executive Orders' imposition of tariffs in reliance on IEEPA, Defendants' implementation of those Executive Orders, and the resulting HTSUS Modifications, are unlawful.

## COUNT II

### The Emergency Declarations in the Executive Orders Exceed the President's Authority Under IEEPA

### (All Defendants)

80.     The preceding paragraphs are incorporated by reference.

81.     IEEPA limits the use of its authorities by the President "to deal[ing] with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

82. None of the declared national emergencies on which the President has relied to impose tariffs pursuant to IEEPA meet the statutory requirement of an "unusual and extraordinary threat."

83. On February 1, 2025, the President declared a national emergency based on the "sustained influx of synthetic opioids" from China and the failure of "multiple attempts" at "bilateral dialogue" with the Chinese government to "resolve this crisis at its root source." 90 Fed. Reg. at 9121–22.

84. A situation that is "sustained" and has been the subject of extended efforts at bilateral dialogue to address it at its "root source" cannot constitute an emergency based on an "unusual or extraordinary threat."

85. On April 2, 2025, the President declared a national emergency with respect to the threat of "underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption," which were "indicated by large and persistent annual U.S. goods trade deficits[.]" 90 Fed. Reg. at 15,041.

86. The President's justification of the emergency begins with the reciprocal principles of U.S. trade policy established in 1934 and aims to address the purported failings of the "post-war international economic system" that "created large and persistent annual U.S. good trade deficits as a feature of the global trading system." *Id.* at 15,041–042.

87. An economic situation that is "persistent"—and in this case over half a century in duration—cannot constitute an emergency that is an "unusual and extraordinary threat."

88. The President also does not have an inherent constitutional authority to impose tariffs—a power that the Constitution grants to Congress.

89. Accordingly, the President's imposition of tariffs through IEEPA pursuant to the aforementioned declared national emergencies is unlawful.

<u>COUNT III</u>

**IEEPA Transfers Legislative Power to the President in Violation of the Constitution**

**(All Defendants)**

90. The preceding paragraphs are incorporated by reference.

91. If IEEPA is construed to authorize the President to impose or modify tariffs, it transfers core legislative powers to the President in violation of the Constitution.

92. Article I, Section 1 of the Constitution provides that "All legislative powers herein granted shall be vested in a Congress of the United States . . . ."

93. Among the powers "herein granted" are the "Power To lay and collect Taxes, Duties, Imposts and Excises," Art. I, § 8, cl.1, and the power to "regulate Commerce with foreign Nations[,]" Art. I, § 8, cl. 3.

94. Legislative powers may not be transferred or delegated to the President or any other entity.

95. If IEEPA's authority to regulate transactions or importation is broad enough to include the authority to impose or modify tariffs, the word "regulate"

contains no intelligible principle and is undefined as to the scope and meaning of the powers granted to the President.

96.    Moreover, if the power to "regulate" includes the power to impose and modify tariffs, that authority is guided by no standards as to the amount, timing, or scope of those tariffs.

97.    Nor does IEEPA provide an intelligible principle as to what constitutes an "unusual and extraordinary threat" and whether or when the President should or should not declare a national emergency with respect to that threat. 50 U.S.C. § 1701(a).

98.    IEEPA's specification that its authorities "may only be exercised to deal with" such a threat, *id.* § 1701(b), provides no meaningful constraint on the President's exercise of the powers conferred.

99.    If IEEPA is read to authorize the imposition or modification of tariffs, it unconstitutionally transfers legislative power to the President in violation of the Constitution.

100.    Accordingly, the above-described Executive Orders' imposition and modification of tariffs in reliance on IEEPA, Defendants' implementation of those Executive Orders, and the resulting HTSUS Modifications are unlawful.

## <u>COUNT IV</u>
### The HTSUS Modifications Violate the Administrative Procedure Act
### (DHS Defendants and USITC)

101.    The preceding paragraphs are incorporated by reference.

102.    The Administrative Procedure Act (APA) directs the Court to "hold un-

lawful and set aside agency action" that is "arbitrary, capricious, an abuse of discre-

tion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to con-

stitutional right, power, privilege, or immunity," *id.* § 706(2)(B), or "in excess of stat-

utory jurisdiction, authority, or limitations, or short of statutory right," *id.*

§ 706(2)(C).

103.    For the reasons alleged in Counts I, II, and III, the HTSUS Modifica-

tions must be held unlawful and set aside pursuant to the APA because they are

either in excess of statutory authority or contrary to constitutional power and not in

accordance with law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court grant the following relief:

1.    Expedite resolution of this action to prevent further harm to Plaintiffs;

2.    A declaratory judgment, pursuant to 28 U.S.C. § 2201, holding that the

imposition of tariffs by the actions described above and any future actions imposing

tariffs pursuant to IEEPA, as well as the HTSUS Modifications, are unlawful because

(1) IEEPA does not authorize the President to impose tariffs, (2) the President has

not declared an emergency that is unusual and extraordinary for the purposes of

IEEPA, or (3) IEEPA unconstitutionally transfers legislative power to the President;

3.    An order setting aside the HTSUS Modifications pursuant to 5 U.S.C.

§ 706;

4.    An injunction, pursuant to 28 U.S.C. § 2643(c)(1) and 28 U.S.C. § 2202,

prohibiting the DHS Defendants, USITC, and Executive Office of the President from

implementing or enforcing the HTSUS Modifications or any forthcoming modifications to the HTSUS pursuant to the actions described above and any future actions imposing tariffs in reliance on IEEPA;

5.    An order pursuant to 28 U.S.C. § 2643(a) or any other applicable authority directing the DHS Defendants to refund, with interest, any duties paid by Plaintiffs pursuant to the actions identified above and any future actions imposing tariffs in reliance on IEEPA or to compensate Plaintiffs for payments to sellers to cover the amount of the duties imposed pursuant to the actions identified above and any future actions imposing tariffs in reliance on IEEPA;

6.    An order pursuant to 28 U.S.C. § 2643(a) or any other applicable authority directing the Defendants to reimburse Plaintiffs for any other damages incurred as a result of or pursuant to the actions identified above and any future actions imposing tariffs in reliance on IEEPA;

7.    An award of reasonable attorney fees and costs to Plaintiffs pursuant to 28 U.S.C. § 2412 or any other applicable authority; and

8.    Any other relief the Court deems just and proper.


APRIL 24, 2025                      Respectfully submitted,


                                  /s/ Molly E. Nixon
                                  MOLLY E. NIXON
                                  JOSHUA M. ROBBINS
                                  Pacific Legal Foundation
                                  3100 Clarendon Boulevard, Suite 1000
                                  Arlington, VA 22201
                                  (202) 888-6881

MNixon@pacificlegal.org
JRobbins@pacificlegal.org

OLIVER J. DUNFORD
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
(916) 503-9060
ODunford@pacificlegal.org

*Attorneys for Plaintiffs*