## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PRINCESS AWESOME, LLC**, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>**UNITED STATES CUSTOMS AND BORDER PROTECTION**, et al.,<br><br>　　　　Defendants. | COURT NO. 25-00078 |

## MOTION FOR SUMMARY JUDGMENT AND EXPEDITED CONSIDERATION BY PLAINTIFFS PRINCESS AWESOME, LLC, ET AL.

MOLLY E. NIXON
JOSHUA M. ROBBINS
ASHLEY TORKELSON LEVINE*
　　*Application Pending
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, VA 22201
(202) 888-6881
MNixon@pacificlegal.org
JRobbins@pacificlegal.org
ALevine@pacificlegal.org

OLIVER J. DUNFORD
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
(916) 503-9060
ODunford@pacificlegal.org

*Attorneys for Plaintiffs*
*Princess Awesome, LLC, et al.*

## TABLE OF CONTENTS

Table of Authorities.................................................................................... ii

Introduction .................................................................................................. 1

Legal Background......................................................................................... 3

The President's New Tariff Policies ........................................................... 7

Plaintiffs' Ongoing and Irreparable Harm................................................ 11

Standard of Review...................................................................................... 14

Law & Argument.......................................................................................... 15

I.    IEEPA Does Not Authorize Tariffs...................................................... 15

    A.  IEEPA's Text and Context Confirm That the Statute Does Not
    Authorize the President to Impose Tariffs ....................................... 16

        1.   IEEPA Does Not Mention Tariffs ............................................. 16

        2.   An Authorization to "Regulate" Specific Transactions and Property Does
        Not Include the Power to Impose Tariffs.................................. 18

    B.  History Confirms That IEEPA Does Not Authorize Tariffs........................... 20

    C.  The Major Questions Doctrine Forecloses the President's
    Reliance on IEEPA ............................................................................ 23

II.   The Emergency Declarations Do Not Address any "Unusual and Extraordinary
    Threat" and, therefore, the President's Assumption of Power Exceeds the
    President's Authorities Under IEEPA................................................... 27

III.  IEEPA Is an Unconstitutional Transfer of Legislative Power............................ 30

    A.  IEEPA provides no intelligible principle guiding the President's
    exercise of its power ........................................................................ 31

    B.  The President's IEEPA Powers Stand in Marked Contrast to the Conditional
    Powers the Supreme Court has Upheld ........................................... 36

    C.  The Non-Delegation Analysis is Not Altered by Any Inherent Executive Power
    Because No Such Power to Impose Tariffs Exists.............................. 41

Conclusion.................................................................................................... 44

Certificate of Compliance........................................................................... 45

Proposed Order…………………………………………………………………….46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ...................................................................... 34

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
594 U.S. 758 (2021) .............................................................. 24, 26

*Am. Inst. for Int'l Steel, Inc. v. United States,*
376 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) ........................ 43

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...................................................................... 14

*Biden v. Nebraska,*
600 U.S. 477 (2023) ...................................................................... 26

*Biden v. Texas,*
597 U.S. 785 (2022) .............................................................. 17, 20

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.,*
601 U.S. 416 (2024) ...................................................................... 24

*Ctr. for Bio. Diversity v. Trump,*
453 F. Supp. 3d 11 (D.D.C. 2020) ...................................... 35, 39

*Demko v. United States,*
216 F.3d 1049 (Fed. Cir. 2000) .............................................. 15

*Dep't of Transp. v. Ass'n of Amer. R.R.s,* 575 U.S. 43 (2015) .................................... 31

*Deripaska v. Yellen,*
No. 21-5157, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022) ...................... 35

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) .............................................................. 17, 19

*Fed. Energy Admin. v. Algonquin SNG, Inc.,*
426 U.S. 548 (1976) .............................................................. 40, 41

*FTC v. Bunte Bros.,*
312 U.S. 349 (1941) ...................................................................... 20

*Gibbons v. Ogden,*
22 U.S. 1 (1824) ............................................................................ 19

*Gross v. FBL Fin. Servs., Inc.,*
557 U.S. 167 (2009) ...................................................................... 16

*Gundy v. United States,*
588 U.S. 128 (2019) .............................................................. 31, 37

*INS v. Chadha*,
    462 U.S. 919 (1983) ................................................................................ 5

*J.W. Hampton, Jr., Co. v. United States*,
    276 U.S. 394 (1928) .........................................................................*passim*

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) .............................................................................. 22

*Ludecke v. Watkins*,
    335 U.S. 160 (1948) .............................................................................. 30

*Marshall Field & Co v. Clark*,
    143 U.S. 649 (1892) .......................................................................... 38–39

*Moers v. City of Reading*,
    21 Pa. 188 (1853) .................................................................................. 39

*PrimeSource Bldg. Prods., Inc. v. United States*,
    59 F.4th 1255 (Fed. Cir. 2023) ............................................................. 15

*Regan v. Wald*,
    468 U.S. 222 (1984) ................................................................................ 6

*Totes-Isotoner Corp. v. United States*,
    32 C.I.T. 739 (2008) ............................................................................. 14

*United States v. Am. Home Assurance Co.*,
    789 F.3d 1313 (Fed. Cir. 2015) ....................................................... 18, 19

*United States v. Mazurie*,
    419 U.S. 544 (1975) .............................................................................. 41

*United States v. Rock Royal Co-op*,
    307 U.S. 533 (1939) .............................................................................. 36

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) ..........................................................*passim*

*Util. Air Reg. Grp. v. EPA*,
    573 U.S. 302 (2014) ......................................................................... 23, 26

*Wayman v. Southard*,
    23 U.S. 1 (1825) .............................................................................. 30, 31

*West Virginia v. EPA*,
    597 U.S. 697 (2022) .........................................................................*passim*

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ................................................................... 17, 30, 34

*Yakus v. United States*,
    321 U.S. 414 (1944) ................................................................... 31, 33, 34

*Zivotovsky v. Kerry,*
    576 U.S. 1 (2015) ..................................................................... 42

**Statutes**

5 U.S.C. § 706 ................................................................................. 15

19 U.S.C. § 1338(a) ......................................................................... 17

19 U.S.C. § 2132 .............................................................................. 22

19 U.S.C. § 2411(c)(1)(B) ................................................................ 17

28 U.S.C. § 2840(e) .......................................................................... 15

50 U.S.C. App. § 5(b)(3) ................................................................... 21

50 U.S.C. § 1601, *et seq.* ................................................................... 5

50 U.S.C. § 1701 ............................................................................... 1

50 U.S.C. § 1701(a) ...................................................................... 6, 28

50 U.S.C. § 1701(b) ................................................................. 6, 28, 39

50 U.S.C. § 1702 ......................................................................... 16, 22

50 U.S.C. § 1702(a) ..................................................................... 16, 20

50 U.S.C. § 1702(a)(1)(A) ................................................................ 32

50 U.S.C. § 1702(a)(1)(A)(i) .......................................................... 6, 16

50 U.S.C. § 1702(a)(1)(B) ........................................................*passim*

50 U.S.C. § 1702(b) .......................................................................... 20

50 U.S.C. § 4305(b)(3) ....................................................................... 6

1917 Trading with the Enemy Act ....................................................... 3

Alien Enemies Act ............................................................................ 30

Emergency Banking Relief Act, Pub. L. No. 13-1, Tit. 1, § 2 (Mar. 9,
    1933) ......................................................................................... 3, 20

*International Emergency Economic Powers Act* ................................... 7

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–10,
    IEEPA...................................................................................*passim*

National Emergencies Act ............................................................... 5, 7

National Industrial Recovery Act...................................................... 33

NEA......................................................................................... 5, 35, 36

Nicaragua Human Rights and Anticorruption Act of 2018, Pub. L. No.
    115-335, § 5, 132 Stat. 5019 (Dec. 20, 2018)................................ 22

Pub. L. No. 65-91, §§ 2–3 (Oct. 6, 1917) ........................................... 3

Pub. L. No. 65-91 § 5(b), 40 Stat. 411, 415 (Oct. 6, 1917) .......................................... 20

Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987–89 (1975) .......................................... 22

Pub. L. No. 94-412, 90 Stat. 1255 (1976) .................................................................. 5

Pub. L. No. 95-223, 91 Stat. 1625 (1977) .................................................................. 5

Pub. L. No. 99-93, 99 Stat. 405, 407, 448 (1985) ........................................................ 5

Pub. L. No. 99-529, § 204, 100 Stat. 3010 (Oct. 24, 1986) .......................................... 22

76 Stat. 877, *as amended by* Section 127(d) of the Trade Act of 1974, 88
    Section 127(d) Stat. 1993, 19 U.S.C. § 1862(b) (1970 ed., Supp. IV) ................... 41

Tariff Act of 1922, ch. 356, § 315, 42 Stat. 858, 941 ................................................ 17

Tariff Act of 1930 .................................................................................................. 17

Tariff Act of 1930 and the Trade Expansion Act of 1962 ...................................... 4, 20

Tariff Act of September 21, 1922 title 6 section 315 ................................................ 38

Trade Act of 1974 .................................................................................................. 22

Trade Act of 1974 Section 301 ............................................................................ 17, 20

Trade Expansion Act Section 232 ....................................................................... 40, 43

TWEA .............................................................................................................. *passim*

U.S. Code Title 19 ......................................................................................... 1, 17, 24

**Other Authorities**

36 Fed. Reg. 15,724 (Aug. 17, 1971) ...................................................................... 4

36 Fed. Reg. 15,724 No. 4074 ................................................................................. 20

89 Fed. Reg. 87761 (Nov. 4, 2024) .......................................................................... 40

90 Fed. Reg. 11,463 .............................................................................................. 23

90 Fed. Reg. 15,041 .............................................................................................. 23

90 Fed. Reg. at 15,042 ........................................................................................... 29

90 Fed. Reg. at 15,044 ........................................................................................... 23

90 Fed. Reg. at 15,045 §§ 2, 3(a) ............................................................................ 10

90 Fed. Reg. at 15,046 § 3(c) .................................................................................. 10

90 Fed. Reg. at 15,625–26 §§ 1–2 ........................................................................... 11

90 Fed. Reg. 8327 (Jan. 29, 2025) ........................................................................... 7

90 Fed. Reg. 8471 (Jan. 30, 2025), § 2(a) ................................................................ 7

90 Fed. Reg. 9038 (Feb. 5, 2025) ............................................................................. 8

90 Fed. Reg. 9837 (Feb. 19, 2025) ........................................................................... 8

90 Fed. Reg. at 9837 § 1 ................................................................ 8, 9, 11

90 Fed. Reg. at 9838 § 3(a) .............................................................. 9, 10

@realDonaldTrump, Truth Social (Apr. 5, 2025, 8:34 AM),
    https://tinyurl.com/3kbmsazv ................................................... 24

Campbell, Tom, *Presidential Authority to Impose Tariffs*, 83 LA. L. REV.
    595 (2023) .................................................................................... 19

Casey, Christopher A. & Elsea, Jennifer K., Cong. Rsch. Serv., R45618,
    *The International Emergency Economic Powers Act: Origins,*
    *Evolution, and Use* (2024) .......................................................... 3

CIT Rule 3(g) .................................................................................. 3

CIT Rule 56 ..................................................................................... 3

Exec. Order No. 14195, 90 Fed. Reg. 9121, 9121–22 (Feb. 7, 2025) ........... 8

Exec. Order No. 14195, 90 Fed. Reg. at 9121–22 ..................................... 28

Exec. Order No. 14228, 90 Fed. Reg. 11463 (Mar. 7, 2025) ....................... 9

Exec. Order No. 14257, 90 Fed. Reg. 15,041 (Apr. 7, 2025) ....................... 9

Exec. Order No. 14257, 90 Fed. Reg. at 15,041 ....................................... 28

Exec. Order No. 14259, § 2, 90 Fed. Reg. 15,509 (Apr. 14, 2025) ............... 10

Exec. Order No. 14266, § 3, 90 Fed. Reg. 15,625, 15,626 (Apr. 15, 2025) .......... 11

Executive Order 14195 .................................................................... 12

Executive Order 14228 .................................................................. 11, 12

Executive Order 14257 ................................................................... 10

Executive Order 14257's ................................................................ 11

Executive Order 14266 ........................................................ 10, 11, 12

*Extraordinary*, *Black's Law Dictionary* 527 (5th ed. 1979) ..................... 29

*Extraordinary*, Black's Law Dictionary 699 (4th Rev. ed. 1968) .............. 29

Further Amended Notice of Implementation, 90 Fed. Reg. 11426 (Mar.
    6, 2025) ....................................................................................... 9

H.R. Rep. No. 95-459 (1977) ..................................................... 4–5, 29

https://tinyurl.com/4bswe556 ......................................................... 25

https://tinyurl.com/5n7ym5mf ........................................................ 11

https://tinyurl.com/yzkkde74 ......................................................... 26

*Joint Statement on U.S.-China Economic and Trade Meeting in Geneva*
(May 12, 2025), https://perma.cc/5CRS-D53A ........................................ 12

*Regulate*, Black's Law Dictionary (12th ed. 2024) ...................................... 18

*Regulate*, Black's Law Dictionary 1451 (4th ed. 1968) ............................... 18

*Regulate*, Oxford English Dictionary (2009), *available at*
https://tinyurl.com/bddwpbr5 ................................................................. 18

*Regulate*, Webster's Third Int'l Dictionary of the English Language
Unabridged 1914 (1961) ......................................................................... 18

Scalia, Antonin & Garner, Bryan A., *Reading Law: The Interpretation
of Legal Texts* (2012) ............................................................................... 17

Torry, Harriet, *U.S. Economy Shrank in First Quarter as Imports
Surged Ahead of Tariffs*, WALL ST. J. (Apr. 30, 2025),
https://tinyurl.com/yzkkde74 .................................................................. 26

U.S. Congress, *A Brief History of Emergency Powers in the United
States* (1974) ............................................................................................. 4

U.S. Const. art. I, § 1 ..................................................................................... 30

U.S. Const. art. I, § 7, cl. 1 ............................................................................ 24

U.S. Const. art. I, § 8, cl. 1 ...................................................................... 1, 24

U.S. Const. art. I, § 8, cl. 3 ............................................................................ 19

U.S. Court of Int'l Trade R. 56 ........................................................................ 2

*Unusual*, Black's Law Dictionary 1708 (4th Rev. ed. 1968) ....................... 29

*Unusual*, Black's Law Dictionary 1708 (5th ed. 1979) ............................... 29

*Vassiliades v. Blinken*,
No. 1:24-cv-01952 (Sept. 17, 2024) ................................................... 32, 33

*V.O.S. Selections, Inc. v. Trump*,
No. 1:25-cv-00066 (Ct. Int'l Trade, Apr. 29, 2025) ....................... 35, 39, 42

*Where We Stand: The Fiscal, Economic, and Distributional Effects of
All U.S. Tariffs Enacted in 2025 Through April 2*, The Budget Lab
at Yale (Apr. 2, 2025), https://tinyurl.com/4bswe556 ...................... 25, 26

**INTRODUCTION**

The Constitution vests in Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8, cl. 1. This includes the power to impose tariffs. Nonetheless, through a series of proclamations and executive orders, President Trump has purported to arrogate the tariff power to himself. Relying on the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–10, the President has imposed steep new tariffs on goods imported from nearly every country in the world.

But IEEPA does not say anything about duties, imposts, or tariffs—much less does it allow the President to rewrite the Nation's elaborate tariff regime. Instead, IEEPA authorizes the President to exercise specified powers over foreign property when he declares a national emergency with respect to an "unusual and extraordinary threat." 50 U.S.C. § 1701. Over the course of its 50-plus-year history, IEEPA has never been used to impose tariffs—until now. Thus, IEEPA's text and history all point in the same direction: IEEPA does not grant the President any tariff power.

Context confirms IEEPA's limited application, since many other statutes do authorize the President to adjust tariffs. *See generally* Title 19, U.S. Code (Customs Duties). But these statutes allow for presidential action under prescribed conditions and for limited amounts of time. Thus, Congress knows how to authorize the President to impose or modify tariffs when it wants to. The President does not rely on any of those statutes. Instead, he seeks to displace Congress's trade structure with a tariff scheme of his own design. This is both unauthorized by statute and unconstitutional.

Plaintiffs Princess Awesome, LLC; Stonemaier, LLC; 300 Below, Inc.; Upward Glance, LLC d/b/a Quent Cordair Fine Art; KingSeal Corporation d/b/a Wesco Enterprises, Inc.; Mischief, LLC d/b/a Mischief Toy Store; Spielcraft Games, LLC; Rookie Mage Games, LLC; XYZ Game Labs, Inc.; Tinkerhouse, Inc.; and Reclamation Studio, LLC d/b/a WitsEnd Mosaic, are small businesses in various fields—clothing, board games, and mechanical services. All but one directly import goods from abroad. Several Plaintiffs have already been forced to pay additional amounts under the President's unlawful tariffs, or will soon be forced to pay them to get their products into the country. And given the President's unilateral and unpredictable tariff policies, none of the Plaintiffs know what to expect or how to plan for their business. The tariffs and the economic uncertainty resulting from their ongoing modification causes each of these businesses significant financial harm and even threatens their ability to remain in operation.

Plaintiffs present four causes of action challenging the lawfulness of the tariffs: (1) the tariffs are not authorized by IEEPA; (2) the emergency declarations do not permit the President to exercise any IEEPA authorities because the emergencies do not regard "unusual and extraordinary threat[s];" (3) IEEPA unconstitutionally transfers legislative authority to the President; and (4) the modifications to the Harmonized Tariff Schedule of the United States to implement the IEEPA tariffs (HTSUS Modifications) violate the Administrative Procedure Act. Pursuant to Rule 56 of the Rules of the U.S. Court of International Trade, Plaintiffs move for summary judgment on all four of their claims. Because there are no material facts in dispute

regarding these purely legal claims and Rule 56 does not restrict the early filing of summary judgment motions, Plaintiffs' legal claims are ripe for resolution.

To address the significant harm to Plaintiffs resulting from the tariffs, the Court should declare the imposition of tariffs pursuant to IEEPA unlawful, issue a permanent injunction precluding the implementation of the IEEPA tariffs, and order Defendants to provide refunds for any IEEPA-based duties paid by Plaintiffs. Due to the significant, ongoing, and irreparable harm from the IEEPA tariffs, Plaintiffs also move pursuant to CIT Rule 3(g) for expedited consideration of the above-captioned action, including this Motion.

## LEGAL BACKGROUND

The origins of IEEPA—passed in 1977—trace back to World War I and Congress's passage of over 20 statutes granting the President emergency wartime powers to exercise control over private property. Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 3 (2024). One of those statutes was the 1917 Trading with the Enemy Act (TWEA), which effectively gave the President the power to oversee or restrict all trade between the United States and its wartime enemies. Pub. L. No. 65-91, §§ 2–3 (Oct. 6, 1917). Congress expanded TWEA in 1933 to ratify President Franklin Roosevelt's four-day bar on banking transactions by adding national emergencies as a triggering event for the President's use of TWEA's authority. Emergency Banking Relief Act, Pub. L. No. 13-1, Tit. 1, § 2 (Mar. 9, 1933); Casey & Elsea, *supra*, at 4. TWEA was amended again in 1941 to cover private property and to ratify "consumer

credit controls" ordered by President Roosevelt through the Federal Reserve. *Casey & Elsea, supra*, at 5; H.R. Rep. No. 95-459, at 5 (1977).

But, consistent with its authorization, TWEA has been used primarily to impose economic sanctions on foreign actors and countries. *Casey & Elsea, supra*, at 6. It was once invoked—but only after the fact—to justify a 10% temporary ad valorem duty on imported goods, purportedly to address a balance-of-payments deficit. *Id.* In 1971, President Nixon relied on the Tariff Act of 1930 and the Trade Expansion Act of 1962 to impose this 10% duty. *See* Imposition of Supplemental Duty for Balance of Payments Purposes (Proclamation 4074), 36 Fed. Reg. 15,724 (Aug. 17, 1971). President Nixon did *not* invoke TWEA as authority. Only upon a legal challenge did reliance shift to TWEA—because, though Proclamation 4074 did not even cite the statute, TWEA was nonetheless "incorporated [in the Proclamation] by [its] 'but not limited to'" language. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 575 n.22 (C.C.P.A. 1975). As explained below, *Yoshida*'s reliance on TWEA to approve President Nixon's temporary 10% duty does not control here. Indeed, due to presidential abuse of "emergency" powers, Congress amended TWEA, enacted IEEPA, and reined in the President's emergency authority. *Casey & Elsea, supra*, at 7–8.

Thus, in the 1970s a bipartisan committee was formed in the U.S. Senate to review the issue. *Id.* at 6–7. The committee observed that the United States had been under a state of emergency in one form or another since 1933 and that there were "470 significant emergency statutes" granting discretionary emergency power to the President. *Id.* at 7 (quoting U.S. Congress, *A Brief History of Emergency Powers in*

*the United States*, p. v.) (1974). TWEA was identified as a particularly problematic statute. *Id.* The House Committee on International Relations lamented that the law had "become essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review." H.R. Rep. No. 95-459, at 7 (1977). Among the evidence cited for this conclusion was President Nixon's 1971 global tariff. *Id.* at 5.

Accordingly, Congress restricted the President's emergency powers. It began with procedural reform. In the 1976 National Emergencies Act (NEA), Congress imposed additional procedural requirements on presidential emergency declarations— the President had to immediately transmit to Congress any emergency declaration and Congress could terminate that emergency through a concurrent resolution.[1] Pub. L. No. 94-412, 90 Stat. 1255 (1976), *codified at* 50 U.S.C. § 1601, *et seq.* The NEA does not grant the President any substantive authority.

Congress next reformed TWEA in 1977 by limiting its authorities to a time of war and passing IEEPA to address "unusual and extraordinary threat[s] with respect to which a national emergency ha[d] been declared[.]" Pub. L. No. 95-223, 91 Stat. 1625 (1977). While IEEPA includes some powers similar to those in TWEA, it limited the scope of the President's non-wartime emergency economic authority. Casey & Elsea, *supra*, at 9. To that end, IEEPA omitted presidential authority that had been

---

[1] Congress's statutory authority to terminate declared national emergencies through concurrent resolutions, which do not require a presidential signature, was called into doubt after *INS v. Chadha*, 462 U.S. 919 (1983). Accordingly, the NEA was amended to allow Congress to end emergencies through joint resolutions. Pub. L. No. 99-93, 99 Stat. 405, 407, 448 (1985).

granted through TWEA "to vest (i.e., to take title to) foreign assets, to regulate purely domestic transactions, to regulate gold or bullion, or to seize records." *Regan v. Wald*, 468 U.S. 222, 228 n.8 (1984). Further, IEEPA stripped the President's authority, previously allowed by TWEA, to define "any or all" of its terms. 50 U.S.C. § 4305(b)(3).

Finally, Congress included language in IEEPA that had not been in TWEA. Now, the President could invoke IEEPA's economic powers only "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). In case it wasn't clear enough, Congress confirmed that the authorities granted to the President may be exercised "*only . . . to* deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may *not* be exercised *for any other purpose.*" *Id.* § 1701(b) (emphasis added).

If those requirements are met, the President may impose certain sanctions and regulations. As relevant here, the President may "by means of instructions, licenses, or otherwise . . . investigate, regulate, or prohibit . . . any transactions in foreign exchange." *Id.* § 1702(a)(1)(A)(i). The President may also

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

*Id.* § 1702(a)(1)(B).

- 6 -

After IEEPA's enactment, no President invoked it to impose tariffs—until now. Christopher A. Casey, Cong. Rsch. Serv., IN11129, *The International Emergency Economic Powers Act (IEEPA), the National Emergencies Act (NEA), and Tariffs: Historical Background and Key Issues* 1 (2025). Prior to the current administration, Presidents used IEEPA to prohibit transactions, block property, institute and maintain maritime restrictions, and maintain export-control systems. Casey & Elsea, *supra*, at 25–26. In 2019, President Trump threatened to impose tariffs on all goods from Mexico through IEEPA, but those tariffs never went into effect. *Id.* at 27.

## THE PRESIDENT'S NEW TARIFF POLICIES

On January 20, 2025, President Trump issued an America First Trade Policy Memorandum, directing his administration to, among other things, investigate the causes of the United States' "large and persistent annual trade deficit in goods" and the "economic and national security implications and risks resulting from such deficits." America First Trade Policy, 90 Fed. Reg. 8471 (Jan. 30, 2025), § 2(a). The President further directed his administration to "recommend appropriate measures, such as a global supplemental tariff or other policies, to remedy such deficits." *Id.* The same day, President Trump declared a national emergency at the southern border of the United States to address the flow of people and "illicit narcotics" into the United States. Proclamation No. 10886, 90 Fed. Reg. 8327, 8327 (Jan. 29, 2025).

On February 1, 2025, the President expanded the scope of the declared emergency on the southern border to cover "the sustained influx of synthetic opioids" from China, China's subsidization of their exports, and its "failure" "to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other

[transnational criminal organizations], criminals at large, and drugs." Exec. Order No. 14195, 90 Fed. Reg. 9121, 9121–22 (Feb. 7, 2025). Despite the findings that the influx of synthetic opioids has been "sustained" and that "the direct flow of fentanyl and other synthetic opioids from" China to the United States dates back at least to President Trump's first administration, this Executive Order nevertheless stated that the Chinese government's "failure to act constitutes an unusual and extraordinary threat." *Id.* at 9121–22. Purportedly to address this emergency, the President imposed a 10% ad valorem rate of duty on all Chinese imports, effective February 4, 2025. *Id.* at 9122. On February 4, 2025, Customs implemented the modifications to the HTSUS. Implementation of Additional Duties, 90 Fed. Reg. 9038, 9038 (Feb. 5, 2025).[2]

On February 13, 2025, the President reaffirmed his policy of reducing the United States' trade deficits. Reciprocal Trade and Tariffs, 90 Fed. Reg. 9837 (Feb. 19, 2025). The President stated that the United States has "one of the most open economies" but has been "treated unfairly by trading partners, both friend and foe," creating, in part, "our country's large and persistent annual trade deficit in goods . . . ." *Id.* § 1, 90 Fed. Reg. at 9837. Accordingly, the President directed his administration to "investigate the harm to the United States from any non-reciprocal trade arrangements adopted by any trading partners" and propose "remedies in

---

[2] Plaintiffs refer collectively to all of Customs' modifications to the HTSUS pursuant to the Executive Orders identified herein as the "HTSUS Modifications."

pursuit of reciprocal trade relations with each trading partner." *Id.* § 3(a), 90 Fed. Reg. at 9838.

While this reciprocal trade investigation was underway, the President issued another Executive Order raising the ad valorem rate of duty on articles imported from China from 10% to 20% because he determined that China had "not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions." Exec. Order No. 14228, 90 Fed. Reg. 11463 (Mar. 7, 2025). Customs published a further amended notice implementing the change in the HTSUS accordingly, effective March 4, 2025. Further Amended Notice of Implementation, 90 Fed. Reg. 11426 (Mar. 6, 2025).

On April 2, 2025, the President implemented his previously ordered reviews of the United States' trading relationships. Exec. Order No. 14257, 90 Fed. Reg. 15,041, 15,041 (Apr. 7, 2025). The President declared a national emergency with respect to the "threat" of "underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption," which were "indicated by large and persistent annual U.S. goods trade deficits[.]" *Id.* The President concluded that the annual trade deficits have undermined our "manufacturing base," "critical supply chains," and our "defense-industrial base." *Id.* And he asserted that "key U.S. trading partners" "suppress domestic wages and consumption, and thereby demand for U.S. exports, while artificially increasing the competitiveness of their goods in global markets." *Id.* Despite the President's acknowledge-

ment that annual U.S. goods trade deficits are "persistent" and "a feature of the global trading system[,]" *id.* at 15,042, and that the decline in U.S. manufacturing has occurred "[o]ver time," *id.* at 15,043, the President nevertheless determined that the "underlying conditions" constitute an "unusual and extraordinary threat," *id.* at 15,041, 15,044–45.

Executive Order 14257 imposed an ad valorem duty of 10% on nearly every country in the world. *Id.* §§ 2, 3(a), 90 Fed. Reg. at 15,045. It also imposed additional "reciprocal" tariffs on specifically identified countries that were applied "in addition to any other duties, fees, taxes, exaction or charges applicable to such imported article" except as otherwise exempted. *Id.* § 3(c), 90 Fed. Reg. at 15,046. As relevant here, the Executive Order provides a 37% "Reciprocal Tariff, Adjusted" rate for Bangladesh, 34% for China, 20% for the European Union, 26% for India, 24% for Japan, 32% for Taiwan, and 46% for Vietnam. *Id.* at 15,049–50 (Annex I). The Executive Order provided that the additional 10% duty on all imports would start on April 5, 2025, and the country-specific ad valorem duty rates would start on April 9, 2025. *Id.* § 3(a), 90 Fed. Reg. at 15,045.

On April 8, 2025, the President issued an Executive Order in recognition of China's announcement that it would retaliate against the United States in response to Executive Order 14257, and he raised the tariff on Chinese imports from 34% to 84%. Exec. Order No. 14259, § 2, 90 Fed. Reg. 15,509, 15,509 (Apr. 14, 2025). One day later, in response to additional retaliatory measures and to address the trade-deficit "emergency," the President issued Executive Order 14266 and again raised the tariff

on Chinese imports to 125%, effective April 10, 2025. Exec. Order No. 14266, § 3, 90 Fed. Reg. 15,625, 15,626 (Apr. 15, 2025). But the President simultaneously suspended, until July 9, 2025, Executive Order 14257's country-specific tariff rates and, instead, imposed a 10% ad valorem tariff purportedly because many nations showed interest in making a deal. *Id.* §§ 1–2, 90 Fed. Reg. at 15,625–26. The total tariff amount imposed through IEEPA on most Chinese imports reached 145%—the 20% tariffs imposed by Executive Order 14228 and the 125% tariff imposed by Executive Order 14266. On May 12, 2025, the President announced a deal through which China and the United States intend to reduce certain tariffs, at least temporarily. *See* Fact Sheet: President Donald J. Trump Secures a Historic Trade Win for the United States (May 12, 2025).[3] Additional tariffs also apply to imports of *de minimis* amounts. Exec. Order No. 14256, § 1, 90 Fed. Reg. 14,899, 14,899 (April 7, 2025); § 3 90 Fed. Reg. at 15,509–10.

## PLAINTIFFS' ONGOING AND IRREPARABLE HARM

Plaintiffs are eleven small businesses suffering immediate, significant, and irreparable harm caused by the President's unlawful tariff policy. A brief description of two Plaintiffs' harms is representative of the group.

Plaintiff Princess Awesome is a children's and adult clothing store founded in 2015 by friends Rebecca Melsky and Eva St. Clair. Melsky Decl. ¶ 2. Princess Awesome imports goods monthly from Bangladesh, China, India, and Peru. *Id.* ¶ 4. These goods are now subject to increased tariffs imposed through Executive Orders 14195,

---

[3] https://tinyurl.com/5n7ym5mf.

14228, 14257, and 14266. *Id.* ¶ 5. Princess Awesome has paid tariffs on goods that were ordered and manufactured last year but were imported after the new tariff rates became effective this year. *Id.* ¶¶ 6–14. Further, for pending and future shipments, Princess Awesome must decide among bad options: cancelling orders (*id.* ¶¶ 18–20); raising prices (*id.* ¶¶ 15, 20); transferring production to different countries (*id.* ¶¶ 19–20); and shipping goods by air, rather than by sea, hoping to import the goods during the current 90-day pause on tariffs on the additional discounted reciprocal tariffs (*id.* ¶¶ 16–17)—all at additional cost.

Plaintiff Spielcraft Games, a tabletop game maker in Nebraska, is likewise suffering from the new tariff policies. Spielcraft imports goods manufactured by Chinese companies with which Spielcraft has worked since 2020. Wolf Decl. ¶¶ 4–5. Spielcraft executed agreements with its manufacturer in 2023 and 2024 for production of its game, Cretaceous Rails, and paid its manufacturer for samples and deposits on the orders. *Id.* ¶¶ 6–7. One shipment, however, was subject to the new tariffs imposed through Executive Order 14195 (10% ad valorem rate on Chinese imports) and Executive Order 14228 (raising the duty to 20%). *Id.* ¶¶ 6–9. Spielcraft therefore paid a 20% tariff on its shipment of game sets. *Id.* ¶¶ 8–9. Spielcraft has another shipment expected to arrive May 16. *Id.* ¶ 11. This shipment is subject to 20% tariff imposed through Executive Order 14228. *Id.* ¶¶ 10. Following these shipments, the President imposed a 145% tariff through Executive Order 14266, but the President has announced a 90-day pause. *See Joint Statement on U.S.-China Economic and Trade Meeting in Geneva* (May 12, 2025), https://perma.cc/5CRS-D53A.

Spielcraft Games cannot afford the unexpected increased tariff costs. Like many other board game publishers, Spielcraft finances its productions primarily through crowdfunding, which it uses as a form of pre-order—customers pay before games are manufactured. Wolf Decl. ¶¶ 13–14. As a result, Spielcraft cannot increase the prices that customers have already paid, even if the games have not yet been manufactured or imported. *Id.* ¶¶ 13, 16. Spielcraft has thus been forced to suspend this year's planned production of a new game that has been in development for years. *Id.* ¶ 14. And it has delayed production of four other games that were planned for distribution in the United States. *Id.*

For these and other Plaintiffs that have already paid tariffs under the new tariff regime, financial losses have occurred and will continue—either from excess tariff costs or from the loss of deposits, shipments costs, and lost profits (if they pause importation).

Similar injuries apply to all eleven Plaintiffs. All but one of the Plaintiffs import goods directly from overseas—including from Argentina, Bangladesh, China, Italy, Peru, Taiwan, and Turkey. Because of the dramatic and unexpected tariff increases, together with the ever-changing tariff policy, Plaintiffs find it all but impossible to plan for the future.

The following chart identifies each Plaintiff and its injury(ies). Declarations, with exhibits, supporting these allegations are attached to this Motion.

| Plaintiff | Paid New Tariffs | Invoiced by Customs Under New Tariffs | Shipments En Route Subject to New Tariffs | Goods Produced or In Production Subject to New Tariffs | Expects to Pay New Tariffs Directly or Indirectly |
|---|---|---|---|---|---|
| Princess Awesome | ✓ | ✓ | | ✓ | ✓ |
| Stonemaier Games | | | | ✓ | ✓ |
| 300 Below, Inc. | | | ✓ | | ✓ |
| Upward Glance | | | | | ✓ |
| KingSeal Corporation | ✓ | ✓ | | | ✓ |
| Mischief | | | | | ✓ |
| Spielcraft Games | ✓ | | ✓ | | ✓ |
| Rookie Mage Games | ✓ | | | | ✓ |
| XYZ Game Labs | | | | ✓ | ✓ |
| Tinkerhouse | | | | ✓ | ✓ |
| WitsEnd Mosaic | | | ✓ | ✓ | ✓ |

Plaintiffs thus seek refunds for tariffs they have paid or will have paid at the time of judgment. *See Totes-Isotoner Corp. v. United States*, 32 C.I.T. 739, 745 (2008) (The refund of excess tariffs is "manifestly within the historic power of this Court.").[4]

## STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine disputes as to any material fact. USCIT R. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–

---

[4] Plaintiffs reserve the right to seek a preliminary injunction suspending liquidation of their entries that include IEEPA-based duties if the government will not agree to reliquidate those entries upon a final judgment holding that they are unlawful.

48 (1986). The interpretation of a statute and the determination whether a statute is constitutional are both questions of law appropriate for summary disposition. *See*, *e.g.*, *Demko v. United States*, 216 F.3d 1049, 1052 (Fed. Cir. 2000). The Court should review this case "as provided in section 706 of title 5[,]" 28 U.S.C. § 2840(e), which provides that a "reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id*. A presidential action may be set aside if the President's action involves "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1260 (Fed. Cir. 2023) (citation omitted).

## LAW & ARGUMENT

### I.    IEEPA DOES NOT AUTHORIZE TARIFFS.

IEEPA, by its plain language, does not authorize the President to impose tariffs. The statute is a tool for the President to address "unusual and extraordinary threats" through the direct control of foreign property and transactions. IEEPA never mentions tariffs, duties, or any other synonym for tariffs—a power the Constitution grants exclusively to Congress. Presidents throughout IEEPA's history have recognized and adhered to the statute's exclusion of tariff authority—until now. Congress cannot be assumed to have handed over effectively the entirety of its tariff authority

whenever the President declares an emergency, though a statute does not even address the topic. IEEPA's text, context, and history all point in the same direction—it does not allow the President to impose or adjust tariffs. Any doubt is removed by the Major Questions Doctrine, which requires in cases of economic and political significance, like here, clear congressional authorization for the power asserted.

### A. IEEPA's Text and Context Confirm That the Statute Does Not Authorize the President to Impose Tariffs

"'Statutory construction must begin with the language employed by Congress.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). Here, IEEPA says nothing about tariffs, much less does it allow the President to rewrite the Nation's tariff policy. 50 U.S.C. § 1702(a). IEEPA grants the President multiple powers if he declares an emergency with respect to an "unusual and extraordinary threat," but none of them is the power to impose tariffs. *Id.* §§ 1701, 1702(a).

#### 1. IEEPA Does Not Mention Tariffs

The words "tariff," "duty," and any like term do not appear among the President's authorities under IEEPA. 50 U.S.C. § 1702. Indeed, it is notable how many *other* presidential actions the statute specifically authorizes. The President may (1) "investigate," (2) "regulate," or (3) "prohibit" "transactions in foreign exchange." *Id.* § 1702(a)(1)(A)(i). He may (4) "investigate," (5) "block during the pendency of an investigation," (6) "regulate," (7) "direct and compel," (8) "void," or (9) "prevent or prohibit" "importation . . . of . . . any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B). None of these actions refers to

tariffs. The only permissible conclusion from IEEPA's silence as to tariff authority is that such authority was not granted by Congress. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Congress could have authorized the President to adjust tariffs through IEEPA—as it has done in many other statutes. *See generally* Title 19, U.S. Code–Customs Duties. Reading these statutes *in pari materia* further shows that IEEPA does not grant the President any tariff authority. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 252 (2012). For example, Congress has authorized the President to adjust the "duties fixed in this [tariff] act" to the extent they "do not equalize" production costs. Tariff Act of 1922, ch. 356, § 315, 42 Stat. 858, 941. The Tariff Act of 1930 authorized the President to "declare new or additional duties" upon a finding that foreign countries are discriminating against American products. 19 U.S.C. § 1338(a). And Section 301 of the Trade Act of 1974 authorizes the U.S. Trade Representative to "impose duties" on foreign countries that violate trade agreements or have trade practices that are otherwise unfair toward the United States. 19 U.S.C. § 2411(c)(1)(B). This extensive and detailed set of statutes governing trade makes the absence of any mention of tariffs in IEEPA even more conspicuous and confirms the conclusion that its silence means tariff authority was withheld. *See Whitman*, 531 U.S. at 468. Indeed, courts "'do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply.'" *Biden v. Texas*, 597 U.S. 785, 803 (2022) (citation omitted).

### 2.   An Authorization to "Regulate" Specific Transactions and Property Does Not Include the Power to Impose Tariffs

The government will likely argue that the authorization to "regulate . . . importation" is sufficient to authorize tariffs. But the word "regulate" cannot sustain this meaning for three reasons.

First, in 1977 when IEEPA was enacted, "regulate" did not mean to impose tariffs or taxes. Words must be given "their ordinary, contemporary, common meaning, absent an indication Congress intended" otherwise. *United States v. Am. Home Assurance Co.*, 789 F.3d 1313, 1325 (Fed. Cir. 2015) (cleaned up). The Fourth Edition of Black's Law Dictionary published in 1968 defined "regulate" to mean "[t]o fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws." *Regulate*, Black's Law Dictionary 1451 (4th ed. 1968). That meaning has not changed. *See Regulate*, Webster's Third Int'l Dictionary of the English Language Unabridged 1914 (1961) ("1: to govern or direct according to rule; to bring under the control of law or constituted authority; to make regulations for or concerning"); *Regulate*, Oxford English Dictionary (2009), *available at* https://tinyurl.com/bddwpbr5 ("To control, govern, or direct, esp. by means of regulations or restrictions; . . . To control, modify, or adjust with reference to some principle, standard, or norm; to alter in response to a situation, set of circumstances, etc."); *Regulate*, Black's Law Dictionary (12th ed. 2024) ("1. To control (an activity or process) esp. through the implementation of rules."). Therefore, to conclude that these definitions incorporate the distinct authority to impose a tariff would be to

enlarge the scope of the word "regulate" beyond its "common meaning." *Am. Home Assurance Co.*, 789 F.3d at 1325 (citation omitted).

Second, and similarly, the Constitution treats the power to regulate foreign commerce (U.S. Const. art. I, § 8, cl. 3) as distinct from the power to impose tariffs and other taxes (*id.* cl. 1). The Supreme Court has long recognized that the power to impose taxes and tariffs and the power to regulate commerce are "substantive, and distinct from each other." *Gibbons v. Ogden*, 22 U.S. 1, 201 (1824). Thus, when Congress authorizes the Executive Branch to "regulate" imports, it cannot be assumed that Congress intended this power to include tariffs—especially, as explained above, because Congress itself has separately authorized the executive to adjust tariffs in distinct statutes.

Third, "regulate" must be read in its "context and with a view to [its] place in the overall statutory scheme." *Brown & Williamson*, 529 U.S. at 133 (citation omitted). IEEPA deals with sanctions necessitated by emergent and distinct threats, not the enactment of broad trade reforms. IEEPA's means of direct control are economically distinct from tariffs, and IEEPA's powers are better suited for regulating or prohibiting certain transactions and property. *See* Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 LA. L. REV. 595, 599–605 (2023). Notably, the power to "regulate" is granted alongside the powers to "investigate, block during the pendency of an investigation," "direct and compel, nullify, void, [and] prevent or prohibit." 50 U.S.C. § 1702(a)(1)(B). All these words contemplate narrow direct control over foreign "property" or transactions that are covered by the statute. *Id.* Lastly, IEEPA exempts from

presidential control communications, "information or informational materials," dona-
tions, and "transactions ordinarily incident to travel," 50 U.S.C. § 1702(b)—items
that would not be subject to tariffs in the first place. These exemptions thus confirm
the statute's limited application.

### B.    History Confirms That IEEPA Does Not Authorize Tariffs

"The historical context in which the provision was adopted confirms the plain
import of its text." *Biden*, 597 U.S. at 804. The authorization of presidential control
of foreign transactions was first enacted in 1917 in TWEA and limited to times of
war. *Compare* 50 U.S.C. § 1702(a) *with* Pub. L. No. 65-91 § 5(b), 40 Stat. 411, 415
(Oct. 6, 1917). The language authorizing the President to invoke TWEA during na-
tional emergencies and to "regulate . . . importation" were added in 1933 and 1941,
respectively. Pub. L. No. 13-1, Tit. 1, § 2; Pub. L. No. 354 § 301, 55 Stat. 838, 839
(Dec. 18, 1941). But, with one exception discussed next, TWEA was not used for tar-
iffs. Similarly, IEEPA was not used (until now) to impose tariffs. Casey & Elsea, *su-
pra*, at 15–23. This "want of assertion of power by those who presumably would be
alert to exercise it" for over 100 years is "significant in determining whether such
power was actually conferred." *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941).

As noted, there was one exception—President Nixon's imposition of a tempo-
rary 10% ad valorem tariff, purported to address a balance-of-payments problem.
President Nixon cited as authority the Tariff Act of 1930 and the Trade Expansion
Act of 1962. *See* Proclamation No. 4074, 36 Fed. Reg. 15,724. When this tariff was
challenged, the government pointed to TWEA, and the predecessor court to the Fed-
eral Circuit upheld the President's action. *See Yoshida*, 526 F.2d at 572–73, 584.

According to the court, the delegation in TWEA, allowing the President to "regulate . . . importation," was "broad indeed"—in no small part because TWEA authorized the President himself to unilaterally "define 'any or all' of the terms" in the statute. *Id.* at 573 (quoting 50 U.S.C. App. § 5(b)(3)). The court then assumed, without carefully analyzing, that because Congress *could* use tariffs as a regulatory tool, Congress must have given that policy question to the President. *Id.* at 574–75 & n.20. In any event, the court concluded that the constitutionality of this delegation turned on, *inter alia*, the "nature" of the tariff. *Id.* at 577. And, according to the court, President Nixon's tariff was narrow; it was "limited to articles which had been the subject of prior tariff concessions," often resulting in a return to previously established tariff rates. *Id.* Where no concession had been granted, "congressionally established rates remained untouched," as did any goods not subject to tariffs. *Id.* The court noted that by upholding the Nixon tariff, it did not "approve in advance any future surcharge of a different nature, or any surcharge differently applied or any surcharge not reasonably related to the emergency declared." *Id.* And the court underscored that the "declaration of a national emergency is not a talisman enabling the President *to rewrite the tariff schedules*, as it was *not in this case*." *Id.* at 583 (emphasis added). Thus, *Yoshida* does not control here, in which the President *has* rewritten the Nation's tariff schedules.

Congress's actions since *Yoshida* further confirms that President Nixon's action was an aberration that should not be given any precedent. Indeed, President Nixon himself recognized the problem. At his request, Congress passed and he signed

the Trade Act of 1974, which authorizes the President to address balance-of-pay-ments issues, to impose "a temporary import surcharge . . . in the form of duties," no higher than 15% and limited to 150 days. Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987–89 (1975), *codified at* 19 U.S.C. § 2132. This law effectively ratified President Nixon's actions. *See Yoshida*, 526 F.2d at 582 n.33.

But that's not all Congress did in response to presidential abuse of emergency powers. Notably, in IEEPA Congress eliminated the President's authority to define "any or all" the statutory terms, 50 U.S.C. § 1702, a relic from TWEA that *Yoshida* relied on, 526 F.2d at 573.[5] And Congress has repeatedly demonstrated that it views IEEPA as an economic-sanctions statute not a tariff statute.[6] Given these significant changes to IEEPA and the subsequent actions of Congress, this Court should conduct a fresh analysis of whether IEEPA authorizes tariffs.

---

[5] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024), reinforces the changed circumstances since *Yoshida* because not only can the President not define his own terms, but the "court must exercise independent judgment in determining the mean-ing of statutory provisions."

[6] Since IEEPA was adopted, Congress has authorized the President to use the law's authorities in non-emergency situations. Casey & Elsea, *supra*, at 23. In 1986, for example, Congress cross-referenced the presidential authorities in IEEPA "to assist the Government of Haiti in its efforts to recover" "assets" allegedly stolen by members of a former regime. Pub. L. No. 99-529, § 204, 100 Stat. 3010 (Oct. 24, 1986). In 2018, Congress directed the President to use IEEPA "to block and prohibit" all property transactions of those the President determined supported human rights violations, the undermining of democratic processes and press outlets, and corruption in Nica-ragua. Nicaragua Human Rights and Anticorruption Act of 2018, Pub. L. No. 115-335, § 5, 132 Stat. 5019 (Dec. 20, 2018). Indeed, authorizing the President to impose economic sanctions through IEEPA is a decades-long practice of Congress. Casey & Elsea, *supra*, at 23–24 (compiling statutes).

### C.  The Major Questions Doctrine Forecloses the President's Reliance on IEEPA

This is a major questions case. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). The major questions doctrine applies in "cases in which the 'history and the breadth of the authority . . . asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *Id.* at 721. The breadth, novelty, and significance of the tariffs imposed pursuant to IEEPA is the kind of "extravagant statutory power over the national economy" that courts "typically greet" with "skepticism." *Id.* at 724. Therefore, the government must point to "'clear congressional authorization'" for the asserted power. *Id.* at 732 (quoting *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (*UARG*)). As discussed throughout, it cannot do so.

***First***, the President's claimed power "represent[s] a transformative expansion in [the government's] regulatory authority." *West Virginia*, 597 U.S. at 724 (quoting *UARG*, 573 U.S. at 324). By simply declaring an emergency, he claims plenary authority under an economic-sanctions statute to apply tariffs on any goods from any country. *See* 90 Fed. Reg. 11,463; 90 Fed. Reg. 15,041. Once an emergency is declared, the President claims, he may "regulate . . . importation" as he sees fit. 50 U.S.C. § 1702(a)(1)(B). In his April 2, 2025, Executive Order, the President asserted that his global tariffs were intended to preserve the "future of American competitiveness" by reversing declines in manufacturing capacity and jobs. 90 Fed. Reg. at 15,044. On April 5, the President declared that his new tariffs would bring about an "economic

revolution."[7] At least if IEEPA is limited to economic sanctions—as it has been for over 50 years—inherent limitations would cabin the scope of the President's emergency authority. But if that authority includes tariffs and the regulation of all foreign commerce, it includes the ability for the President to remake the entire economy. *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 759–60 (2021) ("It would be one thing if Congress had specifically authorized the action that the CDC has taken. But that has not happened.").

**Second**, tariff policy is an important topic within the Legislature's sole domain. *See* U.S. Const. art. I, § 8, cl. 1. Indeed, the question of taxes has been considered a legislative prerogative since at least the time of Magna Carta. The Constitution requires not only that Congress must make such decisions, but also that revenue-raising bills must originate in the House of Representatives. U.S. Const. art. I, § 7, cl. 1; *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 428–31 (2024). And Congress has given the President certain tariff authorities through the *trade* laws—not through IEEPA. *See* Title 19, U.S. Code. Congress's marked choices cannot be ignored. *Cf. West Virginia*, 597 U.S. at 724 (noting Congress's repeated failures to enact EPA's regulatory policy).

**Third**, trade policy, and tariffs in particular, remains a "subject of an earnest and profound debate across the country." *Id.* at 732 (citation omitted). Discussions of trade wars and economic protectionism have dominated the headlines over the past

---

[7] @realDonaldTrump, Truth Social (Apr. 5, 2025, 8:34 AM), https://tinyurl.com/3kbmsazv.

several years. This broad debate further reveals the political nature of this important question of *policy*.

**Fourth**, and relatedly, the new tariff policy "effected a fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind." *West Virginia*, 597 U.S. at 728 (cleaned up). Under the President's interpretation of IEEPA, so long as he declares an emergency, he may rewrite the Nation's tariff laws—raising tariffs on products from all over the world, temporarily pausing those tariffs, and changing them at his whim. This power is a far cry from the targeted sanctioning envisioned by IEEPA.

**Fifth**, the President has "no comparative expertise" in making policy judgments about tariff policy. *West Virginia*, 597 U.S. at 729 (citation omitted). The long tradition of tariffs falling within Congress's authority demonstrates *Congress's* comparative expertise. The President may have a role—if Congress has clearly provided for it.

**Finally**, the President's tariffs, intending to bring about, among other things, an "economic revolution," is an action of tremendous "economic and political significance." *Id.* at 730. Just the tariffs ordered on April 2—the 10% global tariff and the presently suspended discounted reciprocal tariffs—is supposed to raise $1.4 trillion in revenue over 10 years. *Where We Stand: The Fiscal, Economic, and Distributional Effects of All U.S. Tariffs Enacted in 2025 Through April 2*, The Budget Lab at Yale (Apr. 2, 2025).[8] All the tariffs, including tariffs on cars, steel, and aluminum imposed

---

[8] https://tinyurl.com/4bswe556.

pursuant to non-IEEPA statutes—would generate $3.1 trillion in revenue over 10 years. *Id.* Significant economic effects from the tariffs are already being felt, and these effects are expected to continue. In the first quarter of 2024, the gross domestic product contracted at an annual rate of 0.3% in conjunction with a massive increase in imports before the tariffs went into effect. Harriet Torry, *U.S. Economy Shrank in First Quarter as Imports Surged Ahead of Tariffs*, WALL ST. J. (Apr. 30, 2025).[9] Going forward, consumer prices are expected to increase by 1.3% if all the April 2 tariffs go into effect, and by 2.3% if all the tariffs, including the non-IEEPA tariffs, go into effect. *Where We Stand*, *supra*. This is as significant, if not more significant, than any of the executive actions to which the Supreme Court has applied the major questions doctrine so far. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) (approximately $500 billion in student debt cancellation); *West Virginia*, 597 U.S. at 730 ("EPA dictating the optimal mix of energy sources nationwide."); *Ala. Ass'n of Realtors*, 594 U.S. at 764 (CDC eviction moratorium).

Accordingly, because this is a major questions case, the President's use of IEEPA to impose worldwide tariffs must be invalidated unless the government can point to "'clear congressional authorization.'" *West Virginia*, 597 U.S. at 732 (quoting *UARG*, 573 U.S. at 324). It cannot do so. Instead, the government must rely on IEEPA's authorization to "regulate" "importation." But "regulate" cannot bear the extraordinary weight that the government places on it to authorize the tariffs. Even if "regulate" provides a "colorable textual basis" for the imposition of tariffs,

---

[9] https://tinyurl.com/yzkkde74.

"[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' [or] 'vague terms.'" *Id.* at 722–23 (citation omitted). In *West Virginia*, the Court rejected an attempt by the EPA to argue that the phrase "system of emission reduction" authorized not just the regulation of emission reduction technologies, as the phrase had long been understood, but to also authorize a cap-and-trade system for carbon emissions. *Id.* at 724–28. The Court recognized it was a "definitional possibilit[y]" that "system" could refer to a cap-and-trade system, but only if the word was treated like "an empty vessel;" that was "not close to the sort of clear authorization" required. *Id.* at 732.

The President treats the phase "regulate . . . importation" in much the same way here. Even if it is a definitional possibility that "regulate" could include the power to tariff, which Plaintiffs do not concede, it certainly does not clearly authorize tariffs *as used in IEEPA*. The history and usage of IEEPA, its predecessor statute TWEA, Congress's post-enactment use of IEEPA, and the separate congressional authorization of tariffs to address balance-of-payments problems, *see supra* Part I.B, all confirm that "it is not plausible that Congress gave" the President *Congress's* constitutionally assigned power to unilaterally set U.S. trade policy, *West Virginia*, 597 U.S. at 735. IEEPA's "vague statutory grant is not close to the sort of clear authorization required by" the Supreme Court. *Id.* at 732.

## II. THE EMERGENCY DECLARATIONS DO NOT ADDRESS ANY "UNUSUAL AND EXTRAORDINARY THREAT" AND, THEREFORE, THE PRESIDENT'S ASSUMPTION OF POWER EXCEEDS THE PRESIDENT'S AUTHORITIES UNDER IEEPA

IEEPA limits the use of its authorities by the President "to deal[ing] with any unusual and extraordinary threat, which has its source in whole or substantial part

outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). The statute emphasizes that the powers authorized in IEEPA may be used "*only . . . to deal with an unusual and extraordinary* threat with respect to which a national emergency has been declared for purposes of this chapter and may *not* be exercised *for any other purpose.*" *Id.* § 1701(b) (emphasis added); *compare Yoshida*, 526 F.2d at 581 n.32 (noting that Congress had not, at that time, either defined or conditioned an "emergency"), *with* IEEPA, 50 U.S.C. § 1701(b) (authorizing action *only* for emergencies that "deal with an unusual and extraordinary threat"). None of the declared "emergencies" on which the President has relied have anything to do with "unusual and extraordinary threat[s]."

The "emergency" declared in February was based on the "sustained influx of synthetic opioids" from China and the failure of "multiple attempts" at "bilateral dialogue" with the Chinese government to "resolve this crisis at its root source." Exec. Order No. 14195, 90 Fed. Reg. at 9121–22. Similarly, the "emergency" declared in April was based on "underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption," "indicated by large and persistent annual U.S. goods trade deficits[.]" Exec. Order No. 14257, 90 Fed. Reg. at 15,041. Here, the President observed that "U.S. Trade policy has been organized around the principle of reciprocity" "[f]or decades." *Id.*

Thus, the declarations themselves identify "sustained" and "persistent" "policy" questions—not "unusual and extraordinary threats."

Indeed, even if an influx of opioids or the lack of reciprocity in trade relationships or trade deficits are in fact "threats," their "sustained" and "persistent" nature necessarily means that these "threats" are neither *unusual*—i.e., "uncommon, not usual, rare"[10]—nor *extraordinary*—i.e., "[o]ut of the ordinary; . . . remarkable; uncommon; rare."[11] The President himself noted that the goods trade deficits have long been a "feature of the global trading system." 90 Fed. Reg. at 15,042. As the House report on IEEPA confirms, a "national emergency should not be a normal state of affairs." H.R. Rep. No. 95-459, at 65 (1977); *cf. id.* ("[E]mergencies are by their nature rare and brief, and are not to be equated with normal ongoing problems."); *see also Yoshida*, 526 F.2d at 582 (Emergencies "are expected to be shortlived.") (footnote omitted). More so, by necessity, an emergency with respect to an "unusual and extraordinary threat." Here, there is no indication that the President's new tariff policies are to be shortlived. They are, based on the President's own admissions, of indefinite and unpredictable duration.

---

[10] *See Unusual*, Black's Law Dictionary 1708 (4th Rev. ed. 1968) ("Uncommon; not usual, rare"); *Unusual*, Black's Law Dictionary 1708 (5th ed. 1979) (same).

[11] *See Extraordinary*, Black's Law Dictionary 699 (4th Rev. ed. 1968) ("Out of the ordinary; exceeding the usual, average, or normal measure or degree; beyond or out of the common order or rule; not usual, regular, or of a customary kind; remarkable; uncommon; rare. . . . Beyond or out of the common order or method; exceeding the ordinary degree; not ordinary; unusual; employed for an exceptional purpose or on a special occasion"); *Extraordinary*, *Black's Law Dictionary* 527 (5th ed. 1979) (same).

### III.  IEEPA IS AN UNCONSTITUTIONAL TRANSFER OF LEGISLATIVE POWER

IEEPA delegates a massive amount of power to the President, far more than the Supreme Court has previously struck down as unconstitutional. Consequently, even if the Court finds that IEEPA authorizes the President to impose tariffs, the challenged actions are unlawful because the statute transfers legislative power to the President in violation of the Constitution, which vests in Congress "all legislative Powers herein granted." U.S. Const. art. I, § 1. First among those is the power to lay taxes, duties, imposts, and excises. *Id.* § 8, cl. 1. The Supreme Court has made clear that the Constitution "permits no delegation of those [legislative] powers." *Whitman*, 531 U.S. at 472.[12]

Chief Justice John Marshall identified the crux of the inquiry early in the Nation's history, explaining that to "determine the character of the power" granted to another branch—i.e., whether it is legislative, and therefore nondelegable—"we must inquire into its extent." *Wayman v. Southard*, 23 U.S. 1, 43 (1825) (observing also that "important subjects" "must be entirely regulate by the legislature itself").

The Supreme Court's modern nondelegation doctrine generally asks whether Congress has provided an "intelligible principle to which the person or body authorized" to act "is directed to conform[.]" *J.W. Hampton, Jr., Co. v. United States*, 276

---

[12] Regardless of any government arguments about the justiciability of challenges to the President's determinations, there can be no question that the Court has the power to consider and rule on the meaning and constitutionality of IEEPA itself. *See Ludecke v. Watkins*, 335 U.S. 160, 164, 171 (1948) (noting the Alien Enemies Act "confers on the president very great powers . . . as unlimited as the legislature could make it," but "resorts to the courts may be had . . . to challenge the construction and validity of the statute" nevertheless).

U.S. 394, 409 (1928) (upholding statutory provision). "Though worded broadly, the test rested on a narrow foundation." *Dep't of Transp. v. Ass'n of Amer. R.R.s*, 575 U.S. 43, 78 (2015) (Thomas, J., concurring) (explaining that the Supreme Court's decisions up to and including *J.W. Hampton* upheld contingent statutes requiring the President to make factual determinations).

At a minimum, a statute must set forth standards "sufficiently definite and precise to enable Congress, the courts and the public to ascertain whether the [executive branch] . . . has conformed to those standards." *Yakus v. United States*, 321 U.S. 414, 427 (1944) (upholding against a non-delegation challenge a "temporary wartime measure" establishing "a comprehensive scheme for the promulgation . . . of regulations or orders fixing . . . maximum prices of commodities and rents").

## A.   IEEPA Provides No Intelligible Principle Guiding the President's Exercise of Its Power

IEEPA violates the non-delegation doctrine because it authorizes the President to exercise legislative power while providing no principle—much less an intelligible principle—to "guide the [President's] use of discretion." *Gundy v. United States*, 588 U.S. 128, 132, 135 (2019).[13]

As Chief Justice Marshall explained in *Wayman*, the character of the power granted is determined by its scope. And the government has conceded and insisted, time and again, that the scope of power conferred by IEEPA is vast. IEEPA authorizes

---

[13] Plaintiffs believe IEEPA cannot survive a non-delegation challenge under the Supreme Court and Federal Circuit's intelligible-principle precedents. If this Court or an appellate court concludes otherwise, however, Plaintiffs reserve the right to argue that such decisions should be reconsidered.

the President to, among other things, "investigate, regulate, or prohibit" "*any* trans-actions in foreign exchange," bank transfers "involv[ing] *any* interest of *any* foreign country or national[,]" "by *any* person, or with respect to *any* property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(A) (emphasis added). It also allows the President to investigate, block, regulate, direct, compel, nullify, void, pre-vent, or prohibit "*any* acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising *any* right, power, or privilege with respect to, or transactions involving, *any* property in which *any* foreign country or a national thereof has *any* interest by *any* person, or with re-spect to *any* property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B) (emphasis added). And, under the government's reading, it *also* au-thorizes the President to impose broad-based tariffs on imports from nearly every country in the world.

The government has repeatedly asserted that the President's discretion in ex-ercising those legislative powers is unfettered, trumpeting it as a feature, not a bug. Less than a year ago, for example, the government asserted that IEEPA "sets forth *no standards* from which the Court could judge the President's selection of designa-tion criteria [for sanctioned individuals] or determine whether specific criteria effec-tively address an unusual and extraordinary threat to the United States' interests." Mem. in Supp. of Defs.' Mot. to Dismiss at 13, ECF No. 15-1, *Vassiliades v. Blinken*, No. 1:24-cv-01952, (Sept. 17, 2024) (emphasis added). The government went on: "Con-gress did not define the terms 'national emergency' or 'deal with,' nor impose any

conditions or restrictions in IEEPA that would limit the President's authority to de-
cide the circumstances in which individuals' property and interests in property
should be blocked pursuant to a national emergency." *Id.* at 19.

Plaintiffs could hardly have made the point better themselves. If there are no
standards a Court can apply to the President's actions, there are no standards guid-
ing the President's actions, much less "sufficiently definite and precise" standards "to
enable Congress, the courts and the public to ascertain whether the" President has
conformed to the law. *Yakus*, 321 U.S. at 427.

Rather, IEEPA asks the President to exercise a delegation as unguided as (if
not more unguided than) those that have been rejected by the Supreme Court. In
*Panama Refining v. Ryan*, the Court struck down a provision of the National Indus-
trial Recovery Act that authorized the President to prohibit the transportation of pe-
troleum products in excess of an amount permitted by any state law or regulation.
293 U.S. 388, 406 (1935). The Court was clear about the problem. The law:

> establishes no criterion to govern the President's course. It does not re-
> quire any finding by the President as a condition of his action. The Con-
> gress . . . thus declares no policy as to the transportation of the excess
> production. So far as this section is concerned, it gives to the President
> an unlimited authority to determine the policy and to lay down the pro-
> hibition, or not to lay it down, as he may see fit.

*Id.* at 415. The Court observed that other parts of the law declared a "general policy"
"to remove obstructions to the free flow of interstate and foreign commerce" and spoke
"in general terms of the conservation of natural resources, but it prescribe[d] no policy
for the achievement of that end." *Id.* at 418. Consequently, "[a]mong the numerous
and diverse objectives broadly stated, the President was not required to choose. . . .

The Congress left the matter to the President without standard or rule, to be dealt with as he pleased." *Id.* By contrast with even the unconstitutional statute in *Panama Refining*, IEEPA provides *no* general policy or objectives from which the President may choose, rendering it even more clearly an unconstitutional delegation.

IEEPA also provides less in the way of guidance or constraint than the statute struck down in *A.L.A. Schechter Poultry Corp. v. United States*, which held unconstitutional a law that "[i]nstead of prescribing rules of conduct" "authorize[d] the making of codes to prescribe them[,]" providing "no standards" to guide the President's "virtually unfettered" discretion. 295 U.S. 495, 541–42 (1935). But even that law, unlike IEEPA, articulated a vague policy that the President was required to find was effectuated by a given code of competition. *Id.* at 538.

The government will no doubt point to cases that have upheld narrower exercises of IEEPA powers against non-delegation challenges. But courts must review the statute's delegation, not the President's (previously) limited use of it. *See Whitman*, 531 U.S. at 472. *Yoshida*, discussed *supra*, rejected a non-delegation challenge to IEEPA's predecessor because it found an intelligible principle "in the express limitations that" TWEA would be operative only during a war or declared national emergency. 526 F.2d at 581. The court apparently read TWEA in such a way that Congress "remain[ed] the ultimate decision maker and the fundamental reservoir of power to regulate commerce" and could "of course, recall or limit the delegated emergency power at any time." *Id.* at 582.

In its brief opposing the motion for summary judgment in *V.O.S. Selections*, the government attempts to apply the *Yoshida* court's perceived TWEA limitation to IEEPA, stating that it is operative only during declared "national emergencies, which inherently preclude prior prescription of specific detailed guidelines," and "[t]he need for prompt action, another essential feature of a national emergency, precludes the otherwise oft-provided requirement for prior hearings, extensive fact finding, Tariff Commission reports to the President, and the like." Defs.' Resp. in Opp'n to Mot. for Prelim. Injunction and Summ. J., *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066, Doc. 32 at 31 (Ct. Int'l Trade, Apr. 29, 2025) (quoting 536 F.2d at 581–82).

But those characterizations apply to the ordinary meaning of an "emergency," not the substance-less statutory term of art that results from the NEA's framework, which courts have held renders national emergency declarations mere magic words, without judicially reviewable substance. *See, e.g.*, *Ctr. for Bio. Diversity v. Trump*, 453 F. Supp. 3d 11, 32 (D.D.C. 2020) (stating that the NEA "simply allows the President to declare an emergency to activate special emergency powers created by Congress. Nothing else guides how the President should make this decision."). Accordingly, even if *Yoshida* was correct about TWEA when it was decided—before the enactment of the NEA framework—if the government is now correct that those "express limitations" are nonjusticiable, they can hardly be relied on as statutory constraint on presidential power.[14]

_____

[14] Indeed, the *Yoshida* court's apparent understanding of the judicial review available for actions taken pursuant to TWEA is in marked contrast to the judiciary's

And even if the government accurately describes Congress's intent to "guard" against non-delegation concerns when IEEPA was enacted in 1977 by imposing procedural requirements with respect to Congress, the meaningfulness of such provisions was largely eviscerated by the later amendment of the NEA to require a joint resolution—which must be signed by the President or passed by each chamber by a two-thirds vote to be enacted—to terminate a national emergency declaration. *See supra* n. 1.[15] Accordingly, Congress has no more "positioned itself" to police the President's exercise of IEEPA authorities than it has for any other statute authorizing the President to exercise discretion.

### B. The President's IEEPA Powers Stand in Marked Contrast to the Conditional Powers the Supreme Court has Upheld

The Supreme Court has never approved of a delegation of Congress's foreign commerce or tariff power as broad as that claimed by the President here.

In *J.W. Hampton*, for example, the statute under review required the President to modify import classifications and rates of duty (capped at 50%) if, after investigation, the President determined that the statutory duties did not equalize the differences in costs of production in the United States and the principal competing country.

---

current approach to review under IEEPA. *Compare Yoshida*, 526 F.2d at 578 (suggesting that court could review "the extent to which the action taken bears a reasonable relation to the power delegated and to the emergency giving rise to the action"), *with, e.g., Deripaska v. Yellen*, No. 21-5157, 2022 WL 986220, at *2 (D.C. Cir. Mar. 29, 2022) (finding that IEEPA sanctions orders did not "require[ ] a showing of how the particular sanction bears on the declared emergency" because they "reflect[ed] the President's judgment that the covered actions contribute to the situation in Ukraine").

[15] *See also United States v. Rock Royal Co-op*, 307 U.S. 533, 576 (1939) ("[P]rocedural safeguards cannot validate an unconstitutional delegation" they can only "furnish protection against an arbitrary use of properly delegated authority").

276 U.S. at 401–02. It directed the President to take multiple factors into consideration, including differences in specified production conditions and advantages granted to foreign producers. *Id.*[16]

The Court held that Congress "describe[ed] with clearness what its policy and plan was, and then authoriz[ed] a member of the executive branch to carry out its policy and plan and to find the changing difference from time to time and to make the adjustments necessary to conform the duties to the standard underlying that policy and plan." *Id.* at 405. As Justice Gorsuch has observed, the "President's fact-finding responsibility may have required intricate calculations, but it could be argued that Congress had made all the relevant policy decisions, and the Court's reference to an 'intelligible principle' was just another way to describe the traditional rule that Congress may leave the executive the responsibility to find facts and fill up details." *Gundy*, 588 U.S. at 163 (Gorsuch, J., dissenting).[17]

---

[16] The full list was:

> (1) the differences in conditions in production, including wages, costs of material, and other items in costs of production of such or similar articles in the United States and in competing foreign countries; (2) the differences in the wholesale selling prices of domestic and foreign articles in the principal markets of the United States; (3) advantages granted to a foreign producer by a foreign government, or by a person, partnership, corporation, or association in a foreign country; and (4) any other advantages or disadvantages in competition.

*Id.*

[17] The statute's provisions were indeed quite specific. In addition to limiting the increase or decrease of any duty to 50% of the rates provided in the statute, the law provided that "'[i]nvestigations to assist the President in ascertaining differences in costs of production under this section shall be made by the United States Tariff Commission, and no proclamation shall be issued under this section until such

And in *Marshall Field & Co v. Clark*, the Court considered a statute that required the president to suspend the law's duty-free treatment of certain specified products, and impose a statutorily-specified duty on those imports, if he found that a foreign country "imposes duties or other exactions upon . . . products of the United States, which . . . he may deem to be reciprocally unequal and unreasonable[.]" 143 U.S. 649, 680 (1892). The Court reviewed the country's 100-year history of statutes authorizing the president to impose an embargo (or suspend an embargo or statutory duty) upon making certain statutorily required findings, characterizing such contingent statutes as "invest[ing] the president with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations." *Id.* at 691.

The Court nevertheless affirmed: "That congress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution." *Id.* at 692. The statute withstood challenge because "the suspension was absolutely required when the president ascertained the existence of a particular fact," and, accordingly, "it cannot be said that in ascertaining that fact, and in issuing his proclamation,

---

investigation shall have been made. The commission shall give reasonable public notice of its hearings and shall give reasonable opportunity to parties interested to be present, to produce evidence, and to be heard. The commission is authorized to adopt such reasonable procedure, rules, and regulations as it may deem necessary.'" 276 U.S. at 402 (quoting the statute). It *required* the President to modify or terminate the proclaimed duty rates when the production costs differences changed and made clear that the power conferred did not "authorize a transfer of an article from the dutiable list to the free list or from the free list to the dutiable list, nor a change in form of duty." *Id.* (quoting section 315 of title 6 of the Tariff Act of September 21, 1922).

in obedience to the legislative will, he exercised the function of making laws." *Id.* at 693. The Court explained that "[i]t was a part of the law itself, as it left the hands of congress, that the [duty] provisions, full and complete in themselves . . . should be suspended in a given contingency, and that in case of such suspension certain [statutorily-specified] duties should be imposed." *Id.* Indeed, *Marshall Field* favorably quoted an earlier case observing, "'[h]alf the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them.'" *Id.* at 694 (quoting *Moers v. City of Reading*, 21 Pa. 188, 202 (1853)).

But IEEPA is not such an if/then framework, providing for alternative actions contingent on specific events or fact-findings. It is, rather, a striking transfer of core legislative powers. And the exercise of those powers is neither cabined by process nor triggered by specific fact-findings.

The only superficially substantive restriction on the President's IEEPA powers is that they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared[.]" 50 U.S.C. § 1701(b). But the government has argued—and multiple courts have agreed—that the President's decision to declare a national emergency is discretionary and/or nonjusticiable. *See, e.g.*, Defs.' Resp. in Opp'n to Mot. for Prelim. Injunction and Summ. J., *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066, Doc. 32 at 33 (citing cases); *see also supra* 35 (quoting *Ctr. For Bio. Diversity v. Trump*, 453 F. Supp. 3d at 32). If that is correct, the President's exercise of legislative power is dependent only on his own

unreviewable opinions, and an opinion upholding IEEPA would be unprecedented among the Supreme Court's decisions.[18]

The government will likely point to *Fed. Energy Admin. v. Algonquin SNG, Inc.*, in which the Supreme Court briefly addressed a non-delegation challenge to Section 232 of the Trade Expansion Act, which provides that the President may "take such action, and for such time, as he deems necessary to adjust the imports of" articles that the Secretary of the Treasury—after investigation and consultation with the Secretary of Defense and others—reports are being imported in quantities or under circumstances that threaten or impair national security. 426 U.S. 548, 550 n.1 (1976). But the Court held that Section 232 "establishe[d] clear preconditions to Presidential action[,]" including the Treasury Secretary's finding that the imports present a national security threat as well as the "far from unbounded" leeway given to the President in deciding what action to take. *Id.* at 560. Perhaps of even greater importance to the delegation question was the statute's "articulation of standards to guide the President in making the decision whether to act" pursuant to the "limited authorization." *Id.* at 550 n.10.[19] As a result, the Court read Section 232 to "[a]rticulate[ ] a

---

[18] Even if the Court finds that § 1701's "unusual and extraordinary" requirement is justiciable but satisfied here, it does not function to constrain the President or provide a guiding intelligible principle. In addition to the points made with respect to the national emergencies declared here, *supra* Part II, every President since Jimmy Carter has found "the situation in Iran" that began in 1979 to be an "unusual and extraordinary threat" despite its persistence for nearly 50 years. See, most recently, Continuation of the National Emergency With Respect to Iran, 89 Fed. Reg. 87761 (Nov. 4, 2024).

[19] The statute's guiding standards were as follows:

series of specific factors to be considered by the President in exercising his authority"

under that statute. *Id.* at 559.  No such preconditions or standards are found in

IEEPA.

### C.    The Non-Delegation Analysis is Not Altered by Any Inherent Executive Power Because No Such Power to Impose Tariffs Exists.

As a result, IEEPA can survive a non-delegation challenge only if it authorizes

the President to use powers that the office inherently commands. *See United States*

*v. Mazurie*, 419 U.S. 544, 556–57 (1975) (stating that limits on delegation are "less

stringent in cases where the entity exercising the delegated authority itself possesses

---

For the purposes of this section, the Secretary and the President shall, in the light of the requirements of national security and without excluding other relevant factors, give consideration to domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth, and the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries and capacity of the United States to meet national security requirements. In the administration of this section, the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

*Algonquin*, 426 U.S. at 550 n.1 (quoting Section 232(b) of the Trade Expansion Act of 1962, 76 Stat. 877, *as amended by* Section 127(d) of the Trade Act of 1974, 88 Stat. 1993, 19 U.S.C. § 1862(b) (1970 ed., Supp. IV)).

independent authority over the subject matter"). Recognizing this, the government has asserted in other cases that the President has an independent authority to impose tariffs. *See, e.g.*, Defs.' Resp. in Opp'n to Mot. for Prelim. Injunction and Summ. J., *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066, Doc. 32 at 31–32. That is wrong.

Whatever the scope of the President's power to act in foreign affairs, it cannot include powers that have been explicitly vested in another branch. "[W]hether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *Zivotovsky v. Kerry*, 576 U.S. 1, 21 (2015); *see also id.* at 33 (Thomas, J., concurring in part and dissenting in part) (stating that the Constitution vests only "residual foreign affairs powers" in the President, i.e., those foreign affairs powers not explicitly given to Congress).

Finally, as described above, the national emergency declaration regime upon which IEEPA rests cannot, under the government's own logic, provide the basis for any inherent authority because a "national emergency" declaration is discretionary and nonjusticiable—mere magic words that allow for the invocation of legislative powers already transferred to the President (and unavailable for Congress to reclaim in the same way they were granted). *See* Defs.' Resp. in Opp'n to Mot. for Prelim. Injunction and Summ. J., *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066, Doc. 32 at 32–36. Under the government's reading, the President could declare a national emergency over a hangnail and courts could not second-guess the declaration, whether it was unusual or extraordinary, or the President's selected means of dealing with it. If that is correct, it is all the more critical that Congress limit the Executive

Branch's authority triggered by a declared "national emergency" and provide intelligible principles guiding the exercise and review of any such authority conferred. Congress did neither with IEEPA.

\* \* \*

In 2019, a U.S. Court of International Trade judge asked with respect to a different congressional conferral of trade authority: "If the delegation permitted by section 232, as now revealed, does not constitute excessive delegation in violation of the Constitution, what would?" *Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335, 1352 (Ct. Int'l Trade 2019) (Katzmann, J., dubitante). Respectfully, Plaintiffs believe that the actions challenged here in reliance on IEEPA provide the answer.

If IEEPA is upheld, "it would be idle to pretend that anything would be left of limitations upon the power of the Congress to delegate its lawmaking function." *Panama Refining*, 293 U.S. at 430. "Instead of performing its lawmaking function, the Congress could at will and as to such subjects as it chooses transfer that function to the President or other officer or to an administrative body." *Id.* And, as in 1935, the "question is not of the intrinsic importance of the particular statute before us, but of the constitutional processes of legislation which are an essential part of our system of government." *Id.* If any non-delegation limit still exists, this Court must hold that IEEPA crosses it by unconstitutionally transferring to the President legislative power vested in Congress by the people.

## CONCLUSION

Plaintiffs respectfully ask the Court to enter summary judgment in Plaintiffs' favor.


MAY 13, 2025                                    Respectfully submitted,


                                    /s/ Oliver J. Dunford
                                   OLIVER J. DUNFORD
                                   Pacific Legal Foundation
                                   4440 PGA Blvd., Suite 307
                                   Palm Beach Gardens, FL 33410
                                   (916) 503-9060
                                   ODunford@pacificlegal.org

                                   MOLLY E. NIXON
                                   JOSHUA M. ROBBINS
                                   ASHLEY TORKELSON LEVINE*
                                        *Application Pending
                                   Pacific Legal Foundation
                                   3100 Clarendon Boulevard, Suite 1000
                                   Arlington, VA 22201
                                   (202) 888-6881
                                   MNixon@pacificlegal.org
                                   JRobbins@pacificlegal.org
                                   ALevine@pacificlegal.org

                                   Attorneys for Plaintiffs
                                   Princess Awesome, LLC, et al.

## CERTIFICATE OF COMPLIANCE

Pursuant to U.S. Court of International Trade's Standard Chambers Procedures, undersigned counsel certifies this brief complies with the Court's type-volume limitation rules. This brief contains no more than 12,060 words. This brief also complies with all typeface and margin requirements.

Respectfully submitted,

*/s/ Oliver J. Dunford*
OLIVER J. DUNFORD

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PRINCESS AWESOME, LLC**, et al., <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES CUSTOMS AND BORDER PROTECTION**, et al., <br><br> Defendants. | COURT NO. 25-00078 |

### [PROPOSED] ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Plaintiffs' Motion for Summary Judgment. Having considered the Motion, it is hereby:

**ORDERED** that Plaintiffs' Motion is GRANTED.

Further, the Court hereby:

**DECLARES** that the Executive Orders purporting to impose tariffs pursuant to IEEPA, including but not limited to the tariffs first imposed by Executive Orders 14195 and 14257, and all resulting modifications to the Harmonized Tariff Schedule of the United States (HTSUS), are unlawful;

**ORDERS** that Defendants, United States Customs and Border Protection, Peter Flores, Department of Homeland Security, Kristi Noem, United States International Trade Commission, President Donald J. Trump, Executive Office of the President, and the United States of America, and other persons who are in active concert or participation with them, are hereby **PERMANENTLY ENJOINED** from implementing or enforcing the Executive Orders purporting to impose tariffs

- 46 -

pursuant to IEEPA, including but not limited to the tariffs first imposed by Executive Orders 14195 and 14257, and all resulting modifications to the HTSUS, as amended, and all rules, regulations, guidances, directives, or any other agency actions, that implement or enforce the Executive Orders;

**ORDERS** that the HTSUS Modifications be set aside; and

**ORDERS** that Defendants issue refunds, with interest, to Plaintiffs for all duties paid by Plaintiffs pursuant to the Executive Orders identified above and all implementations and enforcements thereof, and/or to compensate Plaintiffs for payments to sellers to cover the amount of the duties imposed pursuant to the Executive Orders identified above and all implementations and enforcements thereof.


DATED: _____    _____
          New York, NY    Judge