## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
           THE HONORABLE TIMOTHY M. REIF, JUDGE
           THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) | Court No. 25-00078 |
| v. ) ) ) | |
| UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

Civil Division
Federal Programs Branch

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
CATHERINE M. YANG
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 305-7568
sosun.bae@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
                THE HONORABLE TIMOTHY M. REIF, JUDGE
                THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) | Court No. 25-00078 |
| v. ) ) | |
| UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for summary judgment, defendants' response thereto, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion for summary judgment is DENIED, and it is further

ORDERED that judgment is entered in favor of defendants.

Dated:_____
      New York, New York                                     JUDGE

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF ARGUMENT.................................................................1

BACKGROUND ...................................................................................................................9

    A.   China Executive Orders..........................................................................................9

    B.   Reciprocal Tariff Executive Orders.......................................................................10

    C.   Plaintiffs Sue To Enjoin The Executive Orders .....................................................12

STANDARD OF REVIEW..................................................................................................12

ARGUMENT .....................................................................................................................13

   I.   IEEPA Constitutionally Authorizes The President To Impose Tariffs, Including The Tariffs Contested Here ...................................................................................................13

    A.   IEEPA Includes Tariff Authority .........................................................................13

    B.   B. IEEPA Is A Valid Delegation Of Congressional Authority...................................28

   II.   The National Emergency Is A Political Question And Valid If Subject To Review ........34

    A.   Whether A Threat Is "Unusual Or Extraordinary" Under IEEPA Is Nonjusticiable ....34

    B.   There Is A Reasonable Relationship Between The Emergency And The Tariffs Imposed.........................................................................................................................42

CONCLUSION..................................................................................................................47

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.L.A. Schecter Poultry Corp. v. United States,*
   295 U.S. 495 (1935) ..............................................................................32

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States,*
   751 F.2d 1239 (Fed. Cir. 1985) ...............................................................35

*Am. Inst. for Int'l Steel, Inc. v. United States,*
   806 F. App'x 982 (Fed. Cir. 2020) ..............................................................8

*Am. Power & Light Co. v. SEC,*
   329 U.S. 90 (1946) ............................................................................31, 33

*Baker v. Carr,*
   369 U.S. 186 (1962) ................................................................... 35, 37, 38

*Bd. of Trs. of Univ. of Ill. v. United States,*
   289 U.S. 48 (1933) ................................................................................14

*Beacon Prods. Corp. v. Reagan,*
   63 F.Supp. 1191 (D. Mass. 1986). ...........................................................40

*Biden v. Missouri,*
   595 U.S. 87 (2022) ................................................................................24

*Biden v. Nebraska,*
   600 U.S. 477 (2023) ..............................................................................28

*B-West Imports, Inc. v. United States,*
   75 F.3d 633 (Fed. Cir. 1996) ...................................................................20

*Canadian Wheat Bd. v. United States,*
   580 F.Supp.2d 1350 (Ct. Int'l Trade 2008) ...............................................13

*Chang v. United States,*
   859 F.2d 893 (Fed. Cir. 1988) .......................................................5, 34, 36

*Chevron U.S.A. Inc. v. NRDC,*
   467 U.S. 837 (1984) ..............................................................................19

*Ctr. for Biological Diversity v. Trump,*
   453 F.Supp.3d 11 (D.D.C. 2020) .............................................................34

*Dames & Moore v. Regan,*
   453 U.S. 654 (1981) ................................................................... 17, 18, 31

*Dep't of Navy v. Egan,*
    484 U.S. 518 (1988) ...........................................................................................23, 24

*Diegelmann v. Yellen,*
    2024 WL 4880468 (D.D.C. Nov. 25, 2024) .............................................................39

*El-Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) ...........................................................................36, 43

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) .................................................................................................25

*Fed. Energy Admin. v. Algonquin SNG, Inc.,*
    426 U.S. 548 (1976) ........................................................................................8, 15, 30

*Florsheim Shoe Co., Div. of Interco v. United States,*
    744 F.2d 787 (Fed. Cir. 1984) ...........................................................................passim

*Galvan v. Press,*
    347 U.S. 522 (1954) .................................................................................................27

*Georgia v. Public.Resource.Org,*
    590 U.S. 255 (2020) .................................................................................................18

*Gibbons v. Ogden,*
    22 U.S. 1 (1824).......................................................................................................14

*Gundy v. United States,*
    588 U.S. 128 (2019) ......................................................................................7, 28, 29

*Haig v. Agee,*
    453 U.S. 280 (1981) .................................................................................................32

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010).................................................................................................43, 44

*Humane Soc. of U.S. v. Clinton,*
    236 F.3d 1320 (Fed. Cir. 2001)...........................................................................21, 35

*INS v. Chadha,*
    462 U.S. 919 (1983) .................................................................................................38

*Japan Whaling Ass'n v. Am. Cetacean Soc.,*
    478 U.S. 221 (1986) ...........................................................................................36, 37

*Loper Bright Enterprises v. Raimundo,*
    603 U.S. 369 (2024) .................................................................................................19

*Lorillard v. Pons*,
434 U.S. 575 (1978) ...................................................................................17

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1984) ................................................... 13, 28, 35

*Marshall Field & Co v. Clark*,
143 U.S. 649 (1892) ..................................................................................28

*Martin v. Mott*,
25 U.S. 19 (1827) ......................................................................................38

*Mayes v. Biden*,
67 F.4th 921 (9th Cir. 2023) ....................................................................22

*MercExchange, LLC*,
547 U.S. 388 (2006) ..................................................................................46

*Michael Simon Design, Inc. v. United States*,
609 F.3d 1335 (Fed. Cir. 2010) ...............................................................43

*Mingus Constructors, Inc. v. United States*,
812 F.2d 1387 (Fed. Cir. 1987) ...............................................................12

*NFIB v. Dep't of Lab.*,
595 U.S. 109 (2022) ..................................................................................22

*Oceanic Steam Nav. Co. v. Stranahan*,
214 U.S. 320 (1909) ..................................................................................27

*Panama Refining v. Ryan*,
293 U.S. 388 (1935) ............................................................................32, 33

*People's Mojahedin Org. of Iran v. Dep't of State*,
182 F.3d 17 (D.C. Cir. 1999) ...................................................................36

*PrimeSource Bldg. Prods., Inc. v. United States*,
59 F.4th 1255 (Fed. Cir. 2023) ........................................... 8, 31, 36, 43

*Pulsifer v. United States*,
601 U.S. 124 (2024) ..................................................................................15

*Regan v. Wald*,
468 U.S. 222 (1984) ............................................................................17, 18

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) ..............................................................................5, 36

*Rucho v. Common Cause*,
    588 U.S. 684 (2019) ............................................................................................36

*S. Corp. v. United States*,
    690 F.2d 1368 (Fed. Cir. 1982) ..........................................................................14

*Sardino v. Fed. Res. Bank of New York*,
    361 F.2d 106 (2d Cir. 1966) ................................................................................38

*Sec. Pac. Nat. Bank v. Gov't & State of Iran*,
    513 F. Supp. 864 (C.D. Cal. 1981) ......................................................................18

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ............................................................................................22

*Silfab Solar v. United States*,
    892 F.3d 1340 (Fed. Cir. 2018) ..........................................................................28

*Totes-Isotoner Corp. v. United States*,
    594 F.3d 1346 (Fed. Cir. 2010) ..........................................................................12

*Touby v. United States*,
    500 U.S. 160 (1991) ............................................................................................33

*Transpacific Steel LLC v. United States*,
    4 F.4th 1306 (Fed. Cir. 2021) .......................................................... 8, 15, 30, 44

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ......................................................................................passim

*United States v. Amirnazmi*,
    645 F.3d 564 (3rd Cir. 2011) ........................................................................passim

*United States v. Arch Trading Co.*,
    987 F.2d 1087 (4th Cir. 1993) ........................................................................7, 29

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ........................................................................................5, 28

*United States v. Dhafir*,
    461 F.3d 211 (2d Cir. 2006) ........................................................... 7, 29, 30, 33

*United States v. Mirza*,
    454 F. App'x 249 (5th Cir. 2011) ..........................................................................7

*United States v. Shih*,
    73 F.4th 1077 (9th Cir. 2023) ......................................................................passim

*United States v. Spawr Optical Research, Inc.,*
    685 F.2d 1076 (9th Cir. 1982) ...............................................................43

*United States v. Yoshida Int'l, Inc.,*
    526 F.2d 560 (C.C.P.A. 1975) .........................................................passim

*USP Holdings, Inc. v. United States,*
    36 F.4th 1359 (Fed. Cir. 2022) ....................................................8, 36, 42

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) .............................................................................23

*West Virginia v. EPA,*
    597 U.S. 697 (2022) .......................................................................passim

*Winter v. NRDC,*
    555 U.S. 7 (2008) .................................................................................47

*Yakus v. United States,*
    321 U.S. 414 (1944) .............................................................................33

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) .............................................................................22

*Zemel v. Rusk,*
    381 U.S. 1 (1965) .................................................................................32

*Ziglar v. Abbasi,*
    582 U.S. 120 (2017) .............................................................................23

**Statutes**

8 U.S.C. §1182(f) .........................................................................25, 26

19 U.S.C. §1338 ................................................................................15

19 U.S.C. §1806(2) ............................................................................16

19 U.S.C. §1862(c) ............................................................................15

50 U.S.C. §1622 ...........................................................................38, 41

50 U.S.C. §1701 ....................................................................23, 30, 35

50 U.S.C. §1702 ..........................................................................passim

50 U.S.C. §4305(b)(1)(B) ...................................................................19

## Rules

USCIT Rule 56(a) ..................................................................................................12

USCIT Rule 56(f)(1) .............................................................................................13

## Executive Actions

Executive Order 13222,
  *Continuation of Export Control Regulations*,
  66 Fed. Reg. 44,025 (Aug. 22, 2001) ..........................................................41, 42

Executive Order 14193,
  *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*,
  90 Fed. Reg. 9,113 (Feb. 7, 2025) ...............................................................40, 45

Executive Order 14195,
  *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*,
  90 Fed. Reg. 9,121 (Feb. 7, 2025) .....................................................................10

Executive Order 14197,
  *Progress on the Situation at Our Northern Border*,
  90 Fed. Reg. 9,183 (Feb. 10, 2025) ...................................................................45

Executive Order 14198,
  *Progress on the Situation at Our Southern Border*,
  90 Fed. Reg. 9,185 (Feb. 10, 2025) ...................................................................45

Executive Order 14228,
  *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*,
  90 Fed. Reg. 11,463 (Mar. 7, 2025) .............................................................10, 45

Executive Order 14257,
  *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*,
  90 Fed. Reg. 15,041 (Apr. 7, 2025) .............................................................passim

Executive Order 14266,
  *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*,
  90 Fed. Reg. 15,625 (Apr. 15, 2025) ..................................................................11

Notice,
  *Continuation of the National Emergency with Respect to Export Control Regulations*,
  89 Fed. Reg. 66,187 (Aug. 15, 2024) ..................................................................41

Notice,
  *Continuation of the National Emergency with Respect to Iran*,
  89 Fed. Reg. 87,761 (Nov. 4, 2024) ....................................................................41

Notice,
  *Continuation of the National Emergency with Respect to Significant Narcotics Traffickers Centered in Colombia*,
  89 Fed. Reg. 83,417 (Oct. 15, 2024) ...................................................................................41

Proclamation 10886,
  *Declaring a National Emergency at the Southern Border of the United States*,
  90 Fed. Reg. 8,327 (Jan. 29, 2025) .......................................................................................9

 **Legislative Materials**
H.R. Rep. No. 95-459 (1977) ..................................................................................................17

H.R. Rep. No. 107-236 (2001) ...............................................................................................39

S. Rep. No. 93-1298 (1974).....................................................................................................19

S.J. Res. 37, 119th Cong. (2025) ......................................................................................39, 40

S.J. Res. 49, 119th Cong. (2025) ............................................................................................40

**Other Authorities**
*Economic Impact of Section 232 and 301 Tariffs on U.S. Industries*, Inv. No. 332-591, USITC
  Pub. No. 5405 (May 2023) ...................................................................................................44

*Exec. Power with Regard to the Libyan Situation*, 5 U.S. Op. Off. Legal Counsel 432 (1981) ...40

6 U.S. Op. Off. Legal Counsel 644 (1982)...............................................................................20

*Extraordinary*, Black's Law Dictionary (12th ed. 2024) ........................................................40

*Fact Sheet: U.S.–U.K. Reach Historic Trade Deal* (May 8, 2025),
  https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-u-s-uk-reach-historic-trade-deal/
  [https://perma.cc/7CPW-8CF2] ..........................................................................................45

Jeff Ferry, *Global 10% Tariffs on U.S. Imports Would Raise Incomes and Pay for Large Income
  Tax Cuts For Lower/Middle Class*, Coalition for a Prosperous America (July 24, 2024),
  https://prosperousamerica.org/global-10-tariffs-on-u-s- imports-would-raise-incomes-and-pay-
  for-large-income-tax-cuts-for-lower-middle-class/ [https://perma.cc/XUZ8-BG99]...............44

*Unusual*, Black's Law Dictionary (12th ed. 2024) ..................................................................40

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) | Court No. 25-00078 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION & SUMMARY OF ARGUMENT

The United States is today engaged in high-stakes negotiations, diplomacy, and

preparation on multiple precarious fronts around the globe.  In South Asia, the United States

tactfully brokered a ceasefire in an escalating confrontation between two nuclear powers, India

and Pakistan.  The United States is also navigating and addressing a range of extremely consequential threats from strategic acquisitions to naval drills to the export of deadly substances.  The success of the Nation, in these endeavors and into the future, is built off the dispatch and unitary nature of the executive, girded by necessary tools.

The International Emergency Economic Powers Act (IEEPA), and President Trump's tariff actions under that Act, is one of those critical tools.  The consequences of judicial intervention would be cascading and devastating, as declarations from four Cabinet Secretaries explain.  Courts lack the institutional competence and authority to interfere in these complex and delicate foreign affairs and national-security matters.  Given that the stakes are so high, only the President and his advisers have the expertise and information to properly and effectively protect the United States from foreign threats.  This Court should deny plaintiffs' summary-judgment motion and enter judgment in favor of defendants.

President Trump found two types of unusual-and-extraordinary threats to the United States's national security, economy, and foreign policy and declared national emergencies as to these threats.  The first emergency involved the flow of illicit drugs like fentanyl into the United States and the resulting public-health crisis, which was magnified by Mexico, Canada, and China's failure to address.  The second emergency involved the exacerbation of the U.S. trade deficit caused by foreign countries' tariff and non-tariff barriers that hollowed out the U.S. manufacturing infrastructure and America's defense-industrial base.

President Trump—acting in accordance with his elected mandate and his obligations under the Constitution—took actions under the IEEPA that are, in his judgment, necessary and appropriate to deal with these unusual-and-extraordinary threats.  Through tariffs, the President imposed leverage on Mexico, Canada, and China to address the illicit-drug crisis that these

countries have the means to remedy but had chosen not to.  In the President's judgment, the tariffs themselves will also reduce imports of illicit drugs, which are often smuggled into the United States with seemingly lawful imports through the standard system.  Through tariffs, the President has also imposed leverage on foreign trading partners, so that these countries will address the tariff and non-tariff barriers that have created an untenable U.S. goods trade deficit and have hollowed out the United States's manufacturing and defense-industrial base.  In the President's judgment, the tariffs themselves will also reduce the United States's trade deficit, increase U.S. manufacturing infrastructure, and strengthen America's defense-industrial base.

President Trump's actions have had immediate effects that began addressing these unusual-and-extraordinary threats to the United States.  With the leverage the President has created in this delicate, complex, and intertwined sphere of foreign relations, the President has already achieved successes and is on the brink of achieving more:

- Over 75 foreign countries have begun negotiations with the United States to align with the America's national-security, economic, and foreign-policy priorities.
- Mexico and Canada took immediate steps to address the illicit-drug crisis.
- China recently agreed to start coordinating with the United States to address the illicit-drug crisis.
- The President successfully negotiated new trade agreements, including with the United Kingdom.
- And the President is on the verge of entering new agreements not only on trade but also on defense.

None of these successes or this progress could have been possible without President Trump's actions.  And any attempt by the judiciary to second-guess the President on these national-security matters would be unprecedented, unravel the progress the President has achieved, and have far-reaching consequences to the United States's foreign, economic, and national-security posture.

In the face of President Trump's strong approach to addressing national-security threats to the United States, various States and businesses seek to override the people's mandate, unravel ongoing negotiations with foreign countries, and hurl the United States in further danger by challenging President Trump's actions that, in his judgment, are necessary to address foreign threats to the United States. These challenges ask this Court to second-guess the duly elected President's findings that these foreign threats are unusual and extraordinary; to second-guess the President's judgment that the actions are necessary and appropriate to deal with these foreign threats; and even to hold unconstitutional the 1977 emergency statute (IEEPA) that President Trump (like every President since 1977) has relied on. In other words, challengers ask this Court to supplant the President's expertise and considered judgment in favor of their own personal views on what is an emergency and which policy tools are best to deal with unusual-and-extraordinary threats to the United States. Even more detrimentally, challengers seek to unravel the complex and delicate foreign-affairs negotiations unfolding around the globe.

This request is remarkably wrong. It defies binding Supreme Court and Federal Circuit precedent, disregards the Constitution's separation of powers, and endangers both the United States and the entire world. Neither challengers nor judges are duly elected political officials with *not only* the obligation to protect U.S. citizens from foreign threats *but also* the expertise to identify and address unusual-and-extraordinary threats and handle the delicate state of affairs that the world and the United States are in. Instead, the President "has the better opportunity of knowing the conditions which prevail in foreign countries," in light of "his confidential sources of information," rendering far out-of-bounds any attempt at judicial second-guessing of the President's assessment that there will be dire consequences to the United States and the world if

this Court accepts challengers' request. *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936).

**First**, IEEPA authorizes the President to "regulate…importation" of "any property." 50 U.S.C. §1702(a)(1)(B). Text, context, history, and purpose all show that IEEPA's use of "regulate…importation" clearly authorizes the President to impose tariffs. Indeed, the Federal Circuit's predecessor interpreted identical language in IEEPA's predecessor to authorize tariffs. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 575-76 (C.C.P.A. 1975). Not only is that interpretive holding still binding in this Court, but Congress knew of this holding when it chose to adopt the identical language in IEEPA and incorporate that interpretation. Challengers ask this Court to overturn *Yoshida*, ignore Congress's clear intent to incorporate *Yoshida*'s interpretation, and defy the overwhelming precedent requiring emergency statutes delegating authority to the President to be read broadly. This Court should decline the invitation.

**Second**, challengers ask this Court to be the first court *ever* to review a President's declaration of a national emergency or his finding that a threat is unusual and extraordinary, to defy Federal Circuit and Supreme Court precedent, and to ignore Congress's clear determination that it is that body with the sole responsibility to review these political decisions. The Federal Circuit has explained that for IEEPA challenges specifically, courts cannot "examine the President's motives and justifications for declaring a national emergency" or assess "whether [a certain circumstance] poses a sufficient threat to trigger the President's IEEPA powers." *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988). The Supreme Court has concluded, in a different context, that courts cannot review the President's finding that circumstances are "a *special* threat" because the courts are "utterly unable to assess their adequacy." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) (emphasis added). Agreeing with

challengers that this Court can review and second-guess the President's emergency (or the back door they attempt to create, the President's sufficient-threat findings) requires deviating from every court to address the issue and violating binding Supreme Court and Federal Circuit precedent. It would also displace Congress.  Congress, in the National Emergencies Act (NEA), designed a careful scheme in which Congress, through a special fast-track procedure, reviews the President's emergency and threat findings and can prevent the President from using emergency powers by terminating any emergency.  Congress even doubled down on its exclusive role in reviewing emergencies and threat assessments by amending the NEA post-*Chadha* to provide a new fast-track process to terminate emergencies. Congress's careful scheme would mean little if courts could do the very assessment that Congress withheld for itself.  The Court must let the political process work and the political branches resolve these quintessential political questions.

*Third*, challengers ask this Court to second-guess the President's chosen means to address the declared emergencies, even though courts have repeatedly and consistently concluded that this Presidential determination is unreviewable and would require unelected judges to question the expertise, judgment, and policy decisions of a duly elected President with the expertise in these areas. As the Federal Circuit has long made clear, "the presidential decision is a multifaceted judgmental decision, for which there is no law to apply"; the President's decision, "his motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny." *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 796 (Fed. Cir. 1984) (cleaned up).  Regardless, the most demanding standard that could apply is the undemanding rational-basis standard, and the President's chosen means easily satisfies that test.

**Finally**, challengers ask this Court to hold IEEPA unconstitutional, even though neither the Supreme Court nor the Federal Circuit has concluded that a statute violates the nondelegation doctrine in *90 years*, and even though every circuit court of appeals to consider the question has held that IEEPA easily passes the nondelegation doctrine. These five circuits were clearly right: Congress sufficiently constrained and guided the President by placing several procedural restrictions on the President's IEEPA authority, including congressional consultation, review, and termination, stating that before acting, the President must declare a national emergency and find an unusual-and-extraordinary foreign threat, and specifying that the President must deal with this threat only through explicitly defined and circumscribed powers. *See United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023); *United States v. Amirnazmi*, 645 F.3d 564, 576-77 (3rd Cir. 2011); *United States v. Dhafir*, 461 F.3d 211, 215-17 (2d Cir. 2006); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092-94 (4th Cir. 1993); *United States v. Mirza*, 454 F. App'x 249, 255-56 (5th Cir. 2011). In arguing otherwise, and asking this Court to split with that substantial authority, all challengers fundamentally misunderstand the nondelegation inquiry. The question is whether *Congress* provided intelligible principles—not whether *the court* can review the principles. An intelligible principle does not disappear based on availability of judicial review—lest every statute that contains political questions suddenly become subject to an invigorated nondelegation challenge irreconcilable with the "not demanding" doctrine the Supreme Court has reaffirmed time and time again. *Gundy v. United States*, 588 U.S. 128, 146 (2019).

This is not the first time that challengers have asked the Court of International Trade to set aside the President's actions that were, in his judgment, taken to protect the United States's national security. Indeed, the challengers to Section 232 tariffs made similar arguments to the

challengers today:  They argued that the court could review the President's threat determinations, that the court could second-guess the reasonableness of the President's chosen means, and that Section 232 violated the nondelegation doctrine because a special nondelegation standard applied in light of Congress's plenary authority over duties.  These challengers all lost.  *See PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255 (Fed. Cir. 2023) (reversing the Court of International Trade); *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021) (reversing the Court of International Trade); *USP Holdings, Inc. v. United States*, 36 F.4th 1359 (Fed. Cir. 2022); *Am. Inst. for Int'l Steel, Inc. v. United States*, 806 F. App'x 982 (Fed. Cir. 2020).  In rejecting the challengers' arguments, the Federal Circuit explained that courts "may not second-guess the facts found" by the President, *PrimeSource*, 59 F.4th at 1263, cannot review the President's finding of "the existence of a [national-security] threat," *USP Holdings*, 36 F.4th at 1369 (cleaned up), cannot assess the reasonableness of the "measures taken by the President to support his" goal, *PrimeSource*, 59 F.4th at 1263, and cannot review any other "remedial-appropriateness determinations" by the President, *id.*  The Federal Circuit, following the Supreme Court's lead, also rejected the challengers' nondelegation argument. Per that court's binding precedent, there is no special, more-stringent nondelegation standard for delegating trade authority, and it makes no difference that many Section 232 questions are unreviewable—those parts of the statute still helped show that Congress "'*easily*'" provided the required intelligible principles.  *PrimeSource*, 59 F.4th at 1263 (quoting *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 (1976)).  Just as in the challenges to the President's Section 232 actions, the Court should enter judgment against the challengers and in favor of the United States.

At the very least, it is imperative that this Court stay any relief against the United States to maintain the status quo and avoid interfering with delicate and complex international

diplomacy while the United States seeks further relief from the Federal Circuit and, if necessary, the Supreme Court.  This is critical.  Interfering with the negotiations in their present state would create a foreign-policy disaster.  And reaching beyond the present tariffs and negotiations, IEEPA is an essential tool for the President's ability to respond to crises in real time.  For example, last week, the President mediated a ceasefire between nuclear-armed countries that were on the verge of armed conflict.  That ceasefire was achieved only after President Trump interceded to offer both nations trading access with the United States.  An adverse ruling could lead to ripple effects among our adversaries, who actively monitor constraints on the President's power, and our trading partners, who have refrained from retaliating against the United States in light of the President's ability to respond rapidly and decisively under the powers conferred by IEEPA.  And a stay would allow this Court to avoid forcing the appellate courts to decide this important case in a rushed emergency posture.  With refunds available, challengers, in stark contrast to the United States, will not suffer any irreparable harm from a stay pending appeal.

## BACKGROUND

At issue in this case are two declared national emergencies and the President's actions to deal with them.[1]

### A.     China Executive Orders

In January 2025, the President declared the flow of contraband drugs like fentanyl through illicit distribution networks, and the resulting public-health crisis, to be a national emergency.  Proclamation 10886, 90 Fed. Reg. 8,327 (Jan. 29, 2025); Executive Order 14157, 90 Fed. Reg. 8,439 (Jan. 20, 2025).

---

[1] For background on the NEA, IEEPA, the Trading with the Enemy Act, and President Nixon's use of TWEA to impose tariffs, see *Oregon v. Trump*, No. 25-00077, Doc.41 (Oregon-U.S.-Br.) at 2-5.

On February 1, the President took action under IEEPA to specifically address the unusual-and-extraordinary threat from the People's Republic of China (PRC), including the PRC's failures to stem the flow of contraband drugs to the United States.  Executive Order 14195, 90 Fed. Reg. 9,121 (Feb. 7, 2025).  To address the emergency, the President imposed tariffs on most goods imported from the PRC and authorized DHS to take any necessary actions to implement the order.  *Id.* at 9,122-23 (10 percent); Executive Order 14228, 90 Fed. Reg. 11,463 (Mar. 7, 2025) (increased to 20 percent).  The President also imposed duties on low-value imports from China because "[m]any shippers based in the People's Republic of China (PRC) hide illicit substances and conceal the true contents of shipments sent to the United States through deceptive shipping practices" and "often avoid detection due to the administration of the *de minimis* exemption."  Executive Order 14256, 90 Fed. Reg. 14,899 (Apr. 7, 2025).

## B.    Reciprocal Tariff Executive Orders

On April 2, the President declared a separate national emergency, finding "that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States."  Executive Order 14257, 90 Fed. Reg. 15,041 (Apr. 7, 2025).  That threat, the President found, "has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system."  *Id.*

In particular, these "large and persistent annual U.S. goods trade deficits" have "atrophied" our nation's "domestic production capacity" to the point where, now, the United States' "military readiness" and "national security posture" are "compromise[d]"—an

10

"especially acute" emergency given "the recent rise in armed conflicts abroad." *Id.* at 15,044-55. The President explained that "[t]he future of American competitiveness depends on reversing" the hemorrhage of manufacturing and manufacturing jobs to create "the industrial base" the nation "needs for national security," as well as safeguarding the vitality of the nation's food and agriculture sectors. *Id.* at 15,044.

Using his broad powers under IEEPA, the President took action to deal with this unusual and extraordinary threat to the United States's national security and economy, and imposed a 10 percent duty on most imported goods. *Id.* at 15,045. These duties took effect on April 5 with select countries having additional duties imposed on April 9. *Id.* Since the initial declaration, the President has taken additional actions that he determined were necessary to address this national emergency, including raising the duty rate for Chinese products and pausing the country-specific duties for 90 days for countries that took steps to negotiate and align with the United States's economic, national-security, and foreign-policy interests. Executive Order 14266, 90 Fed. Reg. 15,625 (Apr. 15, 2025); Executive Order 14259, 90 Fed. Reg. 15,509 (Apr. 14, 2025). More recently, the additional tariffs imposed on China were "suspend[ed]" for 90 days "[i]n recognition of the intentions of the PRC to facilitate addressing the national emergency declared in Executive Order 14257." Executive Order 14298, 90 Fed. Reg. 21,831 (May 21, 2025).

These executive orders have opened discussions with trading partners on solutions that will strengthen our country. "[M]ore than 75…foreign trading partners…have approached the United States to address the lack of trade reciprocity in our economic relationships and our resulting national and economic security concerns." 90 Fed. Reg. at 15,625. "This is a

significant step by these countries toward remedying non-reciprocal trade arrangements and aligning sufficiently with the United States on economic and national security matters." *Id.*

### C.     Plaintiffs Sue To Enjoin The Executive Orders

Plaintiffs, small businesses purporting to be importers,[2] sued on April 24 and moved for summary judgment on May 13.  Compl, Doc.4; Mot., Doc.10; Re-filed Mot., Doc.14-1. Plaintiffs argue that: the tariffs are not authorized by IEEPA, the emergencies do not constitute an "unusual" and "extraordinary" threat under IEEPA, and IEEPA violates the nondelegation doctrine.[3]  Mot.2.  Plaintiffs have not moved for a preliminary injunction.[4]

### STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine disputes as to any material fact.  USCIT R.56(a); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).

---

[2]  At this time, based on plaintiffs' declarations and information from U.S. Customs and Border Protection (CBP), we do not contest the importer status of nine plaintiffs.  But it appears that neither Upward Glance, LLC, nor Mischief, LLC, has shown that they have imported or will import goods subject to the contested tariffs.  *See generally* Mot. Cordair Decl., Marshall Decl. Accordingly, those plaintiffs lack standing and should be dismissed from the case.  *See Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1352 (Fed. Cir. 2010).

[3]  Plaintiffs also allege that modifications to the Harmonized Tariff Schedule of the United States (HTSUS) to implement the tariffs violate the Administrative Procedure Act. Mot.2.  Because plaintiffs have not developed any argument on this point, we note that we addressed a similar argument in *Oregon v. Trump*, No. 25-00077, Doc.41 at 40.  In any event, plaintiffs' unfounded APA claim only illustrates the impropriety of including agencies such as CBP, the Department of Homeland Security, and the U.S. International Trade Commission (ITC) as defendants.

[4] Defendants will not object to the Court reliquidating any of plaintiffs' entries subject to IEEPA duties that are found to be unlawful.  The parties plan to shortly submit a joint notice of stipulation.

Here, no facts are in dispute because the Court reviews the question under the Federal Circuit's *Maple Leaf* standard—whether "there has [been] a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89-90 (Fed. Cir. 1984).[5]  "[F]indings of fact and the motivations for [the President's] actions are not subject to review." *Id.* (quoting *Florsheim Shoe Co. v. United States,* 744 F.2d 787, 793, 795 (Fed. Cir. 1984)).  Because this case "hinges on pure questions of law," "resolution by summary judgment is appropriate." *Canadian Wheat Bd. v. United States*, 580 F.Supp.2d 1350, 1356 (Ct. Int'l Trade 2008), *aff'd*, 641 F.3d 1344 (Fed. Cir. 2011).  The Court may grant summary judgment in favor of the nonmovant.  USCIT R.56(f)(1).

**ARGUMENT**

**I.     IEEPA Constitutionally Authorizes The President To Impose Tariffs, Including The Tariffs Contested Here**

**A.     IEEPA Includes Tariff Authority**

The President imposed the challenged tariffs under the authority granted to him by IEEPA to "regulate…importation" to address an emergency.  50 U.S.C. §1702(a)(1)(B); Executive Order 14257, 90 Fed. Reg. 15,041.  IEEPA clearly authorizes the President to impose tariffs—text, context, and history compel this conclusion.

**1.     Text And Context**

IEEPA's plain text authorizes the President to impose tariffs.  When a national emergency is declared:

---

[5] Here, the tariffs were imposed in compliance with IEEPA's procedures, and—just as in *V.O.S. Selections v. Trump* and *Oregon v. Trump*—no party argues that any tariffs were imposed without compliance with IEEPA's procedures. Any procedural challenge is thus forfeited and *Maple Leaf*'s second category is not at issue in these cases. *See* No. 1:25-cv-00066; No. 1:25-cv-00077.

> [T]he President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise… investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in… *any property* in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. §1702(a)(1)(B) (emphases added).  Imposing tariffs falls within the power to "regulate…importation" of foreign goods.  *Id.*  Tariffs set the terms on which foreign goods enter the United States.  That is consistent with the definition of "regulate."  *See* V.O.S.-U.S.-Br.12 (collecting dictionary definitions).

Precedent confirms this straightforward reading of IEEPA.  Interpreting identical relevant language in TWEA, the Federal Circuit's predecessor upheld a tariff imposed by President Nixon, explaining that the phrase "regulate importation" authorized the President to "impos[e] an import duty surcharge."  *Yoshida*, 526 F.2d at 576.  That precedent's holding continues to control today.  *See S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (adopting the holdings of decisions of the Court of Customs and Patent Appeals (CCPA)).

Courts have likewise long held that tariffs are a form of regulation of commerce.  *See, e.g.*, *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933) (recognizing that it is "well established" that import duties may be imposed "in the exercise of the power to regulate commerce"); *Gibbons v. Ogden*, 22 U.S. 1, 202 (1824) ("[D]uties may often be, and in fact often are, imposed on tonnage, with a view to the regulation of commerce[.]"); *Yoshida*, 526 F.2d at 575 n.20 ("it is well established that" the power to "lay duties upon imports" "can be employed in the exercise of" "the power to regulate commerce" (collecting cases)); *id.* at 575 ("to impose duties can be to 'regulate'").

14

Statutory context reinforces this conclusion.  The power to "regulate" imports by imposing tariffs is similar to the other powers granted in §1702(a)(1)(B), like the power to "block" the import of goods during an investigation, or the power to "prevent or prohibit" those imports.  Each of these terms grants the President a significant power over foreign commerce (not a "narrow" power as plaintiffs assert, Mot.19).  And many partially or fully overlap, suggesting that Congress entrusted the President with wide-ranging powers with respect to imports rather than carefully picking and choosing isolated types of interventions.  For example, the provision's list of powers includes two obvious pairs of belt-and-suspenders terms: "direct and compel" and "prevent or prohibit."  §1702(a)(1)(B).  It confers the overlapping powers to "nullify" and "void" various transactions.  *Id.*  Similarly, the power to "prevent or prohibit" imports could be used to "block" imports during an investigation, but IEEPA goes out of its way to grant both powers.  *Id.*

Regardless, attempting to read §1702(a)(1)(B)'s list as enumerating discrete powers instead of providing broad Presidential authority would lead to the same conclusion about "regulate."  If each power in the list is distinct, then "regulation" of imports must include actions such as tariffs; otherwise, it would mean little, if anything, other than the power to "prevent or prohibit" imports—leaving the term largely superfluous.  *See Pulsifer v. United States*, 601 U.S. 124, 141-43 (2024) (rejecting reading that would leave a provision "without any operative significance").

Plaintiffs seek to narrow IEEPA's text by pointing to statutes that use different language to authorize the President to impose tariffs in certain circumstances.  Mot.17 (discussing 19 U.S.C. §§1338, 2411).  But in enacting Section 232 of the Trade Expansion Act of 1962, Congress used similarly broad language to permit the imposition of tariffs.  *See* 19 U.S.C.

15

§1862(c) ("adjust…imports"); *Algonquin*, 426 U.S. at 562 (Section 232's "adjust…imports" means that "the President's authority extends to the imposition of monetary exactions, i.e., license fees and duties."); *Transpacific*, 4 F.4th at 1318-33 (upholding use of Section 232 to impose tariffs).[6] There is no reasonable explanation for why "regulate…importation" cannot authorize tariffs but "adjust…imports" does.

Regardless, the fact that Congress has elsewhere used narrower language to convey a non-emergency power says little about the meaning of the broader language it used in TWEA or IEEPA. Indeed, *Yoshida* already rejected the idea that statutes that apply in non-emergency situations can narrow the powers available in an emergency. *See* 526 F.2d at 578 ("trade acts" that do not involve "national emergency powers" did not narrow TWEA's scope). Rather than tie the President's hands, Congress clearly granted the President flexibility to determine what action to take to address an emergency, including choosing an import control that can "be quickly imposed and removed" and is "administratively less complex." *Yoshida*, 526 F.2d at 580.

Plaintiffs also claim that IEEPA's exemption of "information or informational materials," donations, and "transactions ordinarily incident to travel" confirm that the statute was never meant to apply to tariffs, because the excepted items would not be subject to tariffs in the first place. Mot.20. Not so. The HTSUS governs the types of excepted goods listed in 50 U.S.C. §1702(b)(3). *See, e.g.*, heading 3072, HTSUS ("Photographic film in rolls, [etc.]"); heading 8523, HTSUS ("Discs, tapes, [etc.]"). Further, the products that are covered by §1702(b)(2) and (3), respectively, are specifically exempted from IEEPA tariffs by HTSUS headings precisely

---

[6] Further, in both the Trade Expansion Act of 1962 and the Trade Act of 1974, Congress defined the phrase "duty or other import restriction" as encompassing not only duties but also "exaction[s] other than dut[ies]" that are "imposed for the regulation of imports." 19 U.S.C. §§1806(2), 2481(2).

because those goods would otherwise be subject to the tariffs.  *See* headings 9903.01.30 and 9903.01.31, HTSUS (exempting from IEEPA reciprocal tariffs products covered by §1702(b)(2) and (3), respectively).

        **2.**      **History**

IEEPA's history further confirms that it authorizes the President to impose tariffs. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).  Congress drew the relevant language directly from TWEA, and it did so *after* the CCPA interpreted that identical language to permit the President to impose tariffs. During the legislative process for IEEPA, Congress was well aware of the relevant language and the court's decision interpreting the language to authorize the President to impose tariffs but chose to keep the language when it enacted IEEPA.

The key language in IEEPA, "regulate…importation," was borrowed verbatim from TWEA.  *See* Dec. 18, 1941, ch. 593, title III, §301, 55 Stat. 839 (authorizing the President to "investigate, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in…" (emphases added)); 50 U.S.C. §1702(a)(1)(B).  Courts, including the Supreme Court, have repeatedly recognized the close relationship between the substantive powers conferred by IEEPA and TWEA.  *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 671-72 (1981) (the pertinent section of IEEPA's language was "directly drawn" from TWEA); *Regan v. Wald*, 468 U.S. 222, 227-28 (1984) ("[T]he authorities granted to the President [under] IEEPA are essentially the same as those [under] TWEA.").

Congress also knew of *Yoshida*'s interpretation of TWEA when it chose to use the same language in IEEPA. The House Report on IEEPA cited *Yoshida* and explained its holding. H.R. Rep. No. 95-459, at 5. It recounted that "section 5(b) [of TWEA] came into play when…President Nixon declared a national emergency…and under that emergency imposed a surcharge on imports," that the Customs Court invalidated the action after holding that "section 5(b)…did not" permit "imposition of duties," but that "the Appeals Court reversed." *Id.* Aware of that history, Congress chose to adopt the same language in IEEPA.

The language Congress drew directly from TWEA carries the same meaning in IEEPA. "[W]hen Congress 'adopt[s] the language used in [an] earlier act,'" courts "presume that Congress 'adopted also the construction given'" to that language. *Georgia v. Public.Resource.Org*, 590 U.S. 255, 270 (2020). Courts, including the Supreme Court, have recognized this by applying TWEA precedent to interpret IEEPA. *See Dames*, 453 U.S. at 672 ("[B]oth the legislative history and cases interpreting the TWEA fully sustain the broad authority of the Executive when acting under this congressional grant of power [*i.e.*, IEEPA]."); *Sec. Pac. Nat. Bank v. Gov't & State of Iran*, 513 F.Supp. 864, 877 (C.D. Cal. 1981) ("[T]he substantial body of judicial interpretation of the TWEA should be applied to interpret the powers of the President under the IEEPA.").

Plaintiffs read this history backwards. They argue that Congress passed IEEPA to take away power previously asserted by the President, claiming that Congress eliminated the President's authority to define "any or all" of the statutory terms. Mot.22. But President Nixon did not purport to define any of TWEA's terms, and the CCPA did not rely on any presidential definitions in holding that "regulate…importation" authorized the imposition of tariffs. Moreover, in IEEPA, Congress primarily limited the President's power by including specific

procedural directives and delineating specific exceptions to the otherwise broad grant of authority under IEEPA—none of which curtailed the President's authority to impose tariffs to deal with a declared national emergency. Congress *knew* that TWEA had been used to impose tariffs, yet it chose to use the same language that had conferred such authority, without modifying it or expressly precluding their imposition. That is especially striking given the reticulated exceptions to IEEPA sanctions that Congress did see fit to add in comparison to TWEA. *See* 50 U.S.C. §1702(b) (listing "Exceptions to Grant of Authority," none of which involve imposing tariffs). Plus, Congress has repeatedly declined to *revoke* the President's authority to impose tariffs under IEEPA. And plaintiffs effectively ask the Court to overturn *Yoshida*'s holding interpreting "regulate importation" in TWEA to authorize imposing tariffs because their theory would mean that TWEA itself does not authorize the President *in times of war* to impose tariffs, as TWEA still has the same relevant language plaintiffs claim does not authorize the President to impose tariffs under IEEPA. 50 U.S.C. §4305(b)(1)(B).[7]

Plaintiffs also point to the Section 122 of the Trade Act of 1974, which they claim "ratified" President Nixon's actions such that *Yoshida* should be considered a nonprecedential "aberration." Mot.21-22. But Section 122's enactment does not limit *Yoshida*'s holding, particularly given that *Yoshida* was issued *after* Section 122. In July 1974, the trial court in *Yoshida* concluded that TWEA did not authorize tariffs. *Yoshida Int'l, Inc. v. United States*, 378

---

[7] Plaintiffs rely on *Loper Bright Enterprises v. Raimundo*, 603 U.S. 369 (2024), in urging the Court to disregard *Yoshida*, Mot.22 n.5, but their argument does not change that Congress knew of *Yoshida*'s interpretation of identical language yet chose to incorporate *Yoshida*'s interpretation when it intentionally kept that language in IEEPA. Nor does it change that *Yoshida* was decided before *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984), so the CCPA could not have performed its analysis under that now-overturned interpretive scheme. Plaintiffs also ignore the Supreme Court's holding that *Loper* does cause reconsideration of decisions preceding it. 603 U.S. at 412.

F.Supp.1155 (Cust. Ct. 1974). In response, Congress passed the Trade Act of 1974, which authorized the President to impose a limited surcharge to address certain balance-of-payments issues. *See* S. Rep. No. 93-1298, at 88 (1974) (enacting the Trade Act as "necessary…*in the light of the recent decision by the United States Customs Court*," despite Congress's view that the President's "authority" to impose import surcharges was already "manifest" (emphasis added)). But the CCPA's decision reversing the trial court and holding that "regulate importation" authorizes tariffs was issued *after* the enactment of Section 122. Thus, in enacting Section 122, Congress ensured that, if the CCPA did not reverse the trial court, the President would still have a mechanism to impose tariffs to address a balance-of-payments deficit. And when Congress enacted IEEPA, the most recent change in the landscape was *Yoshida*—not Section 122. Plaintiffs fail to establish that the context in which IEEPA was enacted permits departing from *Yoshida* or renders that decision nonprecedential.

### 3. Purpose

IEEPA's evident purpose confirms that it includes the power to impose tariffs. The purpose of emergency statutes, like IEEPA, is to give the President broad and flexible powers to effectively address problems of a national emergency. "[T]he primary implication of an emergency power is that it should be effective to deal with a national emergency successfully." *Yoshida*, 526 F.2d at 573. Delegations of emergency authority to the President are "broad and extensive; it could not have been otherwise if the President were to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress." *Id.* Indeed, "the legislative history of [IEEPA] notes that the authorities available to the President should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." 6 U.S. Op. Off. Legal Counsel 644, 681 (1982).

Especially in this context. "[S]tatutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed." *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996). In foreign affairs, "broad grants by Congress of discretion to the Executive are common." *Florsheim*, 744 F.2d at 795. IEEPA "is intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction and not hemmed in or cabined, cribbed, confined by anxious judicial blinders." *Id.* at 793 (cleaned up). When, as here, foreign affairs and national security are involved, "the President plays a dominant role," and "it is generally assumed that Congress does not set out to tie the President's hands; if it wishes to, it must say so in clear language." *Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1329 (Fed. Cir. 2001). Plaintiffs cannot point to clear language cabining the President's authority. Just the opposite—text, history, and context all show that IEEPA clearly authorizes the President to impose tariffs.

### 4.    The Major-Questions Doctrine

In plaintiffs' view, the Court should not presume that Congress delegated authority to the President because of the "vast economic and political significance" of the tariffs and the "history and breadth" of the authority asserted. Mot.23. But the major-questions doctrine does not apply here and, even if it did, it would not help plaintiffs. "Where the statute at issue is one that confers authority upon an administrative agency…there are extraordinary cases that…provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up). In such cases, under the major-questions doctrine, the agency "must point to clear congressional authorization" for the proposed regulation." *Id.* at 723.

21

At the threshold, the major-questions doctrine does not apply because "the statute at issue" does not "confer[] authority upon an administrative agency." *Id.* at 721. It confers authority on the President. The Supreme Court has never applied the major-questions doctrine to a statute delegating power to the President, let alone one involving national security and foreign affairs. It has instead described the doctrine as applicable to statutes giving authority to agencies. "[T]he major questions doctrine label…took hold because it refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem: *agencies* asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 724 (cleaned up) (emphasis added). Unlike the President, agencies lack political accountability. *See NFIB v. Dep't of Lab.*, 595 U.S. 109, 125 (2022) (Gorsuch, J., concurring) (allowing Congress to "hand off all its legislative powers to unelected agency officials" would replace "government by the people" with "government by bureaucracy"). No political-accountability justification applies here, where "the Framers made the President the most democratic and politically accountable official in Government," *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020), and the President directs an action in an executive order.

And the President's overlapping powers in the national-security and foreign-affairs realm diminish any concerns of unauthorized overreach. The President's "authority is at its maximum" when he acts pursuant to the "authorization of Congress," and in those circumstances he "may be said" to "personify the federal sovereignty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-36 (1952) (Jackson, J., concurring in the judgment). A unanimous panel of the Ninth Circuit has recognized that "[t]he Major Questions Doctrine is motivated by skepticism of agency interpretations" and "does not apply to Presidential actions."

*Mayes v. Biden*, 67 F.4th 921, 933, 934 (9th Cir. 2023), *vacated as moot by* 89 F.4th 1186 (Mem.) (9th Cir. 2023); *see Oregon v. Trump*, No. 25-00077, Doc.27 at 10-13 (discussing further why the doctrine is inapplicable to the President).

Similarly, the major-questions doctrine does not apply to national-security and foreign-policy matters. A major-questions approach treats a decision with a "measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That approach is irreconcilable with longstanding precedent compelling the opposite approach in these contexts. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (acknowledging "the deference traditionally accorded the President" on these matters); *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (recounting the "utmost deference to Presidential responsibilities" that courts have "traditionally shown" in these matters). So, in this area, unlike in cases where courts have taken a major-questions approach, there is no "reason to hesitate before concluding that Congress meant to confer" significant authority to regulate foreign commerce on the President. *West Virginia*, 597 U.S. at 721 (cleaned up).

Even if the major-questions doctrine were not categorically inapplicable, plaintiffs press no persuasive argument that it would apply to the challenged tariffs. The Supreme Court has identified several traits of regulatory action that, in combination, implicate the major-questions doctrine when an agency takes a sufficiently significant action. No one doubts the significance of the challenged tariffs, but significance alone is not enough; otherwise, the doctrine would apply to countless Government actions, including every emergency statute. None of the remaining indicia of major questions—let alone an adequate combination—are present here.

Plaintiffs contend that the President has "no comparative expertise" in tariff policy that would render the major-questions doctrine inapplicable. Mot.25. But plaintiffs elsewhere

contradict this argument by acknowledging that Congress has entrusted the Executive Branch with imposing and enforcing tariffs, as needed, under "many other statutes." Mot.17. IEEPA additionally directs the President to exercise power well within his "national security" and "foreign policy" expertise. 50 U.S.C. §§1701(a), 1702. Matters of national security and foreign policy are "the prerogative of Congress and the President." *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *accord Egan*, 484 U.S. at 527. Little could be more clearly within the President's core duties and competencies, and the President's exercise of statutorily-conferred authority over foreign policy and national security is utterly unsurprising. *Cf. Biden v. Missouri*, 595 U.S. 87, 95 (2022) (action not "surprising," despite unprecedented scope, because "addressing infection problems in Medicare and Medicaid facilities is what [the Secretary of HHS] does").

Nor is the President's use of IEEPA an exercise of "unheralded power," especially given the President's exercise of his tariff power under materially identical language in IEEPA's predecessor statute. *West Virginia*, 597 U.S. at 724. The President's exercise of his power to impose worldwide emergency tariffs under materially identical language in IEEPA's predecessor statute means the challenged action is far from "unheralded." *Id.* Likewise, the President's challenged actions accord with a robust history of similar exercises of power under IEEPA to achieve foreign-policy objectives by regulating imports and exports—often with even more serious measures like total or near-total embargoes. *See* Oregon-U.S.-Br.23 (collecting examples). Plaintiffs contradict their argument that the President's exercise of IEEPA authority here is transformative or unprecedented by acknowledging that IEEPA has repeatedly been used to impose economic sanctions to bring America's economic strength to bear in foreign-policy matters. Mot.22.

IEEPA's authorization of the President to regulate imports in an emergency is not a catch-all clause; nor is it an example of "modest words" or an "ancillary provision" of the statute. *West Virginia*, 597 U.S. at 723-24. Just the opposite: the power is conferred as one of the enumerated terms in a list of powers making up one of the statute's principal provisions, and that term straightforwardly grants the President broad, consequential powers over foreign commerce to deal with broad, consequential problems facing the country. Section 1702(a)(1)(B), by including authorization for the President to "regulate…importation," could never be mistaken for a mousehole—*especially* when Congress expressly acknowledged that the court with exclusive jurisdiction over the matter had just conclusively interpreted that language to authorize the President to impose tariffs.

Plaintiffs argue that reading IEEPA to allow tariffs would be "transformative," because their imposition would allow the President to "remake the entire economy" and "rewrite the Nation's tariff laws." Mot.24-25. But it is not surprising that Congress would delegate tariff authority to the President—the basic thrust of the major-questions inquiry. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (looking to evidence of "Congress'[s] consistent judgment to deny the" power being exercised); *West Virginia*, 597 U.S. at 724 (agency adopted "a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."). Congress has repeatedly conferred tariff power on the President and—more specifically—has repeatedly considered and decided *not* to revoke the President's power to impose tariffs under IEEPA. *See* Oregon-U.S.-Br.24 (collecting examples). Plaintiffs cannot use the major-questions doctrine to impose qualitative limits on a power the text unambiguously confers.

Nor does the existence of other tariff-authorizing statutes, or Congress's constitutional authority to impose tariffs, otherwise suggest that IEEPA should be read narrowly despite its plain text. The Supreme Court rejected essentially the same argument in *Hawaii*. There, relying on 8 U.S.C. §1182(f)'s broad delegation of power to "suspend the entry of…any class of aliens" whose entry the President determines "would be detrimental to the interests of the United States," the President issued a Proclamation "prevent[ing] the entry of those foreign nationals about whom the United States Government lacks sufficient information," among others. *Id.* at 679. The plaintiffs argued that the President, in relying on §1182(f), "supplant[ed]" two more-specific statutes addressing "the problem of aliens seeking entry from countries that do not share sufficient information with the United States," requiring a narrow reading of §1182(f). *Id.* at 688-89. The Court rejected that argument. There was no "conflict between the statute and the Proclamation that would implicitly bar the President from addressing deficiencies in the Nation's vetting system." *Id.* at 689. The more specific statutes did not "*require* that systemic problems such as the lack of reliable information be addressed only in a progression of case-by-case admissibility determinations." *Id.* at 689-90. And "[o]ne of the key objectives of the Proclamation [was] to encourage foreign governments to improve their practices, thus facilitating the Government's vetting process overall." *Id.* at 690.

The same is true here. The Trade Act of 1974, the Trade Expansion Act of 1962, and the antidumping and countervailing-duty laws, none of which are predicated on a national-emergency finding, address the specific situations of balance-of-payment problems, injuries to domestic industries, unfair trade practices, and impairment of national security. But those statutes do not "*require* that" the "systemic problems" that the President identified in the challenged Executive Orders be addressed through "case-by-case"—for instance, product-,

industry-, or trade-practice-specific—application of these non-emergency statutes.  *Hawaii*, 585 U.S. at 689-90.  And one of the objectives of the President's actions here is likewise "to encourage foreign governments to improve their practices," which has the benefit of enhancing, not supplanting, enforcement of statutes like Section 301 and the antidumping and countervailing duty laws.  *Id.* at 690.

Nor is there a difference in Congress's role in the underlying constitutional order between *Trump v. Hawaii* and this case.  In the immigration context, it "has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government" that "the formulation of" "[p]olicies pertaining to the entry of aliens and their right to remain here" is "entrusted exclusively to Congress."  *Galvan v. Press*, 347 U.S. 522, 530 (1954); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 343 (1909) (recognizing "the plenary power of Congress as to the admission of aliens").

The President's use of the emergency authorities that IEEPA provides, in short, coexists with enforcement of existing non-emergency trade laws.  For example, the imposition of tariffs under IEEPA has not stopped the U.S. Trade Representative from addressing unfair trade practices on a non-emergency basis under Section 301, has not supplanted the use of Section 232 to impose duties to adjust importation of specific products to protect national security, or slowed the work of the ITC under the antidumping and countervailing duty laws in determining whether imports of certain products of particular countries are threatening domestic industries.  Oregon-U.S.-Br.24-25 (collecting examples).  Given all of these concurrent investigations and actions under other delegated authorities to deal with non-emergency situations, it is hard to see how IEEPA would allow the President to simply "rewrite the Nation's tariff laws."  Though IEEPA "overlap[s] with the traditional framework of trade legislation, it is not controlling that some of

27

the same considerations are involved." *Yoshida*, 526 F.2d at 578; *accord Hawaii*, 585 U.S. at 689-90.

Applying the major-questions doctrine would also conflict with the strong presumption that when Congress uses broad language in a delegation to the President in the foreign-affairs and national-security context, courts give the statute "a broad construction." *Florsheim*, 744 F.2d at 793; *see, e.g.*, *Marshall Field & Co. v. Clark*, 143 U.S. 649, 691 (1892); *Curtiss-Wright*, 299 U.S. at 312; *Maple Leaf*, 762 F.2d at 89 (because case involves the President's authority, the court's review is limited to whether the case involves a "clear misconstruction" of IEEPA). "If Congress desires to eliminate these tariffs or to cabin the President's authority, that is a matter for Congress to address in future legislation, not a matter for this court." *Silfab Solar v. United States*, 892 F.3d 1340, 1349 (Fed. Cir. 2018).

Finally, the major-questions doctrine compares the statute's text to the power exercised. The doctrine is more likely to apply when the power exercised amounts to "a fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind," *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) (cleaned up)—or, put differently, whether the power goes "beyond what Congress could reasonably be understood to have granted," *West Virginia*, 597 U.S. at 724. As defendants have explained, that is not the case here. *See* Oregon-U.S.-Br.27. The President's latest step, exercising tariff authority, is predictable and precedented, not transformational or surprising. The major-questions doctrine is not implicated.

Even if it were, the Executive Orders would still be supported by "clear congressional authorization." *West Virginia*, 597 U.S. at 723. As defendants have explained, IEEPA has far more than a "plausible" or "colorable" textual basis but clearly authorizes the President to impose tariffs. *See* Oregon-U.S.-Br.27-28.

28

### B.    IEEPA Is A Valid Delegation Of Congressional Authority

Congress's delegation to the President in IEEPA does not violate the nondelegation principle.  "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government" without supplying "an intelligible principle to guide the delegee's use of discretion."  *Gundy*, 588 U.S. at 132, 135.  That standard is "not demanding." *Id.* at 146.  "Only twice in this country's history (and that in a single year)" has the Supreme Court "found a delegation excessive."  *Id.*  Courts, including the Supreme Court, have "over and over upheld even very broad delegations."  *Id.*  IEEPA readily meets this undemanding standard.

*Yoshida* compels this conclusion.  There, the CCPA upheld Congress's delegation of tariff authority to the President against a similar nondelegation challenge involving IEEPA's predecessor statute.  526 F.2d at 582.  The Court identified the intelligible principles: (1) "Presidential exercise is limited to actions consistent with the national emergency purpose" of the statute, a purpose that requires the President "to take a political step, the declaring of a national emergency, before acting"; and (2) "that the power delegated therein shall be applied only to 'property in which any foreign country or a national thereof has any interest.'"  *Id.* at 581-83.  *Yoshida* controls here because IEEPA provides at least the same intelligible principles the Court identified as lawful—a limitation to actions consistent with the national-emergency purpose applying only to property in which there is a foreign interest.  *See id.* at 582 ("Congress, by delegating to the President in [TWEA] the power to regulate imports within the national emergency powers standard, has not succeeded in abdicating its constitutional power to regulate foreign commerce.").

In fact, IEEPA has even more limitations than those *Yoshida* upheld for TWEA, showing that Congress clearly provided intelligible principles that "meaningfully constrain the President's discretion."  *Dhafir*, 461 F.3d at 216 (cleaned up).  First, substantively, "[t]he powers granted to

the President are explicitly defined and circumscribed." *Arch*, 987 F.2d at 1093 (citing 50 U.S.C. §1702); *accord Dhafir*, 461 F.3d at 217 ("[T]he authorities delegated are defined and limited."); *Shih*, 73 F.4th at 1092 (IEEPA "limits the President's authority to prohibit certain types of transactions." (citing 50 U.S.C. §1702(b))). And those powers "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared," *Dhafir*, 461 F.3d at 216-17 (citing 50 U.S.C. §1701(b)), and must be exercised only to "deal with" that emergency, 50 U.S.C. §1701(a).

Procedurally, too, IEEPA does not pose a nondelegation problem because IEEPA does not "obviat[e] Congress's role as ultimate arbiter of emergency trade policy." *Amirnazmi*, 645 F.3d at 576. "In effecting the shift…from TWEA to IEEPA, Congress placed several procedural restrictions on the President's exercise of the national-emergency powers, including congressional consultation, review, and termination." *Id.* at 577 (cleaned up). "In so doing, Congress reaffirmed its essential legislative function and struck a careful balance between affording the President a degree of authority to address the exigencies of national emergencies and restraining his ability to perpetuate emergency situations indefinitely by creating more opportunities for congressional input." *Id.* (cleaned up); *see Yoshida*, 526 F.2d at 582 (Even for TWEA, Congress "remains the ultimate decision maker and the fundamental reservoir of power to regulate commerce. It may, of course, recall or limit the delegated emergency power at any time."). Congress guarded against any nondelegation concerns by positioning itself as the body to determine whether the President's use of IEEPA is permissible.

That IEEPA passes the nondelegation doctrine accords with the Supreme Court's and Federal Circuit's repeated decisions rejecting nondelegation challenges to the President's imposition of trade regulations, including tariffs, under similar statutory language. *See, e.g.*,

*Algonquin*, 426 U.S. at 559-60 (concluding that the President's imposition of a license-fee system under his authority to "adjust imports" in Section 232 was not an improper delegation of Congress's power to regulate commerce); *Transpacific*, 4 F.4th at 1332-33 (same); *Shih*, 73 F.4th at 1092 ("[a]gree[ing] with every Circuit to have considered the issue that IEEPA" does not "run afoul of the nondelegation doctrine" (collecting cases)).  As with Section 232, IEEPA has clear conditions, such as congressional reporting, consultation, and termination, on the President exercising his discretion to deal with an unusual and extraordinary threat to the United States' national security and economy.  *See PrimeSource*, 59 F.4th at 1263.

Plaintiffs argue that IEEPA lacks an intelligible principle because IEEPA provides standards by which Congress, rather than a court, can judge the President's action.  Mot.32.  But plaintiffs' position, that IEEPA automatically fails the nondelegation test if the President's actions under IEEPA present a nonjusticable question, is untenable.  Whether the Court can review the merits of the national-emergency declaration is a separate question from whether Congress has expressed intelligible principles to guide the President's use of discretion.  Indeed, multiple circuit courts have acknowledged the nonjusticiability of IEEPA but still rejected nondelegation challenges to the statute.  *See Shih*, 73 F.4th at 1092 (refusing to "review the executive's declaration of a national emergency" and rejecting nondelegation challenge to IEEPA); *Amirnazmi*, 645 F.3d at 581 (same).  And in none of those cases did the court state that nondelegation challenges are stronger in such circumstances.  That is only sensible; otherwise, the political-question doctrine would always be paired with nondelegation issues.  That courts lack authority to review political questions does not bear on whether Congress has permissibly delegated power to the President.

Moreover, Congress is not constitutionally required to enact exacting standards to satisfy the nondelegation doctrine, as "[t]he legislative process would frequently bog down if Congress were constitutionally required to appraise before-hand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946); *see Dames*, 453 U.S. at 678 ("Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act. Such failure of Congress specifically to delegate authority does not, especially in the areas of foreign policy and national security, imply congressional disapproval of action taken by the Executive." (cleaned up)); *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas."); *Haig v. Agee*, 453 U.S. 280, 291 (1981). This is especially so here, where Congress delegated as to an emergency. "It cannot be lightly dismissed that" IEEPA is operative only during declared "national emergencies, which inherently preclude prior prescription of specific detailed guidelines," and "[t]he need for prompt action, another essential feature of a national emergency, precludes the otherwise oft-provided requirement for prior hearings, extensive fact finding, Tariff Commission reports to the President, and the like." *Yoshida*, 536 F.2d at 581-82.

Plaintiffs contend that IEEPA expresses less guidance than the only two cases in which the Supreme Court has ever found nondelegation violation: *Panama Refining v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495 (1935). Mot.33-34. Setting aside that the Supreme Court has never found a nondelegation problem since these decisions nearly a hundred years ago, plaintiffs' assertions are unfounded. *Schecter Poultry* presented an entirely inapposite situation in which private entities—certain trade and industrial

32

groups—could propose codes of competition that the President could then give the effect of law. 295 U.S. at 537. The Supreme Court held that this statutory scheme violated the nondelegation doctrine, as it supplied *no* standards and authorized private parties to make codes which the President could—in his "virtually unfettered" discretion—approve. *Id.* at 541-42. And in *Panama Refining*, the Court struck down a statute because it "does not qualify the President's authority[,]" "establishes no [criterion] to govern the President's course[,]" and "does not require any finding by the President as a condition of his action." 293 U.S. at 415. These cases stand in stark contrast to IEEPA, which marks out the President's authority, directs when, why, and to what ends those authorities can be exercised, and imposes substantial procedural guardrails curtailing the President's ability to exercise his national-emergency powers. *See Amirnazmi*, 645 F.3d at 577; *Dhafir*, 461 F.3d at 216-17; *Shih*, 73 F.4th at 1029; *Yoshida*, 526 F.2d at 581-83.

Indeed, since *Panama Refining* and *Schecter Poultry*, the Supreme Court has upheld Congress's delegations of authority where the intelligible principles were much broader than those for IEEPA. For example, in *Yakus v. United States*, the Court held that there was no nondelegation problem with a statute directing the Price Administrator to establish "fair and equitable" prices. 321 U.S. 414, 419 (1944). Likewise, in *American Power & Light*, the Court approved a statute directing the SEC to "ensure that the corporate structure or continued existence of any company in a particular holding company system does not 'unduly or unnecessarily complicate the structure' or 'unfairly or inequitably distribute voting power among security holders.'" 329 U.S. at 104. The Court remarked that these "standards are certainly no less definite in nature than those speaking in other contexts in terms of "'public interest,' 'just and reasonable rates,' 'unfair methods of competition' or 'relevant factors.'" *Id.* at 105 (citing cases).

In addition, IEEPA involves an area where the President has independent authority—national security and foreign affairs—making the intelligible-principle standard even easier to meet.  *See* V.O.S.-U.S.-Br.31-32 (collecting cases).[8]

Given that every circuit to address nondelegation challenges to IEEPA and TWEA has rejected such challenges, and given the intelligible principles guiding the President's exercise of his delegated authority and the President's independent authority in the realm of foreign affairs and national security, plaintiffs' nondelegation argument fails.  This Court should not break with that uniform authority.

## II.   The National Emergency Is A Political Question And Valid If Subject To Review

### A.   Whether A Threat Is "Unusual Or Extraordinary" Under IEEPA Is Nonjusticiable

Plaintiffs argue that IEEPA, even if it authorizes tariffs in some circumstances, does not authorize the tariffs challenged here because plaintiffs disagree with the merits of the President's declared emergency.  Mot.27-29.  But whether a threat is unusual or extraordinary is reviewable only by Congress, not by the courts.

Of course, "no court has ever reviewed the merits of [a national-emergency declaration]." *Ctr. for Biological Diversity v. Trump*, 453 F.Supp.3d 11, 31 (D.D.C. 2020).  For good reason: reviewing the President's emergency declaration would require "examin[ing] the President's motives and justifications for declaring a national emergency" and the President's factfinding—something the Federal Circuit has said "would likely present a nonjusticiable political question."

---

[8]   Moreover, other circuits have rejected nondelegation challenges to the use of IEEPA to "'define criminal conduct,'" an area where courts assume a *higher* nondelegation standard applies.  *See, e.g.*, *Shih*, 73 F.4th at 1092 (relying on *Touby v. United States*, 500 U.S. 160, 166 (1991), which assumed, without deciding, that "greater congressional specificity is required in the criminal context" for nondelegation purposes).  The delegation of authority here easily passes the even less demanding standard that applies here.

*Chang*, 859 F.2d at 896 n.3 (IEEPA); *see, e.g.*, *Yoshida*, 526 F.2d at 579, 581 n.32 ("courts will not review the bona fides of a declaration of an emergency by the President"); *Shih*, 73 F.4th at 1092 (refusing to review declaration of emergency under IEEPA). Indeed, the Federal Circuit has repeatedly concluded that the President's "motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny." *Florsheim*, 744 F.2d at 796; *see, e.g.*, *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1248 (Fed. Cir. 1985); *Maple Leaf*, 762 F.2d at 89; *Humane*, 236 F.3d at 1330.

Plaintiffs, rather than engaging in an analysis of whether the merits of a national emergency are even reviewable, simply assume the Court can probe whether the President properly found that there was an "unusual and extraordinary threat," 50 U.S.C. §1701(a), justifying the emergency declaration. Mot.27-29. But that is a textbook political question. The seminal political-question case, *Baker v. Carr*, identified six different ways a case could present a nonjusticiable political question. Nonjusticiable political questions arise where there is:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962). The question that plaintiffs seek judicial resolution of fits within multiple of *Baker*'s categories. Most obviously, there is a profound "lack of judicially discoverable and manageable standards for resolving" the validity of the President's threat assessment. *Id.* As one court explained:

> [T]o address the claim that Nicaragua does not pose an unusual and extraordinary threat to the United States…would require the court to assess the wisdom of the President's judgment concerning the nature and extent of that threat, a matter not susceptible to judicially manageable standards. How, for example, is the court to determine whether Nicaragua poses more than an ordinary or usual threat? How is a court to resolve disputed issues of fact concerning the situation in Nicaragua? The court simply lacks the resources and expertise to address these questions. Nor could it resolve such questions without making its own policy judgments about national security and foreign policy, judgments best left to the political branches of the federal government.

*Beacon Prods. Corp. v. Reagan*, 633 F.Supp.1191, 1194-95 (D. Mass. 1986), *aff'd*, 814 F.2d 1 (1st Cir. 1987). The Federal Circuit has signaled agreement with *Beacon Products* that "whether [a certain circumstance] poses a sufficient threat to trigger the President's IEEPA powers is a nonjusticiable political question." *Chang*, 859 F.2d at 896 n.3. And the Supreme Court has concluded, in a different context, that whether the Executive correctly determined that "nationals of a particular country [are] a *special* threat" is unreviewable because the courts are "utterly unable to assess their adequacy." *Reno*, 525 U.S. at 491 (emphasis added); *see Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) ("[C]ourts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.").

Tellingly, plaintiffs fail to provide a "'clear, manageable, and politically neutral'" standard that to identify a threat, let alone one that "can reliably differentiate" unusual and extraordinary threats from usual and ordinary ones. *Rucho v. Common Cause*, 588 U.S. 684, 703-04 (2019). That showcases that this is a political question. The Federal Circuit in the international-trade space has held that a President's determination of whether something constitutes a national-security threat is unreviewable. *See USP Holdings*, 36 F.4th at 1369; *PrimeSource*, 59 F.4th at 1263 (similar); *cf., e.g., People's Mojahedin Org. of Iran v. Dep't of*

36

*State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (whether an organization's activity "threatens…the national security of the United States" is "nonjusticiable"); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843 (D.C. Cir. 2010) (same). If courts cannot review national-security threat assessments, they certainly cannot compare those assessments to determine whether a particular threat is "unusual" or "extraordinary."

Similarly, the matter is nonjusticiable because it is "impossib[le] [to] decid[e] without an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. The underlying merits of the emergency declaration, just like the choice to impose tariffs as a remedy and the particular formulas used to set those tariffs, "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling*, 478 U.S. at 230. The President's "motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny." *Florsheim*, 744 F.2d at 796; *see Hawaii*, 585 U.S. at 708 ("[W]e cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy.").

The President's determination that there is an unusual and extraordinary threat, triggering IEEPA action, is likewise a political question because it falls within the last three *Baker v. Carr* factors. As the declarations of four cabinet secretaries make clear, the United States is presently engaged in extensive, sensitive negotiations with foreign governments premised on the President's IEEPA tariffs. Bessent ¶¶6-10; Greer ¶¶7-11; Lutnick ¶¶ 7-12; Rubio ¶¶8-12. Those negotiations could unravel if the Court were to review and disagree with the merits of the President's action, creating a foreign policy crisis and harming the United States' ability to accomplish diplomacy on this and other matters in the future. Bessent ¶¶10-13; Greer ¶¶11-15;

Lutnick ¶¶15-19; Rubio ¶¶3-4, 10-12.  This is thus a clear case in which a court decision contravening the President's exercise of power under IEEPA would be an unwarranted intrusion into the President's constitutional national-security and foreign-policy role; where there is an exceptional need for adherence to the President's and Congress's decision to adhere to the decision the President has already made; and where conflicting pronouncements by different branches on the same issue would lead to embarrassment of the United States on a global stage. *Baker*, 369 U.S. at 217; Bessent ¶¶9-13; Greer ¶¶11-15; Lutnick ¶¶1, 13; Rubio ¶¶2-3, 8-16.

    None of this means that the President's emergency declarations go unreviewed.  Indeed, *Baker* recognizes political questions arise where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department" or potential "embarrassment from multifarious pronouncements by various departments on one question."  369 U.S. at 217.  Here, as with many emergency statutes, the President "is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts." *Martin v. Mott*, 25 U.S. 19, 31 (1827); *see Sardino v. Fed. Res. Bank of New York*, 361 F.2d 106, 109 (2d Cir. 1966) (regarding President Nixon's national-emergency declaration, emphasizing that "the courts will not review a determination so peculiarly within the province of the chief executive").  After that, Congress designated *itself*—not the judiciary—as the body to supervise emergency declarations and the adequacy of the President's response.  *See* 50 U.S.C. §1622(c) (creating fast-tracked procedures for review and disapproval of emergency declarations); *Amirnazmi*, 645 F.3d at 577 (in IEEPA, "Congress reaffirmed its essential legislative function, and struck a careful balance").  Congress in the NEA and IEEPA "place[d] the onus on Congress to ensure emergency situations remain anomalous and do not quietly evolve into default norms." *Id.* at 581.

38

The Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919 (1983), holding concurrent resolutions unconstitutional, does not affect the analysis. That is because Congress doubled down on its exclusive role in reviewing emergencies and threat assessments by amending the NEA post-*Chadha* to provide for joint resolutions to terminate national emergencies. 99 Stat. 407, 448. This process has worked as intended, with Congress terminating the national emergency relating to the COVID-19 pandemic in 2023. 137 Stat. 6; *see* S.J. Res. 37, 119th Congress (2025). Any challenge to the fact of the emergency itself— particularly plaintiffs' claim that the emergency is not "unusual" or "extraordinary" enough—is a nonjusticiable political question.

IEEPA's provision addressing classified information, 50 U.S.C. § 1702(c), likewise does not represent a veiled attempt by Congress to permit judicial review despite the political-question doctrine. For one, it says as much expressly: "This section does not confer or imply any right to judicial review." *Id.* For two, it merely codifies the Government's ability to submit classified administrative records in suits challenging agency actions taken under IEEPA-based sanctions programs, like blocking or seizing of assets by the Office of Foreign Asset Control (OFAC) under an executive order's terms. In these cases, OFAC often submits a classified administrative record *ex parte* and *in camera* to facilitate APA review of its determination that individuals and their assets are subject to the executive order. *See, e.g.*, *Diegelmann v. Yellen*, 2024 WL 4880468, at *6 (D.D.C. Nov. 25, 2024) (IEEPA "expressly authorizes ex parte and in camera review" of classified information "precisely because" of such litigation by OFAC); H.R. Rep. No. 107-236, at 62 (2001) (explaining that this new section was one of "a number of clarifying and technical changes"). For three, §1702(c) applies only to a review "of a determination made under *this section*," but "this section" refers to §1702, not §1701, and only §1701 involves

"unusual and extraordinary threat," so the provision could not somehow provide for judicial review of that Presidential finding. No court has ever suggested, let alone held, that §1702(c) implies the availability of judicial review of a President's finding of an unusual-and-extraordinary threat or of the means chosen to remedy that threat.

Historical practice confirms that the President's determination that a threat is unusual and extraordinary is unreviewable. Presidents have declared national emergencies and deemed threats to be unusual and extraordinary without significant explanation that could enable judicial review. In fact, Presidents have repeatedly done so in a single sentence. *See, e.g.*, 5 U.S. Op. Off. Legal Counsel 432, 434 (1981); Executive Order 12513 ("I, RONALD REAGAN, President of the United States of America, find that the policies and actions of the Government of Nicaragua constitute an unusual and extraordinary threat to the national security and foreign policy of the United States and hereby declare a national emergency to deal with that threat."); Executive Orders 12543, 12635, 12722, 12735, 12775. Under plaintiffs' theory, these single-sentence findings are reviewable even though there is no detail to review.

Plaintiffs claim that the influx of opioids and persistent trade deficits are not "extraordinary threats." But whether that is so is precisely the sort of judgment committed to the political branches of government. "How, for example, is the court to determine whether" the effects of persistent trade deficits on the United States' national security posture "pose[] more than an ordinary or usual threat?" *Beacon Prods.*, 63 F.Supp. at 1195. The question is not fit for judicial resolution, but is for the political branches to resolve. Indeed, the tariffs at issue are presently being debated in Congress, as designed under IEEPA's legislative-review component. *See* Joint Resolution, S.J. Res. 49, 119th Cong. (2025) (49-49 failed vote on resolution terminating the national emergency the President declared in Executive Order 14257); Joint

Resolution, S.J. Res. 37, 119th Cong. (2025) (passed Senate resolution terminating the national emergency the President declared in Executive Order 14193 regarding fentanyl from Canada; currently held in the House). The Court should let the political process resolve these political questions.

Plaintiffs hinge their argument that the influx of opioids and the trade deficit are not "unusual" or "extraordinary" because they are not "rare and brief," but instead a persistent state of affairs. Mot.29. But "unusual and extraordinary" threats need not be short-lived—and, regrettably, are often persistent. Congress's express allowance for the extension of national emergencies that persist after one year confirms it did not understand IEEPA to apply only to fleeting threats. *See* 50 U.S.C. §1622(d). Presidents have issued Executive Orders, under the NEA and IEEPA, addressing emergencies that have lasted for decades. In fact, one emergency declared under IEEPA was recently extended into its 45th year. Notice, *Continuation of the National Emergency with Respect to Iran*, 89 Fed. Reg. 87,761 (Nov. 4, 2024) (continuing national emergency, with respect to the Iran hostage crisis, dating back to 1979).

Recent presidential declarations have also extended other persistent emergencies. *See, e.g.*, Notice, *Continuation of the National Emergency with Respect to Export Control Regulations*, 89 Fed. Reg. 66,187 (Aug. 15, 2024) (continuing national emergency, dating back to 2001, with respect to the expiration of the Export Administration Act of 1979); Notice, *Continuation of the National Emergency with Respect to Significant Narcotics Traffickers Centered in Colombia*, 89 Fed. Reg. 83,417 (Oct. 15, 2024) (continuing national emergency, dating back to 1995, with respect to narcotics trafficking in Colombia). Plaintiffs' interpretation of IEEPA and the NEA would throw doubt on these and other ongoing national emergencies.

Indeed, the 2001 Executive Order, which declared a national emergency as to export control regulations and is still active, did no more than extend the provisions of an expiring law that had been enacted in 1979. Executive Order 13222, *Continuation of Export Control Regulations*, 66 Fed. Reg. 44,025 (Aug. 22, 2001).[9] And, when invited to second-guess the President's authority to invoke IEEPA in issuing the order, the Ninth Circuit declined to do so, explaining that "courts must be hesitant to review the executive's declaration of a national emergency." *Shih*, 73 F.4th at 1092.

At the very least, there has been no "clear misconstruction of" the "unusual and extraordinary threat" language in IEEPA. *See USP Holdings*, 36 F.4th at 1369. "Unusual and extraordinary threats" are those beyond what is common. *See Extraordinary*, Black's Law Dictionary (12th ed. 2024) ("Beyond what is usual, customary, regular, or common"); *Unusual*, Black's Law Dictionary (12th ed. 2024) ("Different from what is reasonably expected."). Trade deficits are not new, but the United States's trade deficit has increased by 40 percent over the last five years. The scope and gravity of the trade deficit and trade barriers—along with the *acuity* of their *effects*—built up over time, constitute the unusual-and-extraordinary threat. *See* Executive Order 14257, 90 Fed. Reg. at 15,044-45; Executive Order 13818 ("the prevalence and severity of human rights abuse and corruption…have reached such scope and gravity that they threaten the stability of international political and economic systems"); Executive Order 12532 (South Africa's longstanding "policy and practice of apartheid"); Executive Order 14078 ("hostage-

---

[9] Notably, Executive Order 13222 also regulated commerce with foreign nations, relying on IEEPA "to exercise the necessary vigilance over exports and activities affecting the national security" and "to protect the domestic economy from the excessive drain of scarce materials[.]" 66 Fed. Reg. at 44,025. This shows that these executive orders are not the first time that the President has used IEEPA to regulate commerce to protect the domestic economy.

taking and the wrongful detention of United States nationals abroad"); Executive Orders 12868, 12930, 12938 ("the proliferation of nuclear, biological, and chemical weapons").

**B.      There Is A Reasonable Relationship Between The Emergency And The Tariffs Imposed**

Plaintiffs do not contest that there is a reasonable relationship between the emergencies declared and the tariffs imposed to address it.  Nor can they—just as the existence of a national emergency is a political question, so too is the President's chosen means for addressing such an emergency.  As the Supreme Court recently reiterated, "[w]hether the President's chosen method of addressing perceived risks is justified from a policy perspective is irrelevant to the scope of his authority." *Hawaii*, 585 U.S. at 686 (cleaned up); *see Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1342-44 (Fed. Cir. 2010) (use of "may" in statutory authorization to the President meant that "the President's exercise of his discretion is not subject to judicial review," even when it involves consideration of "the nation's economic interests").  In the area of national security and foreign affairs, "the impact of certain conduct" can be "difficult to assess," making "the lack of competence on the part of the courts…marked." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010).  Just as with the emergency declaration, and the closely tied assessment of whether there is an unusual and extraordinary threat, the President's selection of the means to address the emergency "is a 'multifaceted judgmental decision,' for which there is 'no law to apply.'" *Florsheim*, 744 F.2d at 796; *see, e.g.*, *El-Shifa*, 607 F.3d at 843.

Section 232 precedent confirms that evaluating the President's chosen means of dealing with an emergency is a nonjusticiable political question.  With Section 232, as here, "there is no review of the President's pertinent factual and remedial-appropriateness determinations." *PrimeSource*, 59 F.4th at 1263 (the court "may not second-guess the facts found and measures taken by the President to support his adjustment").

If the Court were to go beyond the binding limitations expressed in *Maple Leaf*, it could still do no more than determine whether the President's chosen means are reasonably related to the national emergency. *Yoshida*, 526 F.2d at 578; *United States v. Spawr Optical Rsch.*, 685 F.2d 1076, 1081 (9th Cir. 1982) (assessing whether the President's action is "rationally related to the national emergencies invoked"). The President's chosen means reasonably "deal with" the national emergencies.

As to the trade deficit, the imposed tariffs have a "direct effect" on the United States' trade deficit, *Yoshida*, 526 F.2d at 580, and on improving this nation's "domestic production capacity," "military readiness," and "national security posture," Executive Order 14257, 90 Fed. Reg. at 15,044-45. As a result, the tariffs are "'plausibly related to the Government's stated objective to protect' national security" and increase domestic production. *Transpacific*, 4 F.4th at 1333-34 (rejecting the contention that differing tariff rates between countries was irrational, explaining that "it is rational for the President to try a steep increase on tariffs for only one major exporter to see if that strategy helps to achieve the legitimate objective of improve domestic capacity utilization without extending the increase more widely"); *Yoshida*, 526 F.2d at 580. In 2023, the ITC issued a report analyzing the effects of the President's previous tariffs, imposed under Sections 232 and 301, on more than $300 billion of U.S. imports. *Economic Impact of Section 232 and 301 Tariffs on U.S. Industries*, Inv. No. 332-591, USITC Pub. No. 5405 (May 2023). This analysis revealed that the tariffs reduced imports from China, were effective in stimulating increased U.S. production of steel and aluminum, and had very minor effects on U.S. prices. *Id.* at 21-22. Further, the Coalition for a Prosperous America released an economic model simulating a worldwide 10 percent tariff on U.S. imports and found that the "tariff makes imports less competitive and domestic production of manufactured and other goods rise to take

advantage of the opportunities" leading to "more jobs and more capital investment."  Jeff Ferry, *Global 10% Tariffs on U.S. Imports Would Raise Incomes and Pay for Large Income Tax Cuts For Lower/Middle Class*, Coalition for a Prosperous America (July 24, 2024), https://perma.cc/XUZ8-BG99.  Indeed, the tariffs are already beginning to address the emergencies, as the extensive ongoing negotiations with many countries and the recently announced historic trade deal with the U.K. show.  Bessent ¶¶6-8, 10; Greer ¶¶7, 9, 11; Lutnick ¶¶7-12; Rubio ¶¶3, 8, 11; *see Fact Sheet: U.S.–U.K. Reach Historic Trade Deal* (May 8, 2025), perma.cc/7CPW-8CF2.

As to the illicit-drugs crisis, the President's actions are reasonably related to the desired change in behavior the President seeks from Mexico, Canada, and China because the President's actions pressure those countries to address the crisis.  The tariffs have fostered ongoing negotiations to address the country-specific emergencies.  In response to the President's action, the Governments of Canada and Mexico, for instance, took "immediate steps designed to alleviate the illegal migration and illicit drug crisis through cooperative actions."  *See* Executive Order 14198, 90 Fed. Reg. 9,185 (Feb. 10, 2025); Executive Order 14197, 90 Fed. Reg. 9,183 (Feb. 3, 2025); *but see* Executive Order 14228, 90 Fed. Reg. 11,463 (Mar. 3, 2025) ("I have determined that [China] has not taken adequate steps to alleviate the illicit drug crisis" and increasing the tariffs).  And recently, China agreed to work with the United States to address illegal fentanyl distribution into the United States.  *See* https://perma.cc/U7TZ-LLZR.

Moreover, the President has explained that illicit drugs entered the United States through both illegal networks and through traditional import systems.  *See, e.g.*, Executive Order 14256 ("Many shippers based in the People's Republic of China (PRC) hide illicit substances and conceal the true contents of shipments sent to the United States through deceptive shipping

practices."); Executive Order 14193 ("[t]he flow of illicit drugs like fentanyl to the United States [occurred] through both illicit distribution networks and international mail"). The President's action not only incentivizes the countries to address the emergency but also deters importation of illicit drugs concealed within seemingly lawful imports.

In sum, the Court should not insert itself into the President's complex, sensitive judgments about foreign affairs, national security, and economic policy. The only question, if the Court finds it can address the question at all, is whether the challenged tariffs are reasonably related to the declared emergencies. There is no serious dispute here that they are.

## IV.    Plaintiffs Are Not Entitled To An Injunction, And Any Judgment Should Be Stayed Pending Appeal

Plaintiffs seek declaratory and injunctive relief, as well as vacatur of HTSUS modifications and refunds of duties plaintiffs have paid. Mot.46-47. Plaintiffs are not entitled to any relief, for the reasons already explained. Their request for an injunction, in particular, fails for additional reasons.

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

At the outset, plaintiffs fail to show an irreparable injury that cannot be redressed by monetary damages or other remedies available at law. The injuries they identify are monetary—payment of tariffs—and can be fully redressed by money damages and other legal remedies.

Plaintiffs likewise fail on the third and fourth factors.  As the declarations of four cabinet secretaries make clear, serious and immediate harms to ongoing United States diplomatic efforts, foreign policy, and national security would flow from an injunction.  Bessent ¶¶9-13; Greer ¶¶6, 9-15; Lutnick ¶¶1, 7-15, 19; Rubio ¶¶3, 8-16.  Those grave harms to the United States government and the public interest mandate denial of injunctive relief here.  *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 23-28 (2008) (concluding that harms to the government and the public interest arising from interference with national security needs were independently sufficient to preclude injunctive relief).

Based on the same considerations, the Court should stay any judgment against the United States so that it can seek emergency relief and appeal.  Without a stay, an adverse judgment could shatter current diplomatic efforts, eliminating the premise of ongoing negotiations with dozens of countries.  Bessent ¶¶10-13; Greer ¶¶7, 9-13; Lutnick ¶¶7, 11-13, 15, 19; Rubio ¶¶8-12.  Negotiations cannot simply be paused and resumed at a moment's notice.  This disruption of negotiations with other countries would irreparably harm United States diplomacy and national security.  Bessent ¶¶11-13; Greer ¶¶6, 11-15; Lutnick ¶¶1, 11-19; Rubio ¶¶3-4, 10-16.  A stay of any judgment pending appeal is imperative.

## CONCLUSION

For these reasons, the Court should deny plaintiffs' summary-judgment motion and enter judgment in favor of defendants.


DATED: May 23, 2025                    Respectfully submitted,

OF COUNSEL:                            YAAKOV M. ROTH
                                       Acting Assistant Attorney General
ALEXANDER K. HAAS
Director                               ERIC J. HAMILTON

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
CATHERINE M. YANG
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 305-7568
sosun.bae@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court and this Court's May 15, 2025 order, that this brief contains 13,991 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Sosun Bae
SOSUN BAE