## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:   THE HONORABLE GARY S. KATZMANN, JUDGE
          THE HONORABLE TIMOTHY M. REIF, JUDGE
          THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, <br><br> Defendants. | Court No. 25-00078 |

## DECLARATION OF SECRETARY OF STATE MARCO RUBIO

I, Marco Rubio, hereby state as follows:

1. I am the Secretary of State of the United States and head of the United States Department of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As Secretary of State, I am the President's chief foreign affairs advisor. I carry out the

1

President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2. The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3. The purpose of this Declaration is to confirm, in my capacity as Secretary of State and head of the Department of State, that a ruling for the plaintiffs in this case would cause significant and irreparable harm to U.S. foreign policy and national security. Such a ruling would derail critical ongoing negotiations with our foreign trading partners and threaten broader U.S. strategic interests internationally.

4. In the International Emergency Economic Powers Act (IEEPA), *see* 50 U.S.C. § 1701 *et seq.*, Congress granted to the President dynamic, flexible authority to respond to crises on a global scale. President Trump has exercised that authority to impose tariffs in response to crises threatening America's national security.

5. In particular, the President found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal aliens across our southern and northern borders is an emergency for the United States and its citizens.

6. Likewise, the President found in Executive Order 14,195 that the encouragement by the People's Republic of China (PRC) of PRC businesses to export illegal drugs and precursors

for manufacturing those drugs in the United States is an emergency for the United States and its citizens.

7. Last, the President found in Executive Order 14,257 that our trade partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, and resulting large and persistent annual U.S. goods trade deficits have given rise to acute national security threats driven by our hollowed-out manufacturing base, lack of advanced domestic manufacturing capacity, vulnerable supply chains, a defense-industrial base that depends on foreign adversaries, and the sensitive geopolitical environment.

8. The United States is presently pursuing potential trade deals with Mexico, Canada, PRC, and dozens of other countries. These negotiations could address the urgent threats of mass migration at our northern and southern borders, the flow of fentanyl into our country, and the erosion of our domestic production capacity caused in substantial part by the large and persistent annual U.S. goods trade deficient stemming from our trade partners' non-reciprocal trading practices.

9. The negotiations are currently in a delicate state, with discussions ongoing and final deals not yet reached. In some cases, we have reached frameworks with our trading partners, while we continue to negotiate on details. In other cases, we have not yet reached a framework agreement or arrangement.

10. These negotiations have been one of the country's top foreign policy priorities since the reciprocal tariffs were announced on April 2. Reflecting the urgency of the emergency, much of U.S. global diplomacy in the last six weeks has been focused on these negotiations.

11. In each case, the negotiations are premised on the ability of the President to impose tariffs under IEEPA. If the President is enjoined or limited from exercising his authority under

3

IEEPA to impose tariffs to address these urgent threats, that would cause irreparable harm to our efforts to secure the U.S. production and manufacturing base through our ongoing negotiations and other diplomatic efforts.

12. For example, if the Court were to enjoin the President from imposing tariffs, our trade partners would likely believe that the President lacks power under IEEPA to promptly respond to their actions during the ongoing negotiations. They may also perceive such a ruling as a vulnerability and encourage them to retaliate against the United States for attempting to impose tariffs and negotiate agreements to protect our national security. *See* Executive Order 14,266, § 3. Notably, other countries declined to retaliate against the United States after the President made clear he would exercise his authority under IEEPA to impose additional tariffs, as he did with PRC.

13. The political branches, not the courts, are appropriately situated to handle and intervene in matters of foreign policy and national security. This case and the real-world diplomacy inherent in it exemplify why the courts must not interfere in such foreign affairs. U.S. foreign policy has an exceptional need for consistent implementation of the decision the President has already made under IEEPA. A conflicting pronouncement by this Court on the same issue would lead to embarrassment of the United States on a global stage.

14. Beyond diplomatic embarrassment, which itself is dangerous as it emboldens allies and adversaries alike, the Court's interference would perpetuate the United States' industrial decline and unsustainable trade deficits. The President found in Executive Order 14,257 that the United States' large and persistent trade deficits are a structural imbalance in the global trading system that has hollowed out a number of critical industries. Without robust domestic production capacity, the United States will not be able to produce the weapons

and other resources necessary to defend itself or support the critical industries necessary to avoid being held hostage by foreign adversaries. That weakened position will have a direct impact on the President's ability to conduct foreign policy and advance the United States' interests.

15. Congress has reserved for itself the power to review the President's exercise of his powers under IEEPA. Exercising that role, Congress considered whether to terminate the President's emergency declaration, and it has appropriately declined to do so, recognizing the appropriateness of the President's exercise of powers and the delicate, ongoing international diplomacy that is unfolding as a result.

16. It is critical to the foreign policy and national security of the United States for the Court to decline to enjoin or restrain the President from exercising his power under IEEPA to impose tariffs in recognition of the unusual and extraordinary threats at issue in this litigation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 23rd day of May, 2025.

_____
Marco Rubio
Secretary of State