# UNITED STATES COURT OF INTERNATIONAL TRADE

PRINCESS AWESOME, LLC, et al.,

   Plaintiffs,

  v.

UNITED STATES CUSTOMS AND BORDER
PROTECTION, et al.,

   Defendants.

COURT NO. 25-00078

## PLAINTIFFS' REPLY BRIEF
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

MOLLY E. NIXON
JOSHUA M. ROBBINS
ASHLEY TORKELSON LEVINE*
 *Application Pending
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, VA 22201
(202) 888-6881
MNixon@pacificlegal.org
JRobbins@pacificlegal.org
ALevine@pacificlegal.org

OLIVER J. DUNFORD
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
(916) 503-9060
ODunford@pacificlegal.org

*Attorneys for Plaintiffs*
*Princess Awesome, LLC, et al.*

# <u>TABLE OF CONTENTS</u>

Table of Authorities...................................................................................................... ii

Introduction ................................................................................................................. 1

I.  IEEPA Does Not Authorize Tariffs ................................................................ 2

   A.  "Regulate" Does Not Include Tariffs As Used In IEEPA .......................... 2

   B.  *Yoshida* Does Not Control IEEPA ............................................................ 4

      1.  Congress Did Not Ratify *Yoshida* ...................................................... 4

      2.  The History of IEEPA Shows *Yoshida* is Inapplicable ........................ 4

   C.  The Broad Construction of Emergency and Foreign Affairs Statutes
Does Not Grant the President Tariff Authority.......................................... 6

   D.  The Tariffs Raise a Major Question And Are Not Clearly Authorized
By IEEPA .................................................................................................. 7

      1.  The Major Questions Doctrine Applies to the President andForeign
Affairs ................................................................................................. 7

      2.  The Major Questions Doctrine Applies to the IEEPA Tariffs ............. 9

II.  The Emergencies Were Not Declared With Respect to Unusual and
Extraordinary Threats ................................................................................. 12

III.  IEEPA Unconstitutionally Transfers Tariff Power to the President ............ 15

   A.  IEEPA provides no intelligible principle................................................. 15

   B.  Procedures cannot overcome the absence of an intelligible principle .... 18

   C.  Any foreign policy consequences of tariffs do not fundamentally alter
Congress's legislative responsibilities or the judiciary's review ............. 20

IV.  Plaintiffs' APA Claims Are Fully Briefed ...................................................... 22

V.  Plaintiffs Are Entitled To A Permanent Injunction ...................................... 23

VI.  Plaintiffs Are Entitled To Refunds................................................................ 24

Conclusion................................................................................................................. 24

Certificate of Compliance ......................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
  295 U.S. 495 (1935) ................................................................................. 16

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States,*
  751 F.2d 1239 (Fed. Cir. 1985) ............................................................... 14

*Am. Inst. for Int'l Steel v. United States,*
  806 F. App'x 982 (Fed. Cir. 2020) .......................................................... 21

*Am. Power & Light Co. v. SEC,*
  329 U.S. 90 (1946) ................................................................................... 15

*B-West Imports, Inc. v. United States,*
  75 F.3d 633 (Fed. Cir. 1996) ................................................................. 7, 9

*Baker v. Carr,*
  369 U.S. 186 (1962) ..................................................................... 12–13, 18

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ........................................................................ 6, 8–9

*Bradford v. U.S. Dep't of Lab.,*
  101 F.4th 707 (10th Cir. 2024) ................................................................. 8

*California Steel Indus., Inc. v. United States,*
  745 F. Supp. 3d 1287 (Ct. Int'l Trade 2024) ......................................... 24

*Cargo of the Brig Aurora v. United States,*
  11 U.S. (7 Cranch) 382 (1813) ................................................................ 17

*Chang v. United States,*
  859 F.2d 893 (Fed. Cir. 1988) ................................................................. 13

*Chastleton Corp. v. Sinclair,*
  264 U.S. 543 (1924) ................................................................................. 12

*Conn. Nat'l Bank v. Germain,*
  503 U.S. 249 (1992) ................................................................................... 9

*Ctr. For Bio. Diversity v. Trump,*
  453 F. Supp. 3d 11 (D.D.C. 2020) .......................................................... 18

*Dames & Moore v. Regan,*
  453 U.S. 654 (1981) ........................................................................... 19, 21

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ................................................................................. 11

*FEA v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976) ................................................................. 3, 19, 21

*Florsheim Shoe Co., Div. of Interco v. United States*,
  744 F.2d 787 (Fed. Cir. 1984) ........................................................ 7, 14

*Georgia v. President*,
  46 F.4th 1283 (11th Cir. 2022) ............................................................. 8

*Gibbons v. Ogden*,
  22 U.S. 1 (1824) ...................................................................................... 10

*Gundy v. United States*,
  588 U.S. 128 ............................................................................................ 15

*Haig v. Agee*,
  453 U.S. 280 (1981) .............................................................................. 12

*Humane Soc'y of the United States v. Clinton*,
  236 F.3d 1320 (Fed. Cir. 2001) ........................................................ 14

*Jama v. ICE*,
  543 U.S. 335 (2005) ................................................................................ 4

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
  478 U.S. 221 (1986) .............................................................................. 14

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ................................................................. 8

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ............................................................... 8

*Maple Leaf Fish Co. v. United States*,
  762 F.2d 86 (Fed. Cir. 1985) ......................................................... 13–14

*Marshall Field & Co v. Clark*,
  143 U.S. 649 (1892) .............................................................................. 17

*Martin v. Mott*,
  25 U.S. 19 (1827) ................................................................................... 14

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir. 2023),
  vacated as moot, 89 F.4th 1186 (9th Cir. 2023) ............................... 8

*Ex parte Milligan*,
  71 U.S. 2 (1866) ..................................................................................... 13

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) .............................................................................. 23

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  583 U.S. 109 (2018) ................................................................................ 2

*Nebraska v. Su,*
121 F.4th 1 (9th Cir. 2024) ............................................................. 8

*Oman Fasteners, LLC v. United States,*
125 F.4th 1068 (Fed. Cir. 2025) .................................................... 23

*Oregon v. Trump,*
No. 1:25-cv-00077 (Ct. of Int'l Trade) ......................................... 22

*Panama Refining Co. v. Ryan,*
293 U.S. 388 (1935) ...................................................................... 16

*PrimeSource Bldg. Prods., Inc. v. United States,*
59 F.4th 1255 (Fed. Cir. 2023) ............................................... 14, 19

*Regan v. Wald,*
468 U.S. 222 (1984) ...................................................................... 19

*Reno v. American-Arab Anti-Discrimination Comm.,*
525 U.S. 471 (1999) ...................................................................... 14

*Robert Bosch LLC v. Pylon Mfg. Corp.,*
659 F.3d 1142 (Fed. Cir. 2011) .................................................... 23

*Sardino v. Fed. Res. Bank of New York,*
361 F.2d 106 (2d Cir. 1966) ......................................................... 14

*Seila L. LLC v. CFPB,*
591 U.S. 197 (2020) .................................................................... 7–8

*Snyder v. United States,*
144 S. Ct. 1947 (2024) .................................................................... 2

*Transpacific Steel LLC v. United States,*
4 F.4th 1306 (Fed. Cir. 2021) ...................................................... 19

*Trump v. Hawaii,*
585 U.S. 667 (2018) ................................................................ 11, 14

*United States v. Amirnazmi,*
645 F.3d 564 (3d Cir. 2011) .................................................. 13, 18–19

*United States v. Dhafir,*
461 F.3d (2nd Cir. 2006) .............................................................. 21

*United States v. Mazurie,*
419 U.S. 544 (1975) ...................................................................... 21

*United States v. Rock Royal Co-op,*
307 U.S. 533 (1939) ...................................................................... 18

*United States v. Shih,*
73 F.4th 1077 (9th Cir. 2023) ...................................................... 13

*United States v. Yoshida Int'l, Inc.*,
   526 F.2d 560 (C.C.P.A. 1975) ................................................................*passim*

*USP Holdings, Inc. v. United States*,
   36 F.4th 1359 (Fed. Cir. 2022) ..................................................... 14

*V.O.S. Selections, Inc. v. Trump*,
   No. 25-00066 (Ct. Int'l Trade May 28, 2025) .............................*passim*

*West Virginia v. EPA*,
   597 U.S. 697 (2022) .............................................................. 7–10

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) .................................................................... 4

*Yakus v. United States*,
   321 U.S. 414 (1944) .................................................................. 17

*Zemel v. Rusk*,
   381 U.S. 1 (1965) ...................................................................... 21

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ............................................................ 7–8, 22

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 1 ..................................................... 8

U.S. Const. art. I, § 8, cl. 3 ..................................................... 8

## Statutes

5 U.S.C. § 706(2)(B) ................................................................. 22

5 U.S.C. § 706(2)(C) ................................................................. 22

8 U.S.C. § 1182(f) .................................................................... 11

19 U.S.C. § 1862 ....................................................................... 3

19 U.S.C. § 1862(a) .................................................................... 3

19 U.S.C. § 1862(c) .................................................................... 3

19 U.S.C. § 2132 ....................................................................... 5

19 U.S.C. § 2464 ...................................................................... 14

50 U.S.C. § 1701 ...................................................................... 13

50 U.S.C. § 1701(a) ................................................................... 10

50 U.S.C. § 1701(b) ................................................................... 12

50 U.S.C. § 1702(a)(1) ................................................................ 10

50 U.S.C. § 1702(a)(1)(B) ............................................................. 3

50 U.S.C. § 1702(b) .................................................................................. 6

High Seas Driftnet Fisheries Enforcement Act, 19 U.S.C. §§ 2251–53..................... 14

Trade Expansion Act of 1962 ......................................................................... 14

## Regulations

Exec. Order 12513, *Prohibiting Trade and Certain Other Transactions Involving Nicaragua* ................................................................... 14

Exec. Order 12543, *Prohibiting trade and certain transactions involving Libya*............................................................................... 14

Exec. Order 12635, *Prohibiting Certain Transactions With Respect to Panama*..................................................................................... 14

Exec. Order 12722, *Blocking Iraqi Government Property and Prohibiting Transactions with Iraq* ...................................................... 14

Exec. Order 12775, *Prohibiting Certain Transactions With Respect to Haiti* ....................................................................................... 14

Exec. Order 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025) .................................................................... 13, 21

Exec. Order 14298, *Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21,831 (May 12, 2025) ................................................................. 16

## Other Authorities

Casey, Christopher A., & Elsea, Jennifer K., Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* (2024) .................................................. 5

Oral Argument, *Oregon v. Trump*, No. 1:25-cv-00077 (May 21, 2025) .......................................... 20

Oral Argument, *V.O.S. Selections v. Trump*, No. 1:25-cv-00066 (May 13, 2025) .......................................... 20

## INTRODUCTION

In *United States v. Yoshida Int'l, Inc.*, the court noted that the "declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules[.]" 526 F.2d 560, 583 (C.C.P.A. 1975). But through a series of Executive Orders issued pursuant to the International Emergency Economic Protection Act (IEEPA), the President has done just that. After declaring emergencies with respect to the sustained influx of synthetic opioids and persistent trade deficits, the President unilaterally imposed global tariffs that reached as high as 145%.

Now these tariffs have all been permanently enjoined by this Court. *V.O.S. Selections, Inc. v. Trump*, No. 25-00066 (Ct. Int'l Trade May 28, 2025). The Court should immediately enter judgment for Plaintiffs here who raise similar claims against the same Executive Orders and order a refund of all tariffs they have paid or will pay through a post-appeal final judgment pursuant to the now unlawful Executive Orders or any amendments or modifications thereto. The IEEPA tariffs imposed pursuant to both the fentanyl and trade deficit emergencies are invalid for the additional reasons raised by Plaintiffs in their Motion for Summary Judgment (ECF No. 10) and in this reply.[1]

---

[1] Defendants concede standing for nine Plaintiffs but assert that Upward Glance, LLC, and Mischief, LLC, lack standing because they have not "shown that they have imported or will import goods subject to the contested tariffs." *See* Opp. 12 n.2. This is incorrect. "A non-importer plaintiff may 'fairly employ economic logic' to establish a concrete and particularized injury-in-fact that is fairly traceable to a challenged tariff." *V.O.S. Selections, Inc. v. Trump*, No. 25-00066, Slip. Op. 25-66, at 20 (Ct. Int'l Trade May 28, 2025) (*V.O.S. Selections*). Upward Glance and Mischief have both demonstrated through their declarations and exhibits that the tariffs are "likely to cause [them] an economic injury." *Id.* Upward Glance regularly imports art from countries subject to tariff increases and anticipates incurring "extreme, unexpected

## I.  IEEPA Does Not Authorize Tariffs

### A. "Regulate" Does Not Include Tariffs As Used In IEEPA

IEEPA's authorization for the President to "regulate . . . importation" does not permit the use of tariffs. MSJ 15–27. As this court has already held, IEEPA cannot be read "to delegate an unbounded tariff authority to the President." *V.O.S. Selections* at 25.

The government argues that courts have long considered tariffs to be a form of commercial regulation. Opp. 14. But the question whether a tariff "can be" a form of regulation does not address whether the word "regulate" *as used in IEEPA* authorizes the imposition of tariffs. Even if "[i]n isolation" "regulate" could include a tariff power, the Court is not required to give meaning to every definition of a word where the appropriate meaning is apparent from context. *Snyder v. United States*, 144 S. Ct. 1947, 1959 (2024). In particular, Congress's enumeration of multiple specific powers in IEEPA, but not tariffs, demonstrates the absence of such power. MSJ 16.

The government responds by claiming "broad"—apparently limitless—powers over foreign commerce because the authorities in IEEPA are "partially or fully over-lap[ping]." Opp. 15. But courts are "obliged to give effect, if possible, to every word Congress used." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128–29 (2018).

---

tariff costs for nearly all of [its] imported art." Cordair Decl. ¶¶ 4–5, ECF No. 10-1. Additionally, as a direct result of the increased tariffs, merchandise orders Mischief already placed have been cancelled or subject to tariff surcharges. Mischief Decl. ¶ 8, ECF No. 10-1. Goods that Mischief intended to order for resale have similarly been cancelled or are no longer available. *Id.* ¶¶ 7–8. The increased tariffs have caused and will cause Mischief reduced revenue and net income for the foreseeable future, and they threaten the future viability of the family business. *Id.* ¶¶ 9–12.

The government next claims that if IEEPA's terms are distinct, then "regulate" must include tariff power or else it is "superfluous." *Id.* But this argument fails since there are numerous hypothetical emergencies to which the President may respond with regulations—issued pursuant to 50 U.S.C. § 1704—that do not include tariffs or import prohibitions. For example, in response to an unusual and extraordinary threat from a plant or animal disease, the President could require additional inspections or quarantines of potentially affected imports. This type of regulation is not included by the terms "investigate, block," "direct and compel," "nullify," "void," or "prevent or prohibit." 50 U.S.C. § 1702(a)(1)(B).

Next, the government claims that because Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862) authorizes tariffs through its "adjust . . . imports" language, IEEPA must also authorize tariffs. Opp. 15–16. But Section 232 contemplates *both* quantitative import limits *and* other "circumstances" that may need to be addressed, 19 U.S.C. § 1862(c), making it "most unlikely" "that action must be confined to the imposition of quotas." *FEA v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976). Finally, subsection (a) of § 232 specifically mentions "duties," demonstrating that Congress considered duties as a tool to "adjust . . . imports." *Id.* § 1862(a), (c).

The government dismisses the relevance of the remaining trade statutes because IEEPA is an emergency statute. Opp. 16. But this misconstrues Plaintiffs' textual argument, which is that the existence of Congress's comprehensive tariff scheme makes it implausible that Congress would have used "regulate" in a non-trade statute as a catchall for tariffs. MSJ 17.

In short, IEEPA's silence on tariffs is properly interpreted as an absence of authority rather than an invitation to shoehorn in tariff power. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

### B. *Yoshida* Does Not Control IEEPA

#### 1. Congress Did Not Ratify *Yoshida*

Congress did not ratify, adopt, or otherwise accept *Yoshida's* interpretation of "regulate . . . importation" when it enacted IEEPA, as the government claims. Opp. 17. The government cannot meet the two factors required to show that Congress ratified a preexisting judicial interpretation of statutory text: (1) "reenact[ment] [of the statute] without change" and (2) a "judicial consensus" about the meaning "so broad and unquestioned that [the court] must presume Congress knew of and endorsed it." *Jama v. ICE*, 543 U.S. 335, 349 (2005). Assuming the first prong is satisfied, there is no broad and unquestioned judicial consensus that "regulate . . . importation" includes the imposition of tariffs. Indeed, the government can point to only two cases—*Yoshida* and a later case that adopted *Yoshida's* conclusion without analysis—to establish "consensus." Opp. 17–18. But judicial consensus is not established through two cases decided or affirmed by effectively the same lower court. *See Jama*, 543 U.S. at 351 (holding that two circuit cases, one without analysis, did not establish judicial consensus).

#### 2. The History of IEEPA Shows *Yoshida* is Inapplicable

The inapplicability to *Yoshida* is further demonstrated through the history of the IEEPA's enactment. Contrary to the government's assertions, there are not two competing historical narratives about IEEPA and tariffs. Opp. 18–20. There is simply

the question of how to account for a narrow window of time in the 1970s in which President Nixon imposed a global tariff to address a balance-of-payments crisis, and Congress and the courts responded.

The congressional and judicial responses to President Nixon's unprecedented use of TWEA confirm "regulate . . . importation" does not authorize tariffs. Congress passed Section 122 of the Trade Act of 1974 creating an exclusive process for the President to impose tariffs to address balance-of-payment problems. 19 U.S.C. § 2132; *V.O.S. Selections* at 31. This authorization of tariffs *separate* from TWEA, even in the emergency situation faced by President Nixon, demonstrates that TWEA was never intended by Congress as a mechanism for tariffs, or at least that TWEA no longer included that power as *Yoshida* concluded. 526 F.2d at 582 n.33. Indeed, as this Court held, Section 122 "removes the President's power to impose remedies in response to . . . trade deficits . . . from the broader powers granted to a president during a national emergency under IEEPA." *V.O.S. Selections* at 34. After Section 122, the meaning of "regulate . . . importation" with respect to tariffs must be reevaluated. *Yoshida*, 526 F.2d at 582 n.33.

To that end, IEEPA was then enacted "with the intent of limiting presidential power." *V.O.S. Selections* at 31–32. The government's attempts to minimize the effect IEEPA had on the tariff power do not withstand scrutiny. Opp. 18–19. IEEPA added procedural restrictions demonstrating Congress's intent to limit the President's emergency powers. *See* Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and*

*Use* 6–9 (2024). The government's observation that "tariffs" are not among the exceptions to the President's IEEPA's authority (Opp. 19) is irrelevant because that section applies only to *property and transactions* that the President does not have the "authority to regulate or prohibit." 50 U.S.C. § 1702(b). Read together with *Yoshida* and Section 122, the best interpretation of "regulate . . . importation" *today* is that it does not authorize tariffs. MSJ 20–22.

### C. The Broad Construction of Emergency and Foreign Affairs Statutes Does Not Grant the President Tariff Authority

IEEPA's functioning as an emergency and foreign affairs–related statute does not overcome the lack of congressional authorization in IEEPA for the President to impose tariffs. Opp. 20–21. The deference traditionally accorded to the President in this area does not mean "that courts will unthinkingly defer to the Government's view of Congressional enactments." *V.O.S. Selections* at 40. The Supreme Court recently undertook an interpretive analysis of another emergency statute, the HEROES Act, through which the President purported to cancel significant amounts of student loans. *Biden v. Nebraska*, 600 U.S. 477, 494 (2023). The HEROES Act authorized the Secretary of Education to "waive or modify" statutory loan terms "in connection with a . . . national emergency." *Id.* at 485. In rejecting that this statute could be used "to cancel $430 billion of student loan principal," the Court did not alter its approach because of the "emergency" context. *Id.* at 494–500. It concluded that accepting the government's premise "would grant unlimited power to the Secretary" and was "inconsistent with the statutory language and past practice under the statute." *Id.* at 500–01.

The government also massively overreads the cases broadly construing foreign-affairs statutes to require "clear language cabining the President's authority." Opp. 21. This is a complete inversion of the role of the President and Congress with respect to foreign affairs, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015). Broad construction of foreign-affairs statutes is a much more modest interpretive guideline, as evidenced by the government's cited cases, which involve unnaturally narrow readings of statutes. *B-W. Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996); *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 792–95 (Fed. Cir. 1984).

### D. The Tariffs Raise a Major Question And Are Not Clearly Authorized By IEEPA

#### 1. The Major Questions Doctrine Applies to the President and Foreign Affairs

The major questions doctrine is a tool of statutory interpretation aimed at evaluating the best understanding of authority Congress granted to the Executive Branch. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). The doctrine applies "in certain extraordinary cases" where "separation of powers principles and a practical understanding of legislative intent make [the Court] 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there,'" *id.* at 723, such as this case, *V.O.S. Selections* at 28.

The government is wrong to argue that the major questions doctrine is inapplicable to presidential action. Opp. 22–23. First, as a separation of powers matter, administrative agencies cannot be disaggregated from the President. "Under our constitution, the 'executive Power'—all of it—is 'vested in a President.'" *Seila L. LLC v.*

*CFPB*, 591 U.S. 197, 203 (2020). Second, as a matter of statutory interpretation, the relevant question is what authority Congress delegated based on the text of the statute, not to whom that authority was delegated. *West Virginia*, 597 U.S. at 723. Finally, the Supreme Court has never excluded the President from the major questions doctrine, and five circuits have applied the major questions doctrine to presidential actions. *See Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024);[2] *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 728 (10th Cir. 2024); *Louisiana v. Biden*, 55 F.4th 1017, 1031 n.40 (5th Cir. 2022); *Georgia v. President*, 46 F.4th 1283, 1295–97 (11th Cir. 2022); *Kentucky v. Biden*, 23 F.4th 585, 606–08 (6th Cir. 2022). This Court should follow the circuit-court consensus.

Further, the major questions doctrine applies regardless of the foreign-affairs context because the tariff power and the foreign-commerce powers were each specifically and exclusively granted to *Congress*. U.S. Const. art. I, § 8, cls. 1, 3. Deference to the President in the execution of foreign affairs does not negate Congress's authority over foreign-affairs policy—"it is still the Legislative Branch, not the Executive Branch, that makes the law." *Zivotofsky*, 576 U.S. at 21. As a result, it is essential to determine whether Congress authorized the President to impose tariffs in IEEPA. The major questions doctrine is an interpretive tool to work out "who has the authority to," in this case, impose tariffs. *Nebraska*, 600 U.S. at 501; *see also V.O.S. Selections* at 42 (same).

---

[2] The government relies on *Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023) (*see* Opp. 22–23), but the Ninth Circuit issued *Nebraska* after it vacated *Mayes* as moot, 89 F.4th 1186 (9th Cir. 2023).

Federal Circuit precedents counseling for a broad construction for foreign-affairs statutes granting power to the President do not negate the applicability of the major questions doctrine. *See, e.g.*, *B-West Imports*, 75 F.3d at 636. "[C]anons of construction are . . . rules of thumb," not strict rules that cancel each other out. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992). It may be that the broad construction given to foreign-affairs statutes expands the breadth of authority claimed by the President that triggers the major questions doctrine. But the major questions doctrine still requires courts to invoke "common sense" in the reviewing the manner of "[e]xtraordinary" Congressional delegations. *West Virginia*, 597 U.S. at 722.

### 2.  The Major Questions Doctrine Applies to the IEEPA Tariffs

The IEEPA tariffs are a major questions case. The applicability of the major questions doctrine is a "common sense" analysis of whether Congress would have used the statutory means at issue to delegate vast powers to the executive branch. *West Virginia*, 597 U.S. at 722 (citation omitted). Here, enough "indicators from [the Court's] previous major questions cases are present" to justify applying the doctrine. *Nebraska*, 600 U.S. at 504 (citation omitted). These tariffs have an enormous economic and political significance, as the government concedes (Opp. 23), and were implemented by a branch of government without the tariff power, pursuant to vague statutory language that was only used once in over 100 years to implement significantly more limited tariffs. *See* MSJ 23–27.

The government fails to demonstrate that the imposition of worldwide tariffs imposed to revolutionize our trading relationships is not an unheralded power under IEEPA. President Nixon's 1971 tariffs don't come close to supporting the government.

They reflect a single, limited instance of tariff use in the history of TWEA and IEEPA, which was promptly addressed through separate congressional legislation. Moreover, *Yoshida* noted the 1971 tariff's limited nature, particularly that it did not exceed congressionally proscribed tariff caps. 526 F.2d at 577–78. In contrast, the 2025 IEEPA tariffs were imposed with no regard for the preexisting congressionally authorized tariff scheme. This is precisely the sort of "discover[y] in a long-extant statute [of] an unheralded power" to which the major questions doctrine applies. *West Virginia*, 597 U.S. at 724 (citation omitted).

The government's additional argument (Opp. 24) that the tariffs do not represent an exercise of unheralded power because IEEPA has been used to impose embargoes and sanctions proves too much. IEEPA was enacted to deal with "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States." 50 U.S.C. § 1701(a). In these situations, IEEPA grants the President the power to "prohibit . . . transactions in foreign exchange," "block" a foreign national from "exercising any right" in "any property," and "prevent or prohibit" "importation or exportation." *Id.* § 1702(a)(1). So, freezing property or transactions and imposing trade embargoes are explicitly authorized by IEEPA. Tariffs are substantively distinct from these commercial restrictions. *Gibbons v. Ogden*, 22 U.S. 1, 201 (1824). As such, the embargoes and sanctions cannot serve as historical bases for the tariffs at issue here. *See West Virginia*, 597 U.S. at 725–26 (distinguishing earlier EPA cap-and-trade scheme from Clean Power Plan).

Nor, as the government claims (Opp. 25), is the major questions doctrine limited to assertions of executive authority pursuant to statutory mouseholes and catchall phrases. In *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000), the Court, applying "common sense," concluded that the FDA's significant authority to regulate drugs and devices did not extend to tobacco, given other tobacco-related legislation. *Id.* at 133, 142–43. That approach is appropriate here because while IEEPA grants the President significant authority, a common sense understanding of the statute and tariff-related legislation leads to the conclusion that IEEPA does not extend to tariffs. The government's assertion that "common sense" dictates that Congress would have delegated in IEEPA the entirety of its tariff power to the President without limitation beggars belief. Opp. 25.

The government's reliance on *Trump v. Hawaii*, 585 U.S. 667, 683–84 (2018) is also misplaced. Opp. 26–27. Plaintiffs do not claim that "regulate" cannot mean impose tariffs because that would place IEEPA in conflict with other tariff statutes. Rather, Plaintiffs maintain that Congress's otherwise comprehensive tariff scheme is further evidence that IEEPA's silence on tariffs shows it does not grant such authority. MSJ 17. In *Hawaii*, the statute at issue plainly granted the President authority to suspend the entry of any aliens into the country if he found their entry "detrimental to the interests of the United States." 585 U.S. at 684 (quoting 8 U.S.C. § 1182(f)). The plaintiffs argued that this statute "confer[ed] only a residual power" to suspend entry given the broader statutory-immigration scheme. *Id.* at 683, 688. Here, the question is not whether an otherwise indisputable delegation of power is limited by

other related statutes, but whether the statutory authorization to regulate can be *extended* to cover the substantively distinct authority to impose tariffs.

Finally, the government's representation (Opp. 27–28) that it continues to pursue trade policy through specific trade statutes is welcome—but irrelevant—for it doesn't demonstrate that the President's use of IEEPA to impose tariffs is lawful. The government asserts limitless authority for the President to impose tariffs whenever he declares an emergency. *See, e.g.*, Opp. 5–7. Indeed, under the government's conception of IEEPA, the President could simply declare the problem he is investigating to be an unusual and extraordinary threat and then, "in his judgment," impose the tariff remedy he would otherwise have sought through Sections 301 or 232, or ITC investigations.

## II.  The Emergencies Were Not Declared With Respect to Unusual and Extraordinary Threats

The government spends many pages responding to a simple question—whether the President has abused IEEPA's authorization by failing to point to an "unusual and extraordinary threat" contemplated by the statute. *See* MSJ 27–29; 29 U.S.C. § 1701(b).

To be sure, "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *See Haig v. Agee*, 453 U.S. 280, 292 (1981). But "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211 (1962); *cf. Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924) (reviewing Congress's

determination that World War I emergencies existed after 1922); *Ex parte Milligan*, 71 U.S. 2, 121 (1866) (precluding military commissions during Civil War).

The government here contends (Opp. 34–46) that this Court may not even consider whether IEEPA—a statute for targeting nefarious foreign actors—contemplates "unusual and extraordinary threats" created by domestic policies. But deference to the executive in matters of foreign policy "rests on reason, not habit." *Baker*, 369 U.S. at 213 (footnote omitted). And presidents may not act beyond the powers authorized by statute. *See Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985). An analysis of *this* case is therefore required. *Baker*, 369 U.S. at 217. Indeed, this court held that the "unusual and extraordinary threat" standard in 50 U.S.C. § 1701 is "a justiciable question of statutory construction." *V.O.S. Selections* at 37–43.

And in this case, the government can point to no decision supporting the President's blanket assumption of tariff power under IEEPA based on sustained and persistent "underlying conditions." Exec. Order 14257, 90 Fed. Reg. 15,041, 15,041 (Apr. 7, 2025). Instead, the government cites various opinions that only underscore how unprecedented the President's claims are. Indeed, several cases confirm the (until now) universal understanding that IEEPA has nothing to do with tariffs.[3] Others

---

[3] *See United States v. Shih*, 73 F.4th 1077 (9th Cir. 2023) (controls over exports of certain technology to China); *cf. id.* at 1092 (IEEPA "limits the President's authority to prohibit certain types of transactions."); *United States v. Amirnazmi*, 645 F.3d 564 (3d Cir. 2011) (targeting chemical engineer who hoped to assist Iran's weapons capabilities); *Chang v. United States*, 859 F.2d 893 (Fed. Cir. 1988) (economic sanctions against Libya).

consider responses to war or hostility.[4] Executive Orders cited by the government are similar.[5] And the government's cited cases that involve presidential tariff actions are based on *trade* laws.[6]

Ultimately, therefore, this case, like *Maple Leaf*, involves "a clear misconstruction of the governing statute" and "action outside delegated authority"—actions that allow for judicial review. 762 F.2d at 89. As Plaintiffs previously explained (MSJ 27–29), the government has clearly misconstrued an economics-sanction statute as authorizing a rewrite of the Nation's tariff policies, based on specious claims of unusual

---

[4] *See Hawaii*, 585 U.S. 667 (vetting foreign nationals to identify security threats); *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) (courts are not equipped to decide whether "nationals of a particular country [are] a special threat"); *Martin v. Mott*, 25 U.S. 19 (1827) (War of 1812); *Sardino v. Fed. Res. Bank of New York*, 361 F.2d 106, 109 (2d Cir. 1966) ("communist aggression").

[5] *See* Exec. Order 12513 (prohibiting trade and other transactions involving Nicaragua); Exec. Order 12543 (similar re: Libya); Exec. Order 12635 (Panama); Exec. Order 12722 (Iraq); Exec. Order 12775 (Haiti).

[6] *See PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255 (Fed. Cir. 2023) (Trade Expansion Act of 1962); *USP Holdings, Inc. v. United States*, 36 F.4th 1359 (Fed. Cir. 2022) (same); *Humane Soc'y of the United States v. Clinton,* 236 F.3d 1320 (Fed. Cir. 2001) (High Seas Driftnet Fisheries Enforcement Act, 19 U.S.C. §§ 2251–53); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) (Trade Act of 1974); *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239 (Fed. Cir. 1985) (Agriculture Act of 1956's provisions for textile trade); *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787 (Fed. Cir. 1984) (Trade Act of 1974); *see also Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) (International Convention for the Regulation of Whaling).

Further, these cases involve statutes that explicitly authorize certain presidential action. *See, e.g., Florsheim*, 744 F.2d at 792 ("The President may withdraw, suspend, or limit the application of the duty-free treatment. . .," subject to conditions.) (quoting 19 U.S.C. § 2464).

and extraordinary threats; and the President has obviously acted outside his delegated authority by imposing tariffs based on a statute that never mentions the word "tariffs," "duties," "imposts," or any other synonym.

The President's reliance on "sustained" and "persistent" problems—arising out of domestic policy choices—are not "unusual and extraordinary threat[s]."

## III.    IEEPA Unconstitutionally Transfers Tariff Power to the President

Plaintiffs' opening brief explained that IEEPA unconstitutionally transfers legislative power to the President. The government does not contest—indeed it concedes—that the scope of the power delegated is immense and the President's discretion is unconstrained. If there were any doubt before as to the government's reading of the law, it can be put to rest by Defendants' unwillingness even to contest Plaintiffs' contention that the President could invoke all of IEEPA's powers in response to a declared national emergency over a hangnail. MSJ 42. Defendants contest only that such a delegation violates the Constitution.

### A.   IEEPA provides no intelligible principle

The Supreme Court has no doubt upheld "even very broad delegations." *Gundy v. United States*, 588 U.S. 128, 146 (2019). But it has also continued to recognize that a limit on delegation exists. *Id.* at 136. The government does not counter Plaintiffs' objection that, if the standardless transfer of power in IEEPA does not go too far, it is difficult to imagine a statute that would. *See* MSJ 43.[7]

---

[7] In *Am. Power & Light Co. v. SEC*, the Supreme Court stated that a transfer of authority to the executive branch is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." 329 U.S. 90, 105 (1946). Plaintiffs submit that none

The government hangs its hat on the two intelligible principles *Yoshida* identified for TWEA: that the President was limited to actions consistent with the "national emergency purpose" and that those actions applied only to property in which a foreign actor has an interest. Opp. 29 (quoting 526 F.2d at 581–83). Defendants go so far as to claim that "IEEPA has even more limitations than those *Yoshida* upheld for TWEA." Opp. 29. But, as Plaintiffs explained in their opening brief, *Yoshida* rested on premises that cannot be maintained for IEEPA today. *See* MSJ 34–36, n.14. While *Yoshida* opined that the "declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules[,]" 526 F.2d at 583, that is precisely this administration's reading of IEEPA.[8]

Short work can also be made of the government's argument that an adequate intelligible principle exists even if courts cannot apply it. Opp. 31. Defendants suggest

---

of those conditions is satisfied here. IEEPA articulates no policy goals (general or otherwise), transfers power to the President alone, not an agency, and contains no boundaries on the power delegated.

[8] The government's efforts to distinguish the two Supreme Court cases invalidating laws on delegation grounds are puzzling. They correctly note that the statute in *A.L.A. Schechter Poultry Corp. v. United States*, gave the President "virtually unfettered" discretion to approve codes of competition and provided no standards. Opp. 32–33 (quoting 295 U.S. 495, 541–42 (1935)). But those are IEEPA's precise failings as well. Defendants' attempt to distinguish *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), is even more perplexing. They again correctly note that the statute there did "not qualify the President's authority[,]" "establish[d] no [criterion] to govern the President's course[,]" and did "not require any finding by the President as a condition of his action." Opp. 33. But the facts at issue in this very case demonstrate that is at least equally true of IEEPA. Products that may previously have incurred no import duty have—at various times in the last few months—been subject to 10%, 20%, 84%, 145%, and 34% duties, entirely at the President's discretion. *See* Mot. 7–19; Exec. Order 14298, *Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21,831 (May 12, 2025).

that because Congress "can judge the President's action" in declaring a national emergency, there is no delegation problem. *Id.* But that has it backward. The legislative branch doesn't need to parse whether the executive branch is complying with its intelligible principle in IEEPA or any other law; if Congress disagrees with the President's exercise of discretion, it can change the law or use its power of the purse to compel a change of course.

But in exercising the judicial power, courts must be able to test executive actions against the will of Congress. *Yakus v. United States*, 321 U.S. 414, 427 (1944). Concluding otherwise would render all of the Court's nondelegation precedents a waste of ink: if Congress could delegate legislative authority to the executive branch with unreviewable terminology like "emergency" without running afoul of delegation limits, the Court's centuries-long grappling with the constitutional limits on delegation was wholly misspent time. *See, e.g.*, *Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 387 (1813) (upholding statutory embargo authorization based on presidential fact-finding); *Marshall Field & Co v. Clark*, 143 U.S. 649, 693 (1892).

The government asserts without a supporting citation: "That courts lack authority to review political questions does not bear on whether Congress has permissibly delegated power to the President." Opp. 31. This Court should reject that sweeping claim. A national emergency declared pursuant to the NEA is no more inherently a political question than any other statutorily required executive branch finding. It is, however, nonjusticiable because that statute "provides no 'judicially discoverable and manageable standards' to help the Court determine whether the situation . . . is

- 17 -

a 'national emergency.'" *Ctr. For Bio. Diversity v. Trump*, 453 F. Supp. 3d 11, 32 (D.D.C. 2020) (quoting *Baker*, 369 U.S. at 217). That lack of standards is indisputably relevant to whether Congress has impermissibly delegated its legislative power to the President. Under the government's logic, Congress could, through unguided and thus unreviewable presidential declarations, transfer all policy questions to the executive branch and go home, having leapfrogged the nondelegation doctrine by including no standards for judicial review. That cannot be—and is not—the law.

### B. Procedures cannot overcome the absence of an intelligible principle

Having failed to credibly unearth from IEEPA an intelligible principle, the government directs the Court to IEEPA's procedural requirements. But as Plaintiffs already noted, "procedural safeguards cannot validate an unconstitutional delegation." *United States v. Rock Royal Co-op*, 307 U.S. 533, 576 (1939).

Defendants state that "[p]rocedurally," there is no delegation problem because "IEEPA does not 'obviat[e] Congress's role as ultimate arbiter of emergency trade policy.'" Opp. 30 (quoting *Amirnazmi*, 645 F.3d at 576). But that is illogical. Defendants point to no procedural mechanism by which Congress remains the "ultimate arbiter" under IEEPA any more so than it does through any statute giving authority to the executive branch. *See* MSJ 36.

The government cites *Amirnazmi* repeatedly, as well as *Yoshida*'s view that Congress "may, of course, recall or limit the delegated emergency power at any time," but it offers no response to Plaintiffs' position: Congress retains no more power under IEEPA than it does under any other statute transferring power to the executive

branch. Indeed, *Amirnazmi*, decided in 2011, gave "significant" weight to IEEPA's procedural components in reliance on *Dames & Moore v. Regan*, 453 U.S. 654 (1981), and *Regan v. Wald,* 468 U.S. 222 (1984). But both of those cases were decided before Congress made terminating a national emergency considerably more difficult by requiring a joint resolution. *See* MSJ 36.[9] In practice, a President is unlikely to agree to terminate a national emergency that he declared, necessitating a supermajority in Congress.

As Plaintiffs anticipated, *see* MSJ 40–41, Defendants point to cases upholding nondelegation challenges to Section 232 of the Trade Expansion Act of 1962, asserting that they upheld "similar statutory language." Opp. 30–31. But for the reasons Plaintiffs already explained—to which Defendants do not respond—the attempt to analogize to *Algonquin*, 426 U.S. 548, *PrimeSource*, 59 F.4th 1255, and *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021), all fail. Not only does Section 232 provide far more in the way of standards than IEEPA, *see* MSJ 40–41 n.19, none of the cited cases address the NEA framework, because Section 232 is neither premised nor reliant on that statute.

The irrelevancy and inadequacy of IEEPA's procedural requirements are demonstrated in this case. The government claims that "[a]s with Section 232, IEEPA has clear conditions, such as congressional reporting, consultation, and termination, on the President exercising his discretion to deal with an unusual and extraordinary

---

[9] The *Amirnazmi* court noted and explained the change to the emergency termination procedure but did not acknowledge its import. 645 F.3d at 581 n.26.

threat to the United States' national security and economy." Opp. 31. But more than 100 days after the February 1 Executive Order first imposing an IEEPA-based tariff on imports from China, a lawyer for the government was apparently unaware whether the President had even sent to Congress the report required by 50 U.S.C. § 1703(b). Oral Argument, *V.O.S. Selections v. Trump*, No. 1:25-cv-00066 (argued May 13, 2025). When this Court followed up a week later, the government's attorney claimed simply that the U.S. Trade Representative "briefed" Congress. Oral Argument, *Oregon v. Trump*, No. 1:25-cv-00077 (argued May 21, 2025). Regardless, the government attorney also stated that the Court would not be able to review any failure to comply with IEEPA's procedures. *Id.*

### C. Any foreign policy consequences of tariffs do not fundamentally alter Congress's legislative responsibilities or the judiciary's review

Finally, the government asserts that "the intelligible-principle standard [is] even easier to meet" because "IEEPA involves an area where the President has independent authority—national security and foreign affairs[.]" Opp. 34. Critically, however, Defendants have not asserted that the President has any independent authority that would allow him to impose tariffs. Nor could they. *See* MSJ 42 (explaining that whatever foreign affairs power may be vested in the President under Article II, it does not include a power—like the tariff power—that is explicitly vested in another branch).[10]

---

[10] While the phrase "national security" is sprinkled liberally throughout Defendants' brief, Plaintiffs note that it appears only in the President's April 2 Executive Order, and then only in connection with general policy statements about the importance of domestic manufacturing. Executive Order 14257, *Regulating Imports*

If you combine the government's nearly non-existent intelligible-principle approach with the foreign affairs plus-factor it claims here, Congress could simply delegate all policy touching on foreign affairs—war, foreign commerce, immigration, international agreements—to the President and call it a year. None of the cases cited by Defendants support such an outcome. *See Dames*, 453 U.S. at 688 (determining on "the narrowest possible ground" IEEPA granted the president the authority to nullify certain claims against the Iranian government); *Zemel v. Rusk*, 381 U.S. 1, 17–18 (1965) (upholding law authorizing Secretary of State to refuse passports because it authorized only such actions that "could fairly be argued were adopted by Congress"); *United States v. Mazurie*, 419 U.S. 544, 556–57 (1975) (upholding delegation to tribal officials because of unique sovereign status); *United States v. Dhafir*, 461 F.3d, 211, 217 (2nd Cir. 2006) (noting only that "IEEPA relates to foreign affairs—an area in which the President has greater discretion"); *Am. Inst. for Int'l Steel v. United States*, 806 F. App'x 982, 988–90 (Fed. Cir. 2020) (applying *Algonquin*, 426 U.S. at 558–59, to uphold Section 232 against a nondelegation challenge "without deciding what ruling on the constitutional challenge would be proper in [its] absence").

Even accepting Defendants' assertion that the stakes are high, Opp. 2, or that there are foreign policy implications, *id.*, neither renders this Court unable to interpret a statute or police the outer limits of the Constitution's separation of powers. *See,*

---

*With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025).

*e.g., Zivotofsky*, 576 U.S. at 21 (stating that the sweeping "description of the President's exclusive power was not necessary to the holding of *Curtiss–Wright*—which, after all, dealt with congressionally authorized action, not a unilateral Presidential determination"); *id.* at 66 (Roberts, C.J., dissenting) (observing that despite *Curtiss-Wright*'s description of the President as the "sole organ" of the country in foreign affairs, "our precedents have never accepted such a sweeping understanding of executive power"). The Court should reject Defendants' suggestion that when the executive branch invokes foreign affairs (or national security) the judiciary must abdicate its constitutional role.

## IV. Plaintiffs' APA Claims Are Fully Briefed

Defendants assert (Opp. 12 n.3) that Plaintiffs "have not developed any argument" on their Administrative Procedure Act (APA) cause of action. But Plaintiffs' APA claim here simply provides a remedy if the Court finds in favor of Plaintiffs on the merits of one of their other claims. Under the APA the Court must "set aside agency action" that is "contrary to constitutional right [or] power" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(B), (C). Plaintiffs' Complaint unambiguously asserts that "[f]or the reasons alleged in Counts I, II, and III, the HTSUS Modifications must be held unlawful and set aside pursuant to the APA." *See* ECF No. 4 (Compl.) 25 ¶ 103; *see also id.* ¶ 3. Plaintiffs here have not raised an "arbitrary and capricious" APA claim, as the plaintiffs did in *Oregon v. Trump*, No. 1:25-cv-00077, so Defendants' citation to their response to that "similar argument" (Opp. 12 n.3) is unavailing.

## V.    Plaintiffs Are Entitled To A Permanent Injunction

Plaintiffs have provided sufficient evidence to "demonstrate: (1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (citation omitted). Indeed, this court has already ordered that because the "Tariff Orders are unlawful as to [*V.O.S.* and *Oregon*] Plaintiffs they are unlawful as to all" and that the "Tariff Orders will be vacated and their operation permanently enjoined." *V.O.S. Selections* at 48. So, the *V.O.S.* judgment already includes Plaintiffs in this case.

Plaintiffs have also independently satisfied the test for a permanent injunction. First, Plaintiffs have demonstrated irreparable harm analogous to the showing of significant business harms, including "risk of insolvency," "damage to [] customer relationships" and "disruption," accepted in *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1089 (Fed. Cir. 2025). *See* Melsky Decl. ¶¶ 18–20; Stegmaier Decl. ¶¶ 10–16; Paulin Decl. ¶¶ 9–11; Cordair Decl. ¶ 6–8; Song Decl. ¶¶ 10–12; D. Marshall Decl. ¶¶ 7–12; Wolf Decl. ¶¶ 13–19; McLaughlin Decl. ¶¶ 10–15; Miller Decl. ¶¶ 10–12; C. Marshall Decl. ¶¶ 8–14; Wozniak Decl. ¶¶ 13–16.

Second, because these significant, ongoing, and irreparable harms cannot be remedied through refunds of tariffs paid, Plaintiffs have established the lack of a remedy at law. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011).

The third and fourth factors—equities and the public interest—are resolved by the illegality of the IEEPA tariffs, which has already been resolved by this court. *V.O.S. Selections*. "[T]he government 'has no legitimate interest in collecting [duties]' to which it has no legal claim." *California Steel Indus., Inc. v. United States*, 745 F. Supp. 3d 1287, 1304 (Ct. Int'l Trade 2024). For these same reasons, the court should refuse to stay any of its orders pending appeal.

## VI. Plaintiffs Are Entitled To Refunds

Multiple plaintiffs have already paid tariffs or likely will pay tariffs (either in the ten days prior to the effectuation of the injunction or because of a potential stay of the judgment) pursuant to one of the now unlawful Executive Orders 14195 and 14257 or one of the "modifications and amendments thereto." Judgment, *V.O.S. Selections, Inc. v. CBP*, No. 25-00066 (Ct. Int'l Trade May 28, 2025). Tariffs already paid by Plaintiffs are laid out in Plaintiffs' declarations and were not contested by Defendants. Plfs' S.O.F. (ECF No. 14-1) ¶¶ 50, 83, 84, 85, 98, 104; Defs' Resp. S.O.F. (ECF No. 16-1) ¶¶ 50, 83–85, 98, 104. Plaintiffs also will soon pay or have paid since the filing of their declaration additional tariffs. Plfs' S.O.F. (ECF No. 14-1) ¶¶ 51, 59, 72, 99, 109, 116–18. Plaintiffs request the court order the refunding of all tariffs paid pursuant to the unlawful Executive Orders or any modifications and amendments thereto through a post-appeal final judgment in this case.

## CONCLUSION

Plaintiffs respectfully ask the Court to enter summary judgment in Plaintiffs' favor.

MAY 29, 2025                              Respectfully submitted,


                                          /s/ Oliver J. Dunford
                                         OLIVER J. DUNFORD
                                         Pacific Legal Foundation
                                         4440 PGA Blvd., Suite 307
                                         Palm Beach Gardens, FL 33410
                                         (916) 503-9060
                                         ODunford@pacificlegal.org

                                         MOLLY E. NIXON
                                         JOSHUA M. ROBBINS
                                         ASHLEY TORKELSON LEVINE*
                                             *Application Pending
                                         Pacific Legal Foundation
                                         3100 Clarendon Boulevard, Suite 1000
                                         Arlington, VA 22201
                                         (202) 888-6881
                                         MNixon@pacificlegal.org
                                         JRobbins@pacificlegal.org
                                         ALevine@pacificlegal.org

                                         *Attorneys for Plaintiffs*
                                         *Princess Awesome, LLC, et al.*

## CERTIFICATE OF COMPLIANCE

Pursuant to U.S. Court of International Trade's Standard Chambers Procedures, undersigned counsel certifies this brief complies with the Court's type-volume limitation rules. This brief contains no more than 6,810 words. This brief also complies with all typeface and margin requirements.

Respectfully submitted,

*/s/ Oliver J. Dunford*
OLIVER J. DUNFORD